**E-FILED**
Monday, 17 November, 2014  03:45:56 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | | |
|---|---|---|
| MICHAEL E. DEBACKER, | ) | |
| | ) | |
| COMPLAINANT, | ) | |
| | ) | |
| AND CONCERNING, | ) | Civil Action No. 4:13-CV-04062 |
| | ) | |
| CITY OF MOLINE, | ) | |
| JAY TITUS, INDIVIDUALLY. | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**PLAINTIFF, MICHAEL E. DEBACKER'S, RESISTANCE TO DEFENDANT
CITY OF MOLINE'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Plaintiff, Michael E. DeBacker, (hereinafter "DeBacker") by and through his Attorneys, Jennie L. Clausen and Breanne M. Schadt, of H. J. Dane Law Office, and for his Resistance to Motion for Summary Judgment states the following.

**TABLE OF CONTENTS**

I.      INTRODUCTION…………………………………………………………………….2

II.     RESPONSE TO ALLEGEDLY UNDISPUTED MATERIAL FACTS:

        UNDISPUTED MATERIAL FACTS……………………………………………..2

        DISPUTED MATERIAL FACTS WITH CITATIONS…………………………2

        UNDISPUTED IMMATERIAL FACTS…………………………………………2

        DISPUTED IMMATERIAL FACTS…………………………………………...6

        STATEMENT OF ADDITIONAL MATERIAL FACTS………………………..6

III.    APPLICABLE LAW……………………………………………………………..51

IV.     ARGUMENT……………………………………………………………………..51

**V.      CONCLUSION**…………………………………………………………**78**

**CERTIFICATE OF SERVICE**………………………………………………**79**

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)(2)**…..……**80**

## I.      INTRODUCTION

Plaintiff, Michael E. DeBacker ("DeBacker"), filed the pending action against his former employer, the City of Moline ("City"), and his former supervisor and co-worker, Jay Titus ("Titus"), individually and as an agent of the City of Moline.  There are sufficient material facts in dispute regarding all counts of the Complaint sufficient to overcome Titus' Motion for Summary Judgment, and DeBacker respectfully requests the Court deny the Motion for Summary Judgment in its entirety.

## II.      RESPONSE TO ALLEGEDLY UNDISPUTED MATERIAL FACTS

### A.      <u>UNDISPUTED MATERIAL FACTS</u>

Plaintiff admits the following undisputed material facts asserted by the Defendant City of Moline:  1, 2, 4, 5, 7, 8, 10, 12, 13, 15, 16, 18, 19, 23, 24, 25, 26, 27, 32, 33, 34, 35, 36, 37, 39, 40, 42, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 57, 58, 59, 61, 62, 63, 66, 68, 69, 72.

### B.      <u>DISPUTED MATERIAL FACTS WITH CITATIONS</u>

3.      On May 25, 2011, ███████████████████████████ ███████████████████.  At that time, DeBacker ███████████████████ ████████████████████████████ (Defendant's SJ Ex A, pgs. 12-13).

6.      In April 2011, Titus became DeBacker's commanding officer but was already a lieutenant at that time.  (Defendant's SJ Ex A, pg. 9).

9.      After May 25, 2011, DeBacker ████████████████████ ███████████████████.  (Defendant's SJ Ex A, pg. 20).

11.     On the evening of June 15, 2011, DeBacker told his wife, Julie DeBacker ("Julie"),

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████ (Defendant's SJ Ex A, pgs. 21-22).

17.     DeBacker's wife contacted a family friend, Mark Schumacher ("Schumacher") and

another family friend and co-worker/supervisor, Fred Mincks ("Mincks"), to ask Fred to pull Mike

aside until Mark could get there to pick him up because she did not want Mike at work that day and

██████████████████████. (Defendant's SJ Ex C, pgs. 13-16).

20.     Mincks asked DeBacker ████████████████████████████, to which

DeBacker nodded yes.  (Ex B, p 21)

21.     DeBacker nodded his head in the affirmative to Mincks' questions as to whether █

███████████████████████. (Ex B, p 21)

22.     DeBacker thought he may have ███████████████████████████

Mincks at one time in early or mid-June.  (Defendant's SJ Ex A, pg. 27).

28.     Fisk met with the supervisors on June 16, 2011 to make them aware of the incident,

that DeBacker was ████████████████, that he wasn't allowed on City property, and that it was

████████████████████████. (Ex F, p 9)  The supervisors were further

advised that the ████████████████████████████████ (Ex F, p 9)

The supervisors were requested to float down that the situation was a ████████████. (Ex F, p

29)

29.     Hankins acknowledged that it was unnecessary for anyone other than command staff

to know the reason for DeBacker's ████████████. (Ex D, p 13)

30.     DeBacker and Julie discussed different aspects of the incident with different people,

including friends, family members, and co-workers.  (Defendant's SJ Ex B, p 2)  Many of the

discussions with other people surrounded the manner in which DeBacker was treated upon his

return to work and the rumors that were being spread about him.  (Defendant's SJ Ex B, p 3-5)

DeBacker provided information in order to dispute the rumors that were being spread about him

within the Moline Police Department ("MPD").  (Defendant's SJ Ex B, pgs. 3-5)

31.    DeBacker  . (Ex

B, p 24, Ex D, p 9)

. (Ex B, p 24)

38.    Hankins stated that he took into consideration                         in

determining what duties he would be assigned when he returned to work.  (Ex D, p 43)

41.    Fisk gave Titus permission to contact the FOID Review Division to determine how

he to fight DeBacker getting his FOID reinstated.  (Ex A, p 37, Ex F, p 26)  Titus and Fisk discussed

DeBacker's FOID on a regular basis, and Titus told Fisk about all of his emails and contact with the

Illinois State Police ("ISP") regarding DeBacker's FOID card.  (Ex A, p 17, 22-23)  Fisk was aware

Titus was making those contacts with the ISP during work hours and Fisk provided Titus with

copies of the emails he received regarding the status of DeBacker's FOID card on at least three

occasions.  (Ex A, p 14)

43.    Titus made communications with the ISP for personal reasons and because he was

an employee of the City of Moline.  (Defendant's SJ Ex N, pg. 5)

44.    Titus believed his communications with the ISP were for personal reasons and also

for everybody's safety in the community.  (Defendant's SJ Ex N, pg. 5)

56.    The citations provided by the Defendant do not provide any support for the

statement that the un-redacted copy of the ████████ was provided pursuant to the Open

Meetings Act.  There is nothing in record, to the knowledge of the Plaintiff, supporting that

assertion.

60.     Hankins met with Fisk, Patrick, and Titus to advise Titus that they were giving

DeBacker his weapon back.  (Ex A, p 32)  Hankins advised Titus that the union was forcing his

hand so he had no choice.  (Ex A, p 32)  Titus inquired as to whether DeBacker could carry his

weapon off duty as well, and asked Hankins to check on that issue.  (Ex A, p 33)  Fisk contacted the

FOID Review Division to ensure that DeBacker was exempt from FOID as a police officer.  (Ex F,

p 25)

64.     Section 65/10 of the FOID Card Statute provides both expedited relief for law

enforcement officers who have lost their FOID Card ███████████████████

████ and general relief by requesting a hearing from the Director of the State Police when a FOID

Card has been revoked for that reason.  430 ILCS 65/10.  Section 65/10(c) specifically provides that

any person who is prohibited from possessing a firearm under Section 24-3.1 of the Criminal Code

can apply to the Director of State Police requesting relief.  430 ILCS 65/10(c).  Case law from 1979

further states that the Illinois criminal statute referenced by the Defendant must be reviewed in

conjunction with the Illinois FOID statute, and persons who have obtained from the department a

valid FOID card are not liable for criminal sanctions under the criminal statute.  (*Rawlings v. Illinois

Dept. of Law Enforcement*, 391 N.E.2d 758, 764 (Ill.App. 3 Dist. 1979))

65.     Section 65/10 of the FOID Card Statute provides both expedited relief for law

enforcement officers who have lost their FOID Card ███████████████████

████ and general relief by requesting a hearing from the Director of the State Police when a FOID

Card has been revoked for that reason.  430 ILCS 65/10.  Section 65/10(c) specifically provides that

any person who is prohibited from possessing a firearm under Section 24-3.1 of the Criminal Code

can apply to the Director of State Police requesting relief.  430 ILCS 65/10(c).  Case law from 1979

further states that the Illinois criminal statute referenced by the Defendant must be reviewed in

conjunction with the Illinois FOID statute, and persons who have obtained from the department a

valid FOID card are not liable for criminal sanctions under the criminal statute.  (*Rawlings v. Illinois*

*Dept. of Law Enforcement*, 391 N.E.2d 758, 764 (Ill.App. 3 Dist. 1979))

      67.    This fact represents a legal conclusion that forms the basis of the lawsuit herein.

      70.    Hankins believed ███████████████████████████ on June 16,

2011 and June 23, 2011.  (Defendant's SJ Ex pgs. 9-10)  Hankins was not privy to information

regarding DeBacker's ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ (Defendant's SJ Ex p 9-10, 12, 17)

      71.    DeBacker stated that his situation, and what happened to him, is not comparable to

anything on this planet.  (Plaintiff's SJ Ex A, pgs. 30-31).

### C.    UNDISPUTED IMMATERIAL FACTS

      14.    ███████████ statement during the funeral of ███████████ is immaterial to any issues

in the Defendant's Motion for Summary Judgment.

### D.    DISPUTED IMMATERIAL FACTS

None.

### E.    ADDITIONAL MATERIAL FACTS

**A.   Pre-June 16, 2011**

      1.    The sexual harassment complaint that was filed against DeBacker by Officer

Michelle Mangelsdorf ("Mangelsdorf") resulted from a single comment he made while she was

listening to a voicemail.  (Ex B, p 4)  Mangelsdorf was stressed out listening to a voicemail of an individual that was repeatedly calling and DeBacker told her to tell him that she didn't do it on the first date.  (Ex B, p 4)

2.      DeBacker immediately apologized to Mangelsdorf when he realized she was offended, and told her that it would not happen again.  (Ex B, p 4, Ex J, p 3)  It upset DeBacker that he was told by Human Resources that he could not discuss the situation with Mangelsdorf in order to resolve it, and that he had hurt her feelings by making the statement.  (Ex C, p 2)

3.      DeBacker was directed not to discuss the incident with anyone in the workplace, which included Mangelsdorf.  (Ex N, p 31)

4.      Mangelsdorf felt she had a cordial professional working relationship with DeBacker. (Ex J, p 2)  She did not feel like she was being sexually harassed by DeBacker and said she was made to file a complaint against him.  (Ex J, p 2-3)  She felt like their working relationship thereafter was awkward because of the silent treatment DeBacker was giving her, which was the result of the directive DeBacker was given that he could not discuss the situation with his supervisors or Mangelsdorf.  (Ex J, p 3, Ex K, p 2)

5.      By June 16, 2011, Mangelsdorf was feeling comfortable with DeBacker and her working relationship with him was less awkward.  (Ex J, p 4)

6.      Officer Jerry Glogowski ("Glogowski") worked in the same office as DeBacker and Mangelsdorf.  (Ex I, p 2)  Glogowski never observed DeBacker engage in any sexually harassing behavior and believed DeBacker was respectful of Mangelsdorf.  (Ex I, p 2)

7.      On April 1, 2011, Titus went into the chain of command above DeBacker.  (Ex B, p 5)  DeBacker reported to Mincks, and Mincks reported to Titus.  (Ex B, p 5)  At the time Titus took over as lieutenant in his chain of command, DeBacker got along with him great.  (Ex B, p 6)

8.      On April 11, 2011, DeBacker received a good annual performance review indicating his work performance was acceptable.  (Ex D, p 50, 100)

9.      When Titus took over, he had a meeting with DeBacker, Mangelsdorf, and Mincks and advised them that he was changing their duties such that every other month they would be on the street, and the following month they would be doing the office work.  (Ex B, p 6)  It was not a meeting to discuss the changes, as Titus said he was not going to move or back down on the changes he was implementing.  (Ex B, p 6-7)

10.     Fisk acknowledged MPD realizes they have a problem with Titus during the first two months after he takes over a new unit as everybody hates him, and that they need to work with Titus on counseling him on how to handle meetings with his unit.  (Ex C, p 3)

11.     Titus wanted to implement the changes the following week, however DeBacker was scheduled to be on vacation so it did not start until May.  (Ex B, p 7)

12.     After the changes were implemented, DeBacker became buried in work.  (Ex B, p 7) He was unable to get anything finished and could not do his office duties and follow-ups as a result of having to be on the streets.  (Ex B, p 7)

13.     DeBacker ███████████████████████ as a result of the continuous increases in workload.  (Ex B, p 3)  He was considered the go to guy for people to ask questions, additional duties had been added, and felonies increased from 0-1 his first year to approximately 39 in 2010;  DeBacker filed most of them.  (Ex B, p 3)

14.     DeBacker ██████████████████████.  (Ex C, p 4)

15.     DeBacker advised Mincks that he was experiencing difficulties keeping up and did not have time to work on his hit and runs.  (Ex B, p 7-8)  Since DeBacker did most of the felony upgrades, which were time consuming, he experienced more difficulty than Mangelsdorf did with

the changes.  (Ex B, p 8)  Mincks told DeBacker that they just had to get the work done.  (Ex B, p 31)

16.     On June 1, 2011, DeBacker's turn came to implement Titus' new responsibilities and go out on the street.  (Ex B, p 12)  DeBacker still had to do his office responsibilities and finish up on felony upgrades and other duties, but also had to be out on the street making traffic stops, following up on hit and runs, going to crashes, and towing cars.  (Ex B, p 12)

17.     Prior to Titus' changes, DeBacker did not go out on the street; he only would respond to something if he was out and close to something or he was going to court.  (Ex B, p 12)



18.     On May 25, 2011, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮.  (Ex B, p 9-10)  Debacker also told ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (Ex B, p 10)

19.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (Ex B, p 10)
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (Ex C, p 4)  ▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮  (Ex C, p 4)  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (Ex C, p 4)

20.     DeBacker's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (Ex B, p 10)  ▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (Ex B, p 10)

21.     In late May 2011, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (Ex B, p 11)  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (Ex B, p 11)

22.          ███████████████████████████████████. (Ex B, p 64) ██████████

███████████████████████████████████████ (Ex B, p 64) ███████████████

████████████████████████████ (Ex B, p 64)

23.          ████████████████████████████████

██████████████████████████████████████████████. (Ex B, p 65, 72) ████████████████████████████████████████████

██████ (Ex B, p 65)

24.          In June 2011, Titus started putting more pressure on DeBacker.  (Ex B, p 68)  He would come up to the office frequently and was upset.  (Ex B, p 68)  Jon Schumacher advised Debacker at that time that Titus had a target on his back.  (Ex B, p 69-70)  Titus wasn't putting pressure on Mangelsdorf in the same way he was on DeBacker.  (Ex B, p 71)

25.          On June 10, 2011, █████████████████████████████████

██████████████████ (Ex B, p 71) ███████████████████████████████

████████████████. (Ex B, p 71) ████████████████████████████████

████████████████. (Ex B, p 71-72)

26.          On June 15, 2011, Titus scheduled a meeting with Mincks, DeBacker and Mangelsdorf.  (Ex B, p 82-83)  Titus told them he was tired of hearing things outside MPD, and half of the police department did not think they did anything.  (Ex B, p 82-83)  Mangelsdorf attempted to ask Titus where he'd heard this, and he cut her off and said it was not a discussion.  (Ex B, p 83)  The tone of the meeting was very unpleasant.  (Ex B, p 86)

27.          That same day, ████████████████████████████████

██████ (Ex B, p 13) ████████████████████████████████████████

████████████ (Ex B, p 13) █████████████████████████████████

███████████████████████████████████████████ (Ex B, p 13)

28.     That evening, Glogowski went to DeBacker's house.  (Ex I, p 2)  DeBacker

discussed the ██████████████████████████████ and Glogowski told him he had

███████████████████████████████████████████████. (Ex I, p

2)  DeBacker told him that evening ████████████████████████████████████

██████████████████ (Ex I, p 3)

29.     After Glogowski left that night, DeBacker ████████████████████████

███████████████████████████ (Ex B, p 93-94) ██████████████████████

████████████████████████. (Ex B, p 94)

30.     ██████████████████████████████████ (Ex B, p 94)  She

███████████████████████████████████ (Ex C, p 5)

31.     DeBacker indicated that ██████ ████████████████████

███████████████ ████████████. (Ex C, p 5)  DeBacker discussed with Julie██

██████████████████████████. (Ex C, p 6) ███████████████

███████████████████████████ (Ex C, p 6)

32.     Debacker told Julie that he liked Titus ████████████████████████

██████████████████. (Ex C, p 7)

33.     Julie gave the discussion a lot of thought after DeBacker went to sleep, ████

████████████████████████████████████████████████████████████

██████ (Ex C, p 6)

34.     Julie did not believe it ████████████████████████████████

███████████████████████. (Ex C, p 6-7)

**B.     June 16, 2011**

35.     On June 16, 2011, DeBacker woke up with a migraine ███████████████████████ ██(Ex B, p 97-99)

36.     Julie wanted DeBacker to stay home that morning, however DeBacker was concerned about taking time off from work due to a prior email he'd received from Titus about taking off a few hours a couple of weeks earlier.  (Ex B, p 95)

37.     DeBacker told Julie that things were going to be okay prior to going to work.  (Ex B, p 100)

38.     Julie was concerned about DeBacker being at work, and put together a plan where their family friend, Mark Schumacher ("Schumacher"), would pick DeBacker up and bring him home so that Julie could take him to ████████  (Ex C, p 8)

39.     ██████████████████████████████████████████████████████ ██████████████████████.  (Ex C, p 8)

40.     Julie then called Mincks, who she regarded as a friend for the prior 20 years, on the non-emergency line to ask him to pull DeBacker aside until Schumacher could pick him up.  (Ex C, p 8)  Julie started crying during that telephone call because ███████████████████████ ████████████████████████████████████████████████████ ██████████████████████.  (Ex C, p 8)

41.     Julie advised Mincks that the ████████████████████████, because she did not want to appear as though she was withholding information ██████████████████████.  (Ex C, p 8-9)

42.     Julie then called Schumacher to ask him to go pick up DeBacker.  (Ex C, p 9)  She ███████████████████████████████████████████ and she called him as their friend because he had a police officer background.  (Ex C, p 9)  Julie requested that Schumacher contact

Mincks and have him get DeBacker out of MPD, drive him to her, ███████████.
(Ex K, p 3)

     43.    When DeBacker arrived at work, ████████████████████

████████████ (Ex B, p 20) ████████████████████

████████████ (Ex B, p 20)  He answered ████████████████

██████. (Ex C, p 9)  At that point, Julie wasn't interested in what he was saying ████████████

████████████████████. (Ex C, p 9)  Julie did not tell DeBacker she

had called anyone about the conversation they'd had the prior evening.  (Ex C, p 9)

     44.    Mincks pulled DeBacker to the side and it was apparent to DeBacker that Julie had

called someone.  (Ex B, p 100-101)

     45.    DeBacker went up to the traffic office with Mincks, which was a large open room

with Mincks' office in the corner.  (Ex B, p 109)  Mincks told DeBacker he had talked to

Schumacher and Julie, and ████████████████████. (Ex B, p 21)  DeBacker

nodded affirmatively ████████████████. (Ex B, p 21)

     46.    ████████████████████████

██████ (Ex B, p 21)  He told Mincks that he liked Titus, ████████████████ (Ex

B, p 21) ████████████████████████. (Ex B, p

21)

     47.    Hankins, Captain Jerome Patrick ("Patrick"), Fisk, Mincks, and Titus had a meeting

that morning regarding DeBacker.  (Ex D, p 5, Ex F, p 7)  Hankins was aware DeBacker was calm

and quiet, and there were never any reports to him that DeBacker was irrational or combative.  (Ex

D, p 5)

     48.    Hankins told Titus Julie said that ████████████████████

█████████████████████.  (Ex D, p 18)  Hankins never directed Titus that he could not discuss the

issue with anyone else.  (Ex D, p 24)

      49.     Hankins made the decision █████████████████████████████████

████████████████████████████████.  (Ex D, p 6)

      50.     Hankins ████████████████████████████████████████

████████████████████.  (Ex D, p 7) ███████████████████████████████

███████████████████.  (Ex D, p 7)

      51.     Fisk, who also participated in the initial meetings regarding DeBacker, ████████

██████████████████████████████ (Ex F, p 15)

      52.     ████████████████████████████████████████████████

████████████████ (Ex B, p 117)

      53.     DeBacker was subdued, upset, and very quiet on the date of the incident.  (Ex F, p

11)  He was teary eyed.  (Ex F, p 12)  Fisk was not surprised that DeBacker was █████████████

██████████████████████████████████████████ (Ex F, p

12)  Fisk would have been upset under the circumstances also.  (Ex F, p 12)

      54.     DeBacker was cooperative, and was not acting combative or irrational.  (Ex F, p 12)

      55.     Fisk, Patrick, and Schumacher then met Julie at her house.  (Ex F, p 5)  Patrick

advised Julie that he ██████████████████████████████████████

███.  (Ex C, p 10-11)

      56.     Julie reported to them that ███████████████████████

████████████████████████████████████████████████

████████████████████ (Ex C, p 5-6, 11) ████████████████

████████████████████████████████ (Ex C, p 11)

57.  ████████████████████████████████████████████

████████████████████████████████████████████

(Ex C, p 11)  Patrick called someone on the telephone and gave them that information.  (Ex C, p 11)

58.  ██████████████████████████████████

███████████████████████  (Ex C, p 12)  Fisk told Julie ████████

███████████████████████  (Ex C, p 13)

59.  ████████████████████████████  (Ex F, p 2)  ██████

██████████████████████████████████.  . (Ex F, p 3)  Fisk was

good friends with ████████████████████  (Ex F, p 2)

60.  Julie did not feel free to leave during her meeting with Fisk and Patrick.  (Ex C, p

17)  The fact that two captains had come to her home to conduct an investigation into the situation

lead her to believe that they had information regarding DeBacker that she did not have.  (Ex C, p

17)  She was overwhelmed by their presence at her home and did not feel as though she could leave

and go to DeBacker.  (Ex C, p 17)

61.  ████████████████████████████████

███████████████████████████████████

█████████████████████  (Ex C, p 18)

62.  ████████████████████████████, Hankins and Fisk had a meeting

with Titus.  (Ex F, p 19)  Titus was advised regarding what was going on with DeBacker ████████

██████████████████  (Ex F, p 19)

63.  Later that day, Titus was advised that ██████████████████

████████████████████████████████████

████████████  (Ex A, p 6)

64.    Hankins told Titus that DeBacker would never return to MPD.  (Ex D, p 15, Ex A, p 28) ███████████████████████████████████████████

███████████.  (Ex D, p 15) █████████████████████████████████

███████████.  (Ex D, p 15)

65.    Fisk met with the supervisors that day to make them aware of the incident, that ████████████████████████████, that he wasn't allowed on City property, and ████████████

████████████████████████████████.  (Ex F, p 9)

66.    ██████████████████████████████████████████

██████████████████████████████████.  (Ex F, p 9)

67.    The supervisors were further advised by command that ██████████████████

████████████████████████ (Ex F, p 9)  The basic information that was put out to supervisors ████████████████████████████████████████, and supervisors were requested to float that information down.  (Ex F, p 29)

68.    It was unnecessary for anyone other than command staff to ███████████████

██████████████████████.  (Ex D, p 13)

69.    Fisk held a meeting with Mincks, Glogowski, and Clark.  (Ex I, p 7) ████████████

████████████████████████████.  (Ex I, p 7)  Glogowski advised Fisk that he did not see any similarities.  (Ex I, p 7)  Glogowski and Clark were told that ████████████

████████████████████████████████  (Ex I, p 9)

70.    Hankins, Titus, Patrick, Fisk, and Mangelsdorf had a meeting on that date as well.  (Ex F, p 10) ████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████  (Ex F, p 10-11)

16

71.     Hankins never believed there was a concern for Mangelsdorf's safety, and she was never authorized to know the details of the situation with DeBacker.  (Ex D, p 10)

72.     Titus had a meeting with Glogowski and Liz Clark ("Clark") and told them that ████████████████████████████████████████ (Ex I, p 3)  ██████████████████ ████████████████████████████████████ (Ex F, p 8) Glogowski was astonished and advised Titus that he did not believe it because he was with DeBacker the night before.  (Ex I, p 15, 17) ████████████████████████ ████████████████████████████████████████████████ ████████. (Ex I, p 3)

73.     Hankins was concerned that day about the rumor mill and DeBacker's privacy, so he advised Fisk and Patrick that they could refute false statements that were reported to them.  (Ex D, p 12)  Hankins did not take any other steps to protect or address DeBacker's confidentiality on that date.  (Ex D, p 12)

74.     On the date of the incident, MPD was never advised, nor did they ever think, that ████████████████████████████. (Ex D, p 12) ████████████████████ ████████████████ (Ex D, p 7)

75.     There were no discussions regarding DeBacker's confidentiality the date of the incident.  (Ex F, p 11)  Fisk never told anyone not to discuss the situation with anyone, nor did Hankins ever advise Fisk not to discuss the situation with anyone else.  (Ex F, p 11)

76.     On June 16, 2011, ████████████████ ████████████████████. (Ex H, p 6) ████████████████████████████████████████. (Ex H, p 6)

**C.** ████████████

77.     ████████████████████████████████████████. (Ex D, p 25)

17

DeBacker was quiet at the time.  (Ex D, p 6) █████████████

█████████████. (Ex D, p 6, Ex F, p 14)

78.  ███████████████████

███████████ (Ex D, p 6, Ex F, p 15)

79.  ███████████████████

██████████████ (Ex D, p 6)

80.  ████████████████. (Ex D, p 27)

████████████████████████

██████. (Ex D, p 28) ██████████████

████████████████ (Ex D, p 29)

81.  ███████████████████

████████████████████████████

███████████. (Ex D, p 29-30, Ex F, p 14)

82.  ███████████████████

██████ (Ex F, p 6) ████████████

████████████ (Ex F, p 13)

83.  █████████████████

██████████████. (Ex D, p 9) █████████

█████████████████ (Ex B, p 120)

84.  Mincks contacted Fisk ███████████

████████████████████. (Ex F, p 19) ███████

████████████████████████████

██████████ (Ex F, p 20) ████████████



██████████████████████████████████████. (Ex F, p 20)

85.    ████████████████████████████████████

██████████ (Ex B, p 24) ███████████████████

██████████████████████████████████████████

█████████ (Ex D, p 9)

86.    ████████████████████████████████████

█████████████████ (Ex D, p 9, Ex B, p 24)

87.    ████████████████████████████████████. (Ex B, p 24) ████

██████████████████████████████████████████

█████████████████████████████████ (Ex B, p 24)

88.    ████████████████████████████████████

██████████████. (Ex B, p 24)

89.    ████████████████████████████████████

██████████████████████. (Ex C, p 14) ████████

██████████████████████████████████████████

██████████████████████. (Ex C, p 14)

90.    ████████████████████████████████████

(Ex B, p 25-26)

91.    ███████████████████████████████

██████████████████. (Ex B, p 25) █████████████

████████████████ (Ex B, p 25)

92.    ███████████████████████████████████

████ (Ex C, p 15) ████████████████████████████



. (Ex C, p 15)

. (Ex C, p 15)

. (Ex C, p 15)

93.

(Ex C, p 15, Ex D, p 11)

94.

. (Ex D, p 11, Ex F, p 38)

. (Ex B, p 131)

95.

. (Ex N, p 59)

(Ex N, p 59)

96.

(Ex N, p 60)

97.

. (Ex N, p 59)

98.

(Ex N, p 59)

99.

. (Ex F, p 6)

100.

(Ex C, p 16)  Fisk said he did not believe he could get Titus to agree.  (Ex C, p 16)



101.  ██████████████████████████████████

████████ (Ex C, p 16)

102.  ███████████████████████████████████

███████████████████████. (Ex C, p 16) ████████████████████

███████████████████ (Ex C, p 16)

103.  █████████████████████████████████

██████████████████████████████████

███████████████████. (Ex D, p 11)

104.  ██████████████████████████████████████

███████████████. (Ex D, p 11)

105.  ████████████████████████████████████████

██████████████████. (Ex D, p 13)

106.  ███████████████████████████████████

███████████ (Ex N, p 24) ████████████████████████

████████ (Ex N, p 24) █████████████████████████

█████████████████. (Ex N, p 24)

107.  ██████████████████████████████████

████████████████████ (Ex D, p 88-89) █████████████

████████████████████████████████████████. (Ex D, p
90)

108.  ██████████████████████████████████

██████████████████████████████████████████ (Ex

D, p  90-91) ███████████████████████████████

████████████████. (Ex D, p 91)

109. ██████████████████████████████

████████████████. (Ex D, p 32)

**D.** **June 17, 2011 until DeBacker's Return to Work**

110. █████████████████████████ (Ex B, p 15) ████

█████████████████████████████████████████████

████████████████████████████ (Ex B, p 15)

111. ████████████████████████████████

████████████ (Ex B, p 15) ████████████████████████

████████████████. (Ex B, p 15)

112. ███████████████████████████████

█████████████████████████████████████████████

███████████████(Ex N, p 26, 43)

113. ██████████████████████████████████. (Ex

N, p 26) █████████████████████████████████

█████████████████████████████████████

(Ex N, p 26) ████████████████████████████████

██████████████ (Ex N, p 26)

114. ██████████████████████████████ Ex N, p 29)

115. █████████████████████████████

████████████(Ex P, p 1-10)

116. Pickens knew area checks were being done on Titus' residence.  (Ex G, p  18)  The

checks were called out over the radio and as such, stored in the CAD.  (Ex G, p  18)  ██████

███████████████████████████████████████████████████████████████  and

anyone within command would have known about the area checks.  (Ex G, p  22)  Pickens wasn't

sure who directed the area checks, but he knew he was directed to perform them.  (Ex G, p  24)

117.    Pickens was authorized to tell officers they were conducting area checks on Titus'

home ████████████████████████████████████████████████████████████

██████████████████████  (Ex G, p  30)

118.    Pickens believed the area checks of Titus' home could perpetuate the rumors

regarding DeBacker.  (Ex G, p  63)

119.    Officer Charlene Langenderfer ("Langenderfer") was directed to do area checks of

Titus' house by one of her supervisors, either the sergeant or lieutenant.  (Ex E, p 2)  She called

some of the checks of Titus' home out over the radio, so her sergeants and lieutenant knew she was

doing them.  (Ex E, p 3)  She continued to perform area checks of Titus' home through July 14,

2011  (Ex E, p 3)

120.    Langenderfer believed the area checks of Titus' home could possibly have

perpetuated the rumors that were being spread throughout MPD about DeBacker.  (Ex E, p 4)

121.    Wilson was directed to do area checks of Mangelsdorf's home on June 17, 2011.

Wilson believed he was told to do so by Pickens.

122.    Wilson believed performing area checks of Titus and Mangelsdorf's homes gave

credibility to the rumors he'd heard.

123.    Hankins never directed any area checks to be performed of Titus' house and had no

knowledge area checks were ever done of Titus' house.  (Ex D, p  76)

124.    Hankins did not believe there was a need for area checks of Titus' home or

Mangelsdorf's home.  (Ex D, p 14)  He did not believe it would have been appropriate for an

individual to direct area checks of Mangelsdorf's or Titus' homes, and he never inquired as to

whether area checks were being performed after hearing the rumor they were supposed to be doing

them.  (Ex D, p 15)

125.     Hankins believed if area checks were performed on Titus' home, it could have

perpetuated the rumors that were going around MPD at the time.  (Ex D, p 15)

126.     ███████████████████████████████████████████████

███████████████.  (Ex D, p 20)

127.     On approximately July 20, 2011, officers were being advised ████████████

███████████████████████████████████████████████████

███████████████████████████.  (Ex D, p 57)

128.     ███████████████████████████████████████████

███████████████████ (Ex D, p 23, 56-59)

129.     ███████████████████████████████████████████████

████████████████████████.  (Ex F, p 23)

130.     ███████████████████████████████████████████

███████████████ Ex A, p 27-28)

131.     ███████████████████████████████████████████

███████████ (Ex M, p 5) ████████████████████████

████████████████████████████████████████████████

████████████████████████.  (Ex M, p 8)

        **E.       Rumors Regarding DeBacker**

132.     The Moline Code of Ordinances Section 26-2314(13) states no member of the police

department shall make a false statement or gossip about a member of the police department, either concerning personal character or conduct to the detriment of any such member of the police department.  (Ex N, p 7)

133.    DeBacker became the hot topic of conversation, and there was a lot of gossip.  (W 10)  Everyone was talking about the situation at one point or another.  (W 18)

134.    Cindy Lambach ("Lambach") was told ████████████████████████.  (Ex L, p 2)

135.    Langenderfer was told ████████████████████████████████ ████████████████████████ (Ex E, p 2)

136.    Wilson heard from his fellow employees ████████████████████ ████████████████████████████████████ ████████████████████

137.    Wilson heard ████████████████████

138.    Wilson was told ████████████████████████ ████████████████████████████████ ████████████████

139.    Everything Wilson heard about DeBacker came from within MPD.

140.    Hankins was aware of several rumors that were being spread within MPD, which included ████████████████████████████ ████ (Ex D, p  75)  Hankins became aware of the rumors within a few days of ████████████████ ████████████████.  (Ex D, p 75)

141.    Despite being advised of the initial rumors, Hankins did not conduct any investigation other than asking Patrick and Fisk to meet with Pickens and discuss the rumors.  (Ex

D, p 36)  Hankins did not follow up on what they learned, nor did he ask them to report back to him despite acknowledging the rumors ████████████████████████████████████.
(Ex D, p 36)

142.    Later, prior to DeBacker's return to work, Hankins became aware of additional rumors via an email from Pickens ████████████████████████

████████████████████████████████████████████

████████████████████████  (Ex D, p 36, 66)  He was further advised both rumors ████████████

████████████████████████████  (Ex D, p 36, 66)

143.     Hankins was advised the rumors were discussed amongst CID personnel who acted like it was common knowledge.  (Ex D, p 66)  The rumors were spread throughout the entire Department at that point.  (Ex G, p  50)

144.    Fisk did not recall refuting any of the rumors. (Ex F, p 17)

145.    Hankins, Fisk, and Patrick did not provide any of the supervisors with directives on how to respond to questions about the situation.  (Ex F, p 17)

146.    Fisk was never advised not to speak of the situation.  (Ex F, p 17)

147.    When questioned about the situation, Pickens told Langenderfer that other officers had credible information about DeBacker and she should talk with those officers on her shift.  (Ex E, p 2)  He advised her he was limited on what he could discuss with her.  (Ex E, p 6, 11-13)

148.    Langensderfer was told ████████████████████████████

████████████████████████████████████████

████████████  (Ex E, p 11-13)  She was further told that ████████████████████

████████████████████████████████████████

████████████████████  (Ex E, p 11-13)

149.    Langenderfer did not believe it was appropriate for a sergeant to tell her he had credible information but could not give it to her so she needed to ask other officers.  (Ex E, p 7)

150.    Officer Robert McNabb ("McNabb") advised Langenderfer that CID and the administration ████████████████████████████████████████████████████ ██████████████████████  (Ex E, p 2)

151.    Langenderfer felt better when she learned the rumors weren't true.  (Ex E, p 10) After talking to DeBacker, she no longer had any concerns with working with him nor would she have been concerned if he'd been restored to his former position.  (Ex E, p 10)  She believes if the rumors had been refuted to other officers, they would have been more comfortable with DeBacker's return to work.  (Ex E, p 10)

152.    Julie also reported that Titus ████████████████████████████████████████. (Ex D, p 53)  Hankins believed the source was an internal one that was told the information.  (Ex D, p 97)  Hankins told Fisk to talk to Titus about not discussing the issue, but took no further action regarding the report that Titus was making those false statements.  (Ex D, p 17-18)

153.    Fisk never investigated the report that Titus was making false statements about the incident, nor did he ever tell Titus not to divulge any information regarding the incident.  (Ex F, p 21-22)

154.    Following the report of the rumors, Hankins participated in roll calls to address the rumors with the officers.  (Ex D, p 22)  Hankins refuted all of the rumors, ██████████████████ ████████████████████████████████████████████████████████████ ██████████████████  (Ex D, p 22)

155.    MPD did not do any investigation as to where the rumors came from or who started them.  (Ex F, p 30)

**F.** ███████████████████████

156.    On July 21, 2011, ████████████████████████████████████████

(Ex D, p 60)

157.    ████████████████████████████████████████████████

████████████████████████████████████  (Ex D, p 23)

158.    DeBacker was not returned to work because other people were concerned about him returning to work so the city had to deal with it internally before restoring him to his former duties. (Ex D, p 23)

159.    Hankins makes the decision regarding when an officer █████████████████████

████████████████  (Ex D, p 20)  Human Resources then will make contact with ████████████

███████████████████  (Ex D, p 20)

160.    As Chief of Police, Hankins has requested one other ███████████████████

████████████████████████████████████████████████████████

███████████████████████.  (Ex D, p 20) ███████████████████████████

██████████████████████████  (Ex D, p 20-21) ███████████████

███████████████████  (Ex D, p 20)

161.    Hankins requested to speak to ███████████████████████████

████████████████████████████████████████████████████████

██████  (Ex D, p 61)

162.    Hankins advised Titus ███████████████████████████████

██████████████████.  (Ex D, p 61)

163.    Prior to ████████████████████████████████████████

████████████████████████████████████████████████████████

(Ex D, p 26)

164. ███████████████████████████████████████

████████████████████████████████████████████. (Ex R, p7 ) ████

████████████████████████████████████████████████████

███████████████████████ (Ex R, p 6) ████████████████

████████████████████████████████████████████████████

█████████████████████████████. (Ex R, p 6) ███████████████

████████████████████████████████████████████████. (Ex R,

p 6)

165. ████████████████████████████████████████

████████████ (Ex R, p7-8 )

166. ██████████████████████ ███████████████████████

██████████████████████████████ (Ex R, p7 )

Hankins did not implement that recommendation because Titus chose not to participate. (Ex D, p 168) Hankins could have ordered Titus to attend the meeting, but did not feel it was the right thing to do because Titus was not open to discussing anything with DeBacker. (Ex D, p 28)

167. ██████████████████████████ DeBacker ████████████████

████████████████████████████████████. ████████████ he could be armed during that period of time. (ExR, p 7) Hankins restored DeBacker in a light duty capacity, however did not allow him to be armed. (Ex D, p 28) The decision not to allow him to be armed was based on the rest of MPD and it was decided it was in the best interests of MPD that he return to light duty but not be armed. (Ex D, p 28)

168. Hankins was surprised████████████████████████████. (Ex D, p 27)

### G.   DeBacker's Return to Work & Terms and Conditions of Employment

169.   The City's Employee Fitness for Duty Policy contains the procedures applicable when an employee is off work for a health condition.  (Ex M, p 1)  The Policy indicates that when the City has reasonable suspicion a serious health condition may pose a risk to the employee or others, a fitness for duty examination may be ordered with the appropriate work restrictions or follow-up medical alternatives applied.  (Ex M, p 1)  The Policy indicates an employee will remain on leave status, including FMLA leave, until fully or partially released by Nurse or Occupational Health Provider.  (Ex M, p 3)  Restrictions and light duty may apply if the employee does not receive a release to return to full duty.  (Ex M, p 4)

170.   MPD's General Order 41 states that the policy of MPD is to provide occasional light duty assignments due to illness, injury, or medical necessity.  (Ex N, p 30)  The policy defines a light duty assignment as any duty assignment for a police officer who cannot return to normal or full duty because of sickness, injury, or temporary disability.  (Ex N, p 30)

171.   Hankins returned DeBacker to work in a light duty capacity.  (Ex D, p 30)

172.   Hankins took into consideration ███████████████ in determining what duties he would be assigned when he returned to work.  (Ex D, p 43, Board tr 289)

173.   Prior to DeBacker's return to work, Hankins sent out an email to command letting them know DeBacker was returning and if any discrepancies were observed regarding his duties and assignments to let Patrick or him know.  (Ex A, p 26)

174.   DeBacker was returned to work as a booking officer.  (Ex D, p 34, 63-64)  The booking officer position was created to accommodate DeBacker's return to work and did not exist prior to his return to work or following his termination of employment.  (Ex D, p 34)

175.   The booking area was very different than DeBacker's prior work area as he

30

previously worked in an office with carpet.  (Ex I, p 5)  It is an isolated part of MPD that has two

doors with key fobs, cameras, equipment, metal benches, and a couple of cells.  (Ex I, p 5)  The area

has no carpet and is basically a jail.  (Ex I, p 5)

176.     Glogowski stated he would not want to work in booking as it is an isolating position

without much contact with other police officers and is not a place to work eight hours a day.  (Ex I,

p 5)

177.     Langenderfer did not believe the booking area was a pleasant place to spend a lot of

time, it was isolated, and she would not want to work in that area all day.  (Ex E, p 5)

178.     Pickens would not like the position because it was not police work and was more

akin to being a jailer.  (Ex G, p 9)

179.     DeBacker had numerous restrictions as a condition of his return to work.  (Ex D, p

33)  He was not to be in uniform, not to be armed or operate a squad that was armed, not to have

contact with Titus, his duty station was in the booking area, and he was not to have access to the

firearms range, the armory, the gun cleaning room, CCU equipment rooms or van, the Firearms

Simulator room, the basement, the records area, or the traffic section.  (Ex D, p 33-34, 63-64)

180.     The restriction that DeBacker could not be in any areas where guns were located

was not related to any concern about DeBacker, but rather were due to balancing other people's

concerns with him being around firearms.  (Ex D, p 37)

181.     The restriction that DeBacker could not be in traffic was later added in October 2011

solely because Mangelsdorf was allegedly uncomfortable around DeBacker.  (Ex D, p 39, 68)

182.     DeBacker was later told to leave through the prisoner release door rather than the

regular door.  (Ex C, p 19)

183.     DeBacker was asked to limit contact with Titus and Mangelsdorf upon his return to

work.  (Ex F, p 28)  Titus would complain when DeBacker was in the general area he was in, and command would discuss Titus' concerns with DeBacker and advised him to avoid Titus as best as possible.  (Ex M, p 15)  DeBacker was so concerned about Titus' even seeing him at work he felt the need to report those occasions when Titus might have seen him during his normal workday.  (Ex M, p 15)  DeBacker was further concerned about reports he was in the same location as Mangelsdorf so he would advise command when those situations occurred.  (Ex N, p 68)

184.    As situations came up, DeBacker was further asked to limit his movements and if certain people were in the area, to avoid contact with them.  (Ex F, p 28)

185.    DeBacker was not allowed to go into records, so he had to ask Langenderfer for supplies.  (Ex E, p 8)  Langenderfer believed that was demeaning.  (Ex E, p 10)

186.    Titus advised Langenderfer she was to refrain from spending time in booking and the keys to the squad car that she shared with DeBacker would be in another location.  (Ex E, p 8)  Langenderfer believed the request was unreasonable, and part of the reason for the email with that request was to target her because she was talking to DeBacker.  (Ex E, p 9)  Langenderfer did not believe Titus would have had an issue if she had been talking to another officer.  (Ex E, p 9)

187.    Titus requested DeBacker be banned from Officer Powell's office because he was there quite often.  (Ex A, p 25)  DeBacker was thereafter prohibited from going into Powell's office. (Ex A, p 25)

188.    On November 15, 2011, Titus was having discussions with other officers regarding topics that supervisory personnel would like to discuss and the same included a discussion of DeBacker.  (Ex A, p 29)  The outline of issues referenced the "Officer DeBacker" issue, ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓and the creation of a new position that offers little or no benefit to the PD when other positions are being eliminated.

(Ex A, p 30)

189.    As of November 18, 2011, command was continuing to advise personnel to report on any concerns or behavior regarding DeBacker directly to them.  (Ex M, p 12)

190.    Fisk wrote a report regarding alleged comments reported to him by Sergeant Noe that DeBacker had a screen saver of an albatross on his computer and made comments that when ███████████████████████████████████.  (Ex M, p 14, Ex N, p 57)  The Officer who heard the comments did not believe DeBacker was trying to be malicious and believed he was simply trying to bring humor to the situation.  (Ex M, p 14)

191.    Fisk wrote a report that DeBacker was spending more time outside the booking area and visiting with officers in other areas of MPD.  (Ex M, p 12)  Titus indicated he did not like DeBacker's freedom of movement, and Fisk requested that the issue be addressed with DeBacker pertaining to a reduction in the amount of time he spent outside his assigned area.  (Ex M, p 12)

192.    Titus notified two individuals within MPD that DeBacker was restricted to the booking area and was not allowed to carry a firearm, despite the fact that Hankins had not authorized the information to be provided to those individuals.  (Ex D, p 35, 65)  DeBacker was not restricted to the booking area and the information Titus was providing other individuals within MPD was false in that regard.  (Ex D, p 36)

193.    Titus told Lambach and Judy Jackson to report any odd behavior by DeBacker.  (Ex A, p 34)

194.    Titus somehow received an email from Fisk regarding DeBacker and complaints made about him, which appeared as though he was blind copied, and he later forwarded the email to his personal email account.  (Ex A, p 29-30, 47)  Titus forwarded other complaints about DeBacker and his work performance to his personal email address as well.  (Ex O, p 173)

195.    The restrictions on DeBacker's return to work lead Pickens to believe ██████████ ████████████████████████████████████████████████████ (Ex G, p 56-57)  Pickens could not think of any other reason for DeBacker's restrictions other than ████████████████ ████████████ (Ex G, p 83)

196.    Pickens believed that it was demeaning to DeBacker to not be in uniform, and the restriction perpetuated ████████████████████████████. (Ex G, p 62, 84)

197.    Glogowski believed the restrictions were unreasonable ████████████████████████ ████████████████ (Ex I, p 5)  He believed that the restrictions further perpetuated the rumors that were going around. (Ex I, p 5)

198.    Wilson believed that restricting DeBacker from carrying a weapon or going in any area where weapons were kept perpetuated the rumors about him.   (W 21-22)

199.    Langenderfer believed the restrictions were unreasonable and perpetuated the rumors ████████████████████████████████████. (Ex E, p 4, 9)

200.    Following a month of light duty work, DeBacker was not returned to his full duties ████████████████████████. (Ex D, p 28)  DeBacker did nothing upon his return to work to interfere with his ability to be restored to full duty and his work performance was satisfactory.  (Ex D, p 29-30)

201.    Hankins said DeBacker was not being fully reinstated because they were dealing with people in MPD that ████████████ with DeBacker having a gun.  (Ex D, p 28)

202.    Hankins believed, ████████████████████████████████████████ ████████████████████████ (Ex D, p 28)

203.    Hankins had an obligation to DeBacker to return him to full duty.  (Ex D, p 175)

204.    Hankins could not recall any other situations where an officer was restricted from

being in uniform for a period of seven days after he was cleared by the City to return to duty.  (Ex

D, p 232) ██████████████████████████████████████████████

█████████████ (Ex D, p 231-232)

205.  ████████████████████████████████████████████

████████████████████. (Ex H, p 7-8, 10, 35)

206.  During their approximately twenty meetings, ███████████████████

██████████████████ (Ex H, p 3-4) █████████████████████████

██████████. (Ex H, p 5) ██████████████████████████████

████████████████████████████████████████████████████████

(Ex H, p 11)

207.  ████████████████████████████████████████████

████████████████ (Ex P, p 1-10)

208.  Following his return to work, DeBacker would frequently find his radio walkie

talkie had been moved and the battery wasn't getting charged.  (Ex I, p 6)  Glogowski believed that

someone in MPD was messing with DeBacker by doing that, as no other officers experienced that

problem.  (Ex I, p 6)

209.  At one point, the temperature in the booking office increased to approximately 80

degrees and was incredibly humid.  (Ex B, p 30, Ex N, p 57)  The booking office was the only area

that had become warm and Titus had control over the heating and cooling of the building.  (Ex B, p

30, 32)  DeBacker reported it to Patrick, however the issue was not remedied and the temperature

did not change.  (Ex B, p 30)

210.  DeBacker had numerous difficulties in obtaining a squad car for work related

transportation, which he reported to Patrick.  (Ex N, p 67-68)  The key to the car he was directed to

drive would not be where it was supposed to be, was placed in Titus' box on several occasions, and was unavailable for his use.  (Ex N, p 67-68)  DeBacker was unable to do his job as a result of the necessity of tracking down a vehicle each time he needed transportation.  (Ex N, p 67-68)

211.    On February 1, 2012, the day the  a representative of the City of Moline provided a reporter, Dawn Neuses, with an un-redacted version an open meeting.  (Ex D, p42, 69-81, Ex B, p 36)  The Commission, human resources, and the legal department would have had possession of the document on that date. (Ex D, p 42)

212.    Upon receiving the un-redacted version, Ms. Neuses said that she didn't even know how to write the article because it was so personal and the City Attorney, Maureen Riggs, advised Mike of this in an email correspondence the day after the decision was released.  (Ex B, p 36, Ex N, p 23)

213.    A newspaper article was published in the Dispatch ▮▮▮▮▮▮▮▮ ▮ as a result of its un-redacted release.  (Ex K, p 4, Ex N, p 22)

214.    Following the ▮▮▮▮▮▮, Fisk released information to Craig Sommers, a retired sergeant, regarding DeBacker's employment status.  (Ex F, p 33, 43)  Sommers had no reason to know about DeBacker's employment status or restrictions on the date of the email.  (Ex F, p 34)

215.    Titus communicated with Doug Burke, a retired Moline Police Department officer, regarding the incident.  (Ex A, p 18)  Titus knows that he cannot tell other individuals about employee reprimands, sick leave, health information, and suspensions; however, Titus felt it was acceptable to tell Burke ▮▮▮▮▮▮▮▮ ▮▮▮▮▮.  (Ex A, p 19)

216.    Titus forwarded emails concerning DeBacker to his personal email account.  (Ex A, p 20)

217.    The booking area is recorded, and Titus, Fisk, and IT were the only individuals that had access to the recordings.  (Ex D, p 41)  Titus watched DeBacker on video while he was in booking, as the videos are available to him in his office.  (Ex A, p 35-36)

218.    Hankins and Fisk continued to meet about DeBacker's progress and where he was at in the process pertaining to his ███████████ throughout the entire year.  (Ex F, p 24)

219.    ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████ (Ex N, p 56)

## H.    DeBacker's FOID Card

220.    A FOID card is a mechanism for the state police to know who has the ability to possess and purchase firearms.  (Ex D, p 32)

221.    DeBacker's FOID card was revoked on June 24, 2011 ████████████████████ ███████████████████.  (Ex N, p 61)

222.    Hankins claimed DeBacker's FOID card status was not relevant to his employment with MPD.  (Ex D, p 31)  Hankins advised DeBacker that the status of his FOID card was irrelevant to the City of Moline regarding his ability to perform his duties.  (Ex D, p 31)  Despite this belief, Hankins was directing command staff to check on the status of Mike's FOID card even prior to his return to work.  (Ex D, p 31, 62)

223.    Following the revocation of DeBacker's FOID card, DeBacker immediately began the process of attempting to get it reinstated.  (Ex B, p 33, Ex N, p 62)  He filled out the paperwork, and was then advised that the law had changed and he would need to submit additional information.

(Ex B, p 33)  On March 13, 2012, DeBacker submitted additional information as requested by the ISP.  (Ex N, p 63)

224.  ███████████████████████████████████████████

███████████████████████████████████████████.  (Ex N, p 28)

225.    On June 15, 2012, DeBacker received a letter denying his request for reinstatement of his FOID card.  (Ex B, p 34, Ex N, p 64)

226.    After having a FOID card revoked, one of the requirements for reinstatement is to obtain a letter from your employer if they require a FOID card.  (Ex B, p 129)  DeBacker requested Hankins' request for assistance in getting his FOID card back, by way of a letter, however he refused to provide any assistance in that regard.  (Ex D, p 254, Ex B, p 25)

227.    DeBacker thereafter sent a letter to the ISP requesting reconsideration of the denial for reinstatement of his FOID card.  (Ex N, p 65)  He sent a follow-up correspondence on June 10, 2013 formally requesting an administrative hearing on the issue.  (Ex N, p 66)

228.    On September 7, 2011, Hankins directed Fisk to contact the ISP about DeBacker's FOID process.  (Ex F, p 27, 41)  Fisk did so and reported the results to Hankins.  (Ex F, p 41)  The ISP indicated that after Fisk's contact with them, the incident report would be a part of DeBacker's file and would be reviewed prior to his reinstatement.  (Ex A, p 2)

229.    Titus asked Fisk to check DeBacker's FOID status, and Fisk agreed to do so.  (Ex F, p 26)  Fisk gave Titus permission to contact the FOID Review Division to determine how he could be involved in the review process and how to fight DeBacker getting his FOID reinstated.  (Ex F, p 26, Ex A, p 37)  Hankins was aware of this.  (Ex F, p 26)

230.    Titus and Fisk discussed DeBacker's FOID on a regular basis.  (Ex A, p 17)  Titus

told Fisk about all of his emails and contact with ISP regarding DeBacker's FOID card.  (Ex A, p 22-23)  Fisk was aware Titus was making those contacts during work hours.  (Ex A, p 22)  Fisk provided Titus with copies of the emails he received from the ISP regarding the status of DeBacker's FOID card on at least 3 occasions.  (Ex O, p 51-52, 54)

231.    Hankins did not believe it was appropriate for Fisk to provide Titus with emails regarding contact he had with the ISP pertaining to DeBacker's FOID status.  (Ex D, p 293)

232.    Titus engaged in regular and consistent communications with the ISP regarding DeBacker's FOID card status.  (Ex O, p 6-50 )  The contact was through Titus' work email and occurred during his work hours.  (Ex O, p 6-50)

233.    On October 13, 2011, Titus sent an email to the ISP ███████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████ (Ex O, p 6)

234.    Hankins stated that Titus' statement to the ISP ██████████████████████ ██████████████████████████████████████████████.  (Ex D, p 49)

235.    On November 2, 2011, Titus requested that the ISP send a formal request for the police reports relating to the incident.  He advised them that DeBacker was not allowed to arm himself as an officer and was confined to a room at the police department with orders to not be in areas where firearms are at or being stored ████████████████████.  (Ex O, p 7)

236.    On November 2, 2011, Titus sent another email indicating that MPD does not require officers to have FOID cards so DeBacker would not lose his employment based on losing his FOID if that were the panels' decision.  (Ex O, p 13) Titus informed them of this because he believed it might impact their decision on reinstating DeBacker's FOID.  (Ex A, p 21)

237.     On July 18, 2012, Titus sent an email to the ISP stating ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████. (Ex O, p 61)  Titus thereafter spoke to the ISP as a follow-up to his email.  (Ex O, p 63)

238.     Titus sent an additional 8 emails (above and beyond those specifically detailed

herein) to the ISP during the period of November 2, 2011 until January 6, 2012 discussing and

inquiring into the status of DeBacker's FOID card.  (Ex O, p 10, 18, 21, 24, 32, 36, 40, 45)  Titus

emailed several of the exchanges to his personal email address, including the email information Fisk

received and forwarded to him.  (Ex O, p 8, 28, 57, 59)

239.     Hankins did not authorize Titus to forward emails to his personal email address

regarding DeBacker and the same was inappropriate.  (Ex D, p 292)

240.     On November 2, 2011, Titus sent a letter to the ISP requesting they deny

DeBacker's request for reinstatement of his FOID card.  (Ex O, p 1)  Titus stated ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

and that MPD does not require officers to have a FOID card for employment so any decision by the

panel would not affect his employment.  (Ex O, p 3)

241.     ████████████████████████████████████████████████████████

████████████ (Ex D, p 215)

242.     Officer Robert McNabb sent an email to the ISP asserting that ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████. (Ex A, p

27)  McNabb forwarded Titus a copy of the email the same day he sent it, to which Titus thanked

him and said he appreciated it.  (Ex O, p 5)

        243.    Titus acknowledged that the information McNabb put in his email to the ISP was

information he should not have had access to, and it was not fully accurate.  (Ex A, p 31)

        244.    Titus acknowledged he did what he could to interfere with the reinstatement of

DeBacker's FOID card and to get DeBacker fired from MPD.  (Ex A, p 24)  Titus acknowledged if

there was anything else he could have done to get DeBacker fired, he would have done it.  (Ex A, p

24)

        245.    Hankins was aware that Titus was communicating with the ISP regarding

DeBacker's FOID status.  (Ex D, p 49)

        246.     Hankins acknowledged that Titus' communications through his work email could

provide the ISP with the impression that his contact was authorized by someone within MPD.  (Ex

D, p 49)

        247.    Titus wrote letters to the ISP both for personal reasons and as a representative of

MPD.  (Ex A, p 38)

        248.    Hankins directed Fisk to check on DeBacker's FOID status on more than one

occasion, and he would make the request in person.  (Ex F, p 25)  Hankins did not provide Fisk with

a reason for his requests.  (Ex F, p 25)  When Fisk received information about DeBacker's FOID

card, he would provide that information to Titus.  (Ex F, p 31)

        249.    All of Fisk's inquiries  were done from his work email and on his work computer.

(Ex F, p 32)

250.    On February 7, 2012, Hankins was inquiring on DeBacker's FOID status.  (Ex D, p

285, Ex P, p 1-10)  Hankins directed Fisk to run a search on the L.E.A.D.S. program despite the fact

that he claimed DeBacker's FOID had no departmental relevance and it was just out of his curiosity.

(Ex D, p 286)

251.    MPD ran L.E.A.D.S. searches regarding DeBacker's FOID on more than one

occasion.  (Ex D, p 287)

252.    Prior to the EEOC mediation, Hankins contacted a FOID representative to determine

the process DeBacker was going through in order to get his FOID reinstated and where he was at in

the process.  (Ex D, p 272-273, Ex SS)  Hankins stated he had no departmental reason for making

that phone call because he did not believe DeBacker's FOID card was relevant to his employment

with MPD.  (Ex D, p 273)

253.    After learning about the criminal statute, and prior to DeBacker's termination, Fisk

emailed Hankins and Patrick inquiring as to whether they'd talked to legal because if the director

denied DeBacker's FOID appeal, he may have no recourse.  (Ex F, p 37, 49)

254.    As of the date of the deposition, MPD was not checking on the status of every

officer's FOID despite learning about the criminal statute.  (Ex F, p 50)  Titus performs the

background checks for officers and MPD does not check FOID status for pre-employment

background checks.  (Ex A, p 17)

255.    DeBacker's FOID card was reinstated on November 21, 2013.  (Ex B, p 127, Ex N,

p 32)

256.    The Recommended Order and Decision of Administrative Law Judge Robin

Schmidt determined that ████████████████████████████████████████

████████████████████████████████████.  (Ex N, p 41)  Judge Schmidt further opined that

██████████████████████████████████████████

████████████████████  (Ex N, p 41)

### I.      DeBacker's Requests for Reinstatement to Full Duty

257.    On February 8, 2012, DeBacker emailed Hankins, Fisk, and Patrick requesting the reinstatement of his full police authority and the lifting of his restrictions.  (Ex D, p  83)

258.    On April 11, 2012, DeBacker's annual performance review was good and indicating his work performance was acceptable.  (Ex D, p 103)

259.    On May 18, 2012, DeBacker met with Fisk to again request reinstatement to his prior position.  (Ex D, p 85-86)  DeBacker advised Fisk of the embarrassment he was experiencing every day when he came to work and that he was being ostracized by the restrictions still being placed on him which was looked upon by his peers █████████████████████████.  (Ex D, p 85-86)

260.    On June 4, 2012, DeBacker advised Fisk that he had made multiple requests to be reinstated to full duty to no avail.  (Ex D, p 87)

261.    On June 5, 2012, Hankins advised DeBacker via email that he wanted to discuss his return to full duty and to resolve the EEOC complaint.  (Ex D, p 88)  Hankins further advised DeBacker that the status of his FOID card had no effect on his ability to carry a firearm on or off duty as a police officer.  (Ex D, p 88)  Hankins acknowledges that statement to DeBacker was false. (Ex D, p 43)

262.    On June 26, 2012, DeBacker and his union representative met with Hankins and the City Attorney regarding DeBacker's union grievance which requested reinstatement to full duty in his prior position as a traffic investigator, the lifting of all of his restrictions, he be allowed to carry a firearm, financial compensation for his lost benefits, a mediation between himself and Titus, and

assistance with his FOID Card reinstatement.  (Ex D, p 95)  The City denied DeBacker's union grievance in its entirety on August 7, 2012.  (Ex D, p95)

263.    A month prior to DeBacker's termination, Titus had a meeting with Hankins, Patrick and Fisk where Hankins told him that they were giving DeBacker his weapon back.  (Ex A, p 32) Hankins advised it would be happening the following day, and the union was forcing his hand so he had no choice.  (Ex A, p 32)  Titus inquired as to whether DeBacker could carry his weapon off duty as well, and asked Hankins to check on that issue.  (Ex A, p 33)  Fisk called Titus that evening to advise him that the return of DeBacker's weapons was on standby.  (Ex A, p  33)

### K.    Emotional Distress of DeBacker

264.    DeBacker advised Fisk that he was embarrassed every day to come to work due to his restrictions.  (Ex F, p 35, 44-45)  The restrictions continued to expand, rather than diminish over time.  (Ex B, p 27)

265.    The booking officer position was a demeaning position; DeBacker wore blue jeans and a shirt, was not allowed to wear insignia or a badge, and did not even have the basic weapons that a correction officer would have.  (Ex B, p 27)  He was down in a room, under the surveillance of cameras at all times, and felt like he was sentenced.  (Ex B, p 27)  He was isolated and didn't see anyone.  (Ex B, p 27)

266.    DeBacker advised Nurse Rudsell that he was having employment problems, was frustrated with not being returned to full duty, and had concerns with the way he was being treated in MPD.  (Ex H, p 6)  Rudsell felt that during some of the meetings, ███████████████ ██████████ and at other times, he was trying to be more positive.  (Ex H, p 8)  DeBacker advised her that he was humiliated that the █████████████ was made public.  (Ex H, p 9)

267.    DeBacker was ashamed that he was unable to go to the traffic division without being

supervised. (Ex C, p 19)

268. DeBacker was very embarrassed to go to the courthouse and be questioned about whether he was still a police officer and where his gun was. (Ex C, p 19)

269. Langenderfer knew DeBacker was embarrassed about being the booking officer, and she indicated that she would also be embarrassed in that position. (Ex E, p 9)

270. Schumacher was aware that DeBacker was highly embarrassed because he was proud of his job, he was very upset about not being able to carry a gun, not being able to do his job, and about what other people were thinking about him. (Ex K, p 5) Every time DeBacker heard a rumor that was generated by the patrolmen, it hurt his feelings and made him feel terrible. (Ex K, p 5)

271. DeBacker expressed his frustration to Glogowski regarding his restrictions and that he wanted to be reinstated to full duty. (Ex I, p 5) He further advised Glogowski that he was embarrassed by the booking officer position and believed it was demeaning. (Ex I, p 6)

272. DeBacker expressed his frustration to Wilson about his work restrictions. Ex I, p 5

273. Glogowski does not believe DeBacker was treated fairly, and believes the incident impacted his life and his wife. (Ex I, p 8)



274. ██████████████████████████ ████ (Ex B, p 139) ████████████████████████ ██████ (Ex B, p 140)

275. ██████████████████████████ ██████████████ (Ex B, p 28)

276. ████████████████████. (Ex B, p 28) █████████████████████████

████.  (Ex B, p 28)

277.    The situation was life changing for DeBacker.  (Ex B, p 37)  DeBacker was no

longer able to competitively shoot, and as of the date of the deposition, he still hadn't shot even

though he had his FOID back.  (Ex B, p 37)  He could no longer afford his jeeping, and he was

trying to sell his trailer.  (Ex B, p 37)  Everywhere he goes, people act as if they don't see him and

turn the other way.  (Ex B, p 37)  Financially, he is unable to do anything and has substantial debt.

(Ex B, p 37)  His current employment requires him to work outside in the elements, and he is

banged up and injured performing the job.  (Ex B, p 37)  He has no benefits, substantially reduced

income, and the job was nearly over.  (Ex B, p 37)

**L.    Retaliation**

278.    Hankins testified at the ████████ that until DeBacker or the Union filed some

type of document indicating the Stanard report said he should be armed and full duty, that he would

remain in his light duty capacity.  (Ex D, p 41, transcript)

279.    At the EEOC mediation, in July 2012, the City Attorney stated that the City was not

going to deal with the union grievance until the EEOC complaint was resolved.  (Ex D, p 44)

Hankins acknowledged that statement represented the City's position.  (Ex D, p 44)

**M.    DeBacker's Termination of Employment**

280.    The City of Moline did not learn of the criminal statute that they used as the basis for

DeBacker's termination of employment until July 2012.  (Ex D, p 33, 44)  The criminal statute did

not form any basis for the City's refusal to restore DeBacker to full duty from September 2011 until

July 2012.  (Ex D, p 33)

281.    Section 65/8 of the Illinois FOID Card Statute provides grounds for denial or

revocation of an individual's FOID Card.  430 ILCS 65/8.  The Department of State Police has

authority to revoke a FOID card under the statute if a person ████████████████████

██████████████████████. 430 ILCS 65/8(e).  An active law enforcement officer employed

by the government who is revoked can obtain relief under the statute ████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████. 430 ILCS 65/8(e).

282.     Section 65/10(c-5) provides a direct expedited appeal to the director for law

enforcement officers who have had their FOID Card revoked which can provide relief within thirty

days of an application for relief.  430 ILCS 65/10.

283.     The FOID Card statute explicitly states that any person prohibited from possessing a

firearm under Section 24-3.1 of the Criminal Code may apply to the Director of State Police for a

hearing on the revocation.  430 ILCS 65/10(c), (f).

284.     Case law states that the Illinois criminal statute referenced by the Defendant, Section

24-3.1, must be reviewed in conjunction with the Illinois FOID statute, and persons who have

obtained from the Department a valid FOID card are not liable for criminal sanctions under the

criminal statute. *Rawlings v. Illinois Dept. of Law Enforcement*, 391 N.E.2d 758, 764 (Ill.App. 3

Dist. 1979).

285.     Fisk contacted the FOID review division to ensure that DeBacker was exempt from

FOID as a police officer.  (Ex F, p 25)  Fisk was told that he ████████████████████████

████████████████████████████████. (Ex F, p 25)  Fisk researched the

law and forwarded the research to Hankins, Patrick, and Titus.  (Ex F, p 36, 46)

286.     After learning about the criminal statute on July 17, 2012, Hankins continued

checking on the status of DeBacker's FOID card.  (Ex H, p 45, 91)

287.     Following his termination, a memorandum was sent out to all Department personnel

advising them that DeBacker was no longer employed by the City, that he was not allowed inside the secured areas of the MPD, and if he requested access it would need to be cleared through the Captains or the Chief.  (Ex D, p 46, 95)

288.    Hankins does not send out a memorandum notifying personnel when every police officer is terminated.  (Ex D, p 278-279)  Hankins sent out the Memorandum regarding DeBacker as a result of the circumstances despite having no concern that DeBacker would take any action as a result of his termination.  (Ex D, p 279-280)

289.    Hankins told Titus that he was terminating DeBacker's employment prior to doing so on the date of his termination.  (Ex A, p 35)

290.    As of May 1, 2014, ███████████████████████████████

███████████████████ (Ex D, p 115)  Following the date of DeBacker's

termination, ███████████████████████████.  (Ex D, p 96)

291.    ███████████████████████████████

███████████████████████████████

███████████████████████ (Ex N, p 51-55)

███████████████████████████████

███████ (Ex N, p 52)



### N.    Actual Disability and Perception of Disability

292.    DeBacker believes there was a period of time in which he was unable to perform all the duties of a police officer ███████████████.  (Ex B, p 3)

293.    DeBacker's supervisors knew he was having difficulties at work in the months prior to the incident.  (Ex N, p 17)  Several days prior to the June 16, 2011 incident, DeBacker froze up after being diverted from an abandoned vehicle call to assist with a traffic crash.  He pulled his

squad car over and didn't know what to do.  (Board transcript 99-101, 222-224)  On another

occasion, ███████████████████████████████████████████████████████

███████████████  (Board Tran 90-92)

294.     DeBacker believes that he has been perceived as disabled.  (Ex B, p 3)

295.     ████████████████████████████████████████████████████

███████████████████████████████████████████.  (Ex B, p 3, 29)

296.     People did not want to work with him or talk to DeBacker.  (Ex B, p 3)  Supervisors

did not want him working under them.  (Ex B, p 3)

297.     Following the incident, DeBacker was able to perform all the essential functions of

being a police officer.  (Ex B, p 3)

298.     Hankins ████████████████████████████████████████

███████████████████████████████████████.  (Ex N, p 4)  He

█████████████████████████████████████████████████████████████.

(Ex N, p 4)  Hankins ███████████████████████████████████████.  (Ex N,

p 2)

299.     Fisk believed ████████████████████████████████████████

████████  (Ex D, p 48) ████████████████████████████████████████

████████████████████████████████.  (Ex F, p 3) ████████████████████

████████████████████████████████████████████████.  (Ex

F, p 3)

**O.     Similarly Situated Employees**

300.     Council for the City refused to allow Fisk to testify regarding any other possible

police personnel ████████████████████████████████.  (Ex F, p 16)

301.   Glogowski had his FOID revoked during his employment with MPD.  (Ex I, p 7)  It

███████████████████████████████████████████████████████████.

(Ex I, p 9)

302.   Despite Glogowski's FOID being revoked, MPD allowed him to handle firearms,

drive squad cars with rifles in them, and gave him access anywhere in the building.  (Ex I, p 7)

303.   When Hankins became Chief, Glogowski's FOID was still revoked and he was still

allowed access to firearms.  (Ex I, p 7)  He never had any restrictions regarding firearms during his

employment with MPD and having his FOID revoked did not affect his conditions of employment.

(Ex I, p 7)

304.   The Chief at the time of the revocation offered to write Glogowski a letter to assist

him in getting his FOID card back.  (Ex C, p 19)

305.   

███████████████████████████████████ (Ex B, p 35) ███████████████████████

███████████████████████████████████████████████████████. (Ex

B, p 35)

### III.     APPLICABLE LAW

A motion for summary judgment should be granted where there are no issues of material

fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (2014)  Any doubt

as to the existence of a general issue for trial is resolved against the moving party.  *Citizens for a*

*Better Environment v. Caterpillar, Inc.*, 30 F.Supp.2d 1053, 1056 (C.D. Ill. 1998).

### IV.     ARGUMENT

**1.     Count I – Plaintiff has Stated a Prima Facie Case of Discrimination Under the American Disability Act ("ADA")**

DeBacker agrees with the law set forth by the Defendant and will generally not restate the

same.

      **a.**     **Plaintiff Was Disabled on June 16, 2011**

Prior to, during, and after June 16, 2011, DeBacker was suffering from an actual disability under the ADA pursuant to the criteria set forth in *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950-951 (7th Cir. 2000) and the ADA. 42 U.S.C. § 12102(2) ████████████████

████████████████████

████████████████████████████

████████████████████████. (Ex B, p 9-10) ████████

████████████████████████████

████████████████ (Ex B, p 10, 13)

"[M]edically diagnosed mental conditions" are impairments under the ADA. *Krocka v. City of Chicago*, 203 F.3d 507, 512 (7th Cir. 2000)(internal citations omitted). ████████

████████████████████████

████████████ (Ex N, p 24, 26) The City of Moline ████████

████████████ (Ex M, p 5, 8) ████████

████████████████████.

DeBacker's ████████████████████

████████ *See Dickerson v. Bd of Trustees of Comty. College Dist. No.* 522, 657 F.3d 595, 599 (7th Cir. 2011), 42 U.S.C. § 12102(1). ████████

████████████████████

████████████████████ (Ex

C, p 4, Ex B, p 10-11) ████████

████████████████████████████████████████████████ (Ex B, p 14-15) ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████ (Ex B, p 13)

███████████████████████████████████. (Ex B, p 15)

████████████████████████████████████. (Ex H, p 6) ██████████

████████████████████████████████████████████████

██████████████

 To substantially limit a major life activity, the disability must significantly restrict his major life activities as compared to the condition, manner, or duration in which an average person can perform the same major life activity. *Moore*, 221 F.3d at 951. ████████████████████

████████████████████████████████████████

██████████████████████ (Ex B, p 10-11, 14) ██████████████████ were sufficiently impacted as compared to how long it would take an average person to perform their job or maintain their focus and concentration.

 The City's argument that ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

  **b.**  **Plaintiff Was Perceived by Defendant as Disabled on June 16, 2011 and Thereafter**

On June 16, 2011 and thereafter, the City of Moline perceived DeBacker to be disabled. The ADA protects an individual from disability discrimination in the event the employer regards an employee as having impairment.  42 U.S.C. § 12102(2).  The "regarded as" portion of the ADA provides a remedy to an employee based on misperceptions about the abilities of the impaired persons.  *Krocka*, 203 F.3d at 513-514.  Impairments may not actually be disabling, are believed to be so, and employees may be shunned as a consequence.  *Id*. at 514 (citing *Vande Zande v. State of Wisc. Dept. of Admin.*, 44 F.3d 537, 541 (7th Cir. 1995).  In order to satisfy such a claim, a covered entity must "entertain misperceptions about the individual, and those misperceptions can constitute believing "that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment, when, in fact, the impairment is not so limiting."  *Id*. at 514.



(Ex D, p 5-6, 36-37)

(Ex B, p 25, Ex C, p 15, Ex D, p 11, 13, 38)

(Ex D, p 90-91)

(Ex D, p 15, Ex A, p 28)

(Ex D, p 20)

(Defendant's SJ Ex p 9-10, 12, 17)

(Ex B, p

3, 29) 

(Ex N, p 2)

In addition to Hankins,

(Ex F, p 4, 15)

(Ex F, p 3)

(Ex F, p 9, 29)

Hankins placed DeBacker on light duty upon his return to work.  (Ex D, p 30)  Hankins took into consideration ████████████████ in determining what duties he would be assigned when he returned to work, and said DeBacker was not fully reinstated due to people in MPD ████████████████ (Ex D, p 28, Ex B, p  42) MPD's General Order 41 states light duty assignments will be provided due to illness, injury, or medical necessity.  (Ex N, p 30) The policy defines light duty assignments as any duty assignment for a police officer who cannot return to normal or full duty because of sickness, injury, or temporary disability.  (Ex N, p 30)

In addition to returning DeBacker to work in a light duty capacity, Hankins created the booking officer position for him which did not exist prior to his return to work.  (Ex D, p 34, 63-64) DeBacker was further restricted from entering any work area where he would have access to firearms, from entering the areas where Titus and Mangelsdorf worked, and he was told to limit ████████████████ (Ex D, p 33-34, 39, 63-64, Ex F, p 28)

MPD clearly perceived DeBacker was suffering from a disability based upon their own admissions and the actions they took regarding the terms and conditions of DeBacker's employment

upon his return to work.

          **c.**      **Plaintiff has Presented Sufficient Direct Evidence of Disability Discrimination.**

In the present case, as set forth herein, there is direct evidence ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████

          **d.**      **Plaintiff has Presented Sufficient Circumstantial Evidence of Disability Discrimination.**

There is ample circumstantial evidence to allow a jury to infer intentional discrimination on the part of the City of Moline.  Upon his return to work, DeBacker was assigned the job of booking officer.  (Ex D, p 34, 63-64)  The booking area was an isolated part of MPD with no carpet and is basically a jail; it was very different from the prior office area DeBacker had worked in with carpet. (Ex I, p 5)  DeBacker was given numerous restrictions, including he could not be in any area with firearms, any areas Titus or Mangelsdorf worked, and he was to limit contact with Titus and Mangelsdorf.  (Ex D, p 33-34, 37, 63-64, Ex F, p 28)  Hankins expressed ████████████

████████████████████████████████████████████

████████████  (Ex B, p 3, 29)

The City claims DeBacker's restrictions upon his return to work were related to attempts to reintegrate DeBacker into MPD.  (Ex G, p 10, Plaintiff's SF 38, 71)  Despite the City's argument,

████████████████████████████████████████████████

██████████████████████████████████████████████████ and the City failed to

implement any of those recommendations.  (ExR, p , Ex D, p 28)  ████████████████████

██████████████████████████████████████████████ however MPD did not

implement that recommendation because Titus refused to participate.  (Report, Ex D, p 28)  Hankins

could have ordered Titus to attend the meeting, but he did not feel that would be the right thing to

do.  (Ex D, p 28)

████████████████████████ DeBacker return to work █████████████████████

████ AND he could be armed during that period of time, and then return him to his full duties if

there were no issues.  (ExR, p )  Hankins did return DeBacker to work in a light duty capacity,

however he didn't allow him to be armed nor did he restore him to his full duties after a month.  (Ex

D, p 28)  If the City's sole reason for the restrictions on DeBacker and the changes to the terms and

conditions of his employment were reintegration, MPD would have implemented ████████

████████████████████████████████████████████████████

███████████████████.

Despite repeated and continuous requests to be restored to full duty, MPD denied

DeBacker's requests.  (Ex D, p 87)  MPD would not engage in a discussion with DeBacker

regarding his requests until nearly a year after the incident when he filed an EEOC complaint.  (Ex

D, p 88-89)  At that point, MPD indicated a willingness to discuss the request and resolve the

complaint.  (Ex D, p 88-89)

Upon DeBacker's return to work, █████████████████████████████████

████████████████ (Ex H, p 7-8, 10, 35)

███████████████████████████████████████████████ (Ex

H, p 3-4, 13-34) ██████████████████████████████



████████ (Ex H, p 2) ████████████████

█████████████████████████████████ (Ex H, p 2)

████████████████████████████████████████

███████████████████████ (Ex H, p 12, 36)

All of the aforementioned establishes additional evidence MPD offered a pretextual reason for not reinstating DeBacker to his full position and ultimately terminating his employment.  If the City did not believe DeBacker was disabled or did not perceive him as disabled, there would have been no reason for the requirement that ████████████████████████████ ███████████████████████████.  There also would have been no reason to refuse to implement ████████ recommendations for reintegration and maintain DeBacker's restrictions until his termination with only the consideration of lifting them when the union forced his hand and to resolve his EEOC complaint.

       **e.**      **Plaintiff Was Performing the Essential Functions of his Job, and Continues to Be Able to Perform the Essential Functions of His Job**

DeBacker was performing the essential functions of his job with reasonable accommodations at the time of his termination.  Hankins stated DeBacker did nothing upon his return to work to interfere with his ability to be restored to full duty and his work performance was satisfactory.  (Ex D, p 29-30)  Hankins acknowledged he had an obligation to return DeBacker to full duty, yet he did not do so in the eleven months DeBacker continued to be employed by MPD prior to his termination.  (Ex D, p 29)

The City argues in Section 1(b)(1) of their Motion that the job DeBacker was performing included tasks necessary to run the police department.  DeBacker was successfully performing all of the essential functions of being a police officer by performing the tasks that were assigned to him.  (Ex B, p 3)  As such, DeBacker was performing pursuant to the City's expectations.

The restrictions imposed upon DeBacker by Hankins directly opposed the City's ordinance requiring police officers to be armed.  The City cannot be allowed to ignore the ordinance requiring officers be armed with a firearm while on duty when it suits them for purposes of discriminating against DeBacker based upon a disability or perceived disability, and then use the same ordinance when it inures to their benefit to support termination.

Further, the City is responsible for the very reason they claim DeBacker cannot carry a firearm under the Illinois criminal code. ██████████████████████████

██████████████████████████. (Ex D, p 145, 33, Ex F, p 14)██████████████

██████████████████████████████████████████

██████████████████ (Ex D, p 6, Ex F, p 15) █████████████████

██████████████████████████████████. (Ex B, p 25-26)

████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████.

(Ex B, p 24-25, Ex D, p 9, 11, Ex F, p 38)

████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████ (Ex B, p 24, 131,  Ex D, p 9, 11, Ex F, p 38)  As a result, both DeBacker's FOID card was revoked and the criminal statute the City alleges restricts his ability to carry a firearm were implicated.  If the Court buys into Defendant's arguments they were entitled to terminate DeBacker in this case, a police department will have found an effective means of terminating a police officer for having a disability under the ADA.  A department will have a free

pass to ████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

The City's articulated reason for terminating DeBacker was pretextual and inaccurate.  The City cites Section 24-3.1 of the Criminal Code ████████████████████████████████████ ████████████████████████ from possessing a firearm or ammunition. 720 ILCS 5/24-3.1.

The Dept of State Police has authority to revoke a FOID card if a person has been ██████████ ████████████████████████████. 430 ILCS 65/8(e).  Law enforcement officers employed by the government who are revoked can obtain relief under the statute ██████████████ ████████████████████████████████████████████████ ████████████████████████████████████████. 430 ILCS 65/8(e).  Section 65/10(c-5) provides a direct expedited appeal to the director for law enforcement officers who have had their FOID Card revoked which can provide relief within thirty days of an application for relief.  430 ILCS 65/10.  Further, the FOID Card statute explicitly states that any person prohibited from possessing a firearm under Section 24-3.1 of the Criminal Code may apply to the Director of State Police for a hearing on the revocation.  430 ILCS 65/10(c), (f).

Case law also states the Illinois criminal statute referenced by the Defendant, Section 24-3.1, must be reviewed in conjunction with the Illinois FOID statute, and persons who have obtained from the Dept a valid FOID card are not liable for criminal sanctions under the criminal statute. *Rawlings v. Illinois Dept. of Law Enforcement*, 391 N.E.2d 758, 764 (Ill.App. 3 Dist. 1979).

From September 2011 when DeBacker returned to work until his termination, MPD claimed

DeBacker did not need a FOID Card in order to maintain his employment.  (Ex D, p 31)  Despite making these claims, Hankins repeatedly checked the status of DeBacker's FOID Card and claimed to do so out of curiosity.  (Ex D, p 31, 48, 62, Ex F, p 25 )  Hankins acknowledged ███████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████ (Ex D, p 32)

In addition, command staff was continuing to check on DeBacker's FOID appeal after learning of the alleged criminal statute and prior to his termination, thus indicating MPD clearly believed there was significance to the status of DeBacker's FOID card.  (Ex F, p 37, 49)  If the criminal statute was the SOLE basis for the termination of DeBacker's employment, MPD would have had no reason to continue checking on the status of DeBacker's FOID card and the fact that MPD did implies it was aware of the interrelation between DeBacker's FOID Card and the criminal statute.  The articulated reason for terminating DeBacker's employment was pretextual.

Even if the Court were inclined to believe the criminal statute was the reason for discharge, the same does not excuse the manner in which MPD treated DeBacker upon his return to employment which was set forth in Section 1(d).  The restrictions imposed upon DeBacker by MPD perpetuated the rumors that were spread about DeBacker and ███████████████ ██████████████████████████████████████████████████████████████████████ ███████████ (Ex I, p 5, Ex G, p 8-9, 11, W 21-22, Ex E, p 4, 9)  In addition, DeBacker's work belongings were frequently moved around, the temperature in his work area that Titus had control over was increased, and he had difficulties finding appropriate work transportation.  (Ex B, p 30, 32, Ex I, p 6,  Ex N, p 57, 67-68)

**f.       Plaintiff Suffered an Adverse Employment Action**

The record establishes direct evidence that the decision to ███████████████████████████

████████████████████████████████████████

████████████ was based upon the actual disability or perceived disability of DeBacker.

Sections 1(a) and (b) set forth the facts and details that support this allegation, thus they will not be

restated herein.

On June 15, 2012, DeBacker's request for review and reinstatement of his FOID Card was

denied by the Director of the ISP.  (Ex B, p 34, Ex N, p 64)  On July 17, 2012, Hankins alleged

learned about the criminal statute from the ISP.  (Ex F, p 25, 36, 46)  After learning about the

criminal statute, Hankins continued checking on the status of DeBacker's FOID Card and Fisk was

engaging in email communications with Hankins and Patrick that if the Director denied DeBacker's

FOID appeal, he may have no recourse.  (Ex D, p 45, 91-92, Ex F, p 37, 49)  On August 7, 2012,

DeBacker was terminated.  (Ex D, p 45, 93)  The aforementioned establishes the City did not

terminate DeBacker solely due to the criminal statute as they continued inquiring on DeBacker's

FOID Card status.

In addition, there is a clear causal nexus between DeBacker's actual or perceived disability

and the duties and restrictions of DeBacker upon his return to work.  The facts were set forth in

detail previously in this Section that support DeBacker's contentions a causal nexus exists sufficient

to be presented to a jury.

> **g.     Similarly Situated Employees Without a Disability were Treated More
> Favorably.**

The City argues that there are no similarly situated employees, thus DeBacker cannot utilize

the indirect method of proof.  The argument by the City is not accurate for several reasons.  First,

Council for the City refused to allow witnesses, including Fisk, to testify regarding other possible

police personnel ██████████████████████████.  (Ex F, p 16)  As a result, DeBacker was

unable to determine whether other individuals may have been similarly situated in regards to the

criminal and FOID statute, however not perceived by the City as disabled and allowed to return to employment.  Second, there are at least two known individuals who may be considered similarly situated employees.

Glogowski had his FOID Card revoked during his employment with MPD.  (Ex I, p 7)  His FOID Card was revoked ███████████████████████████████████████████████████

████████████████████  Following the revocation of Glogowski's FOID Card, MPD allowed him to handle firearms, drive squad cars with rifles in them, and access anywhere in the building.  (Ex I, p 7)  When Hankins became Chief, Glogowski's FOID Card was still revoked and he was allowed access to firearms.  (Ex I, p 7)  He never had any restrictions regarding firearms and having his FOID Card revoked did not affect his conditions of employment.  (Ex I, p 7)  The Chief at the time of the revocation offered to write Glogowski a letter to assist him in getting his FOID Card back.  (Ex C, p 19)  The aforementioned establishes that Glogowski, a similarly situated employee who had his FOID Card revoked and was not perceived as disabled by MPD, was treated more favorably than was DeBacker.

In addition,███████████████████████████████.  (Ex B, p 35) ███████████████

███████████████████████████████████████████████(Ex B, p 35) ████████

███████████████████████████████████████████████████████

████████  (Ex B, p 35)███████████████████████could be considered a similarly situated employee who was not perceived as disabled and was treated more favorably by MPD.

### 2.      Count II – Plaintiff was Retaliated Against for Taking Part in a Protected Investigation, Proceeding, or Hearing.

DeBacker agrees with the case law as articulated by the Defendant, and for purposes of

brevity will not rearticulate the same.

In May 2012, DeBacker filed a complaint with the Equal Employment Opportunity Commission ("EEOC") against the City of Moline. (Complaint Section 62)  The filing of the EEOC Complaint is a statutorily protected activity.  DeBacker was terminated on August 7, 2012.  (Ex D, p 45, 93)  Thus, DeBacker suffered an adverse employment action.  Thus, there is no dispute DeBacker satisfies the first two elements of retaliation sufficient to overcome summary judgment.

Under the indirect method of proof, DeBacker was also meeting MPD's legitimate expectations as Hankins acknowledged DeBacker did nothing upon his return to interfere with his ability to be restored to full duty and his work performance was satisfactory.  (Ex D, p 29-30)  In addition, DeBacker's annual performance review on April 11, 2012 was good and indicated his work performance was acceptable.  (Ex D, p 51, 103-105)  Finally, DeBacker was treated less favorably than similarly situated employees, namely ███████████████, who did not file EEOC Complaints as he was never restored to full duty and was terminated from his employment.  DeBacker has already set forth argument that the alleged non-discriminatory reason for DeBacker's discharge was pretextual and DeBacker incorporates his prior arguments herein.

Under the direct method, there is a causal connection between DeBacker's EEOC Complaint and his termination of employment.  In July 2012, an EEOC mediation was held between DeBacker and the City.  (Ex D, p 44)  At the time of the mediation, the City Attorney stated the City was not going to deal with the union grievance that had also been filed by DeBacker requesting reinstatement to full duty until the EEOC complaint was resolved.  (Ex D, p 44)  The City Attorney's statement represented the position of MPD on that date.  (Ex D, p 44)  Within weeks of the failed EEOC mediation, DeBacker was terminated from his employment.  (Ex D, p 45, 93)

3.     **Count III – Plaintiff Has Suffered Extreme Emotional Distress.**

a.     **The City's Conduct was Extreme and Outrageous as a Matter of Law and is Not Excusable Through a Legitimate Employer Interest.**

The City's actions, as alleged in the Undisputed Material Facts set forth by the City and herein, were extreme and outrageous such that no reasonable person could be expected to endure it under the circumstances and as such, it is an issue for the jury.  In evaluating whether conduct is extreme and outrageous, there are several factors for the Court to consider.  *McGrath v. Fahey*, 533 N.E.2d 806, 809 (1988).  First, the more control the defendant has over a plaintiff, the more likely defendant's conduct will be deemed outrageous, especially when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment.  *Id.*  Threats are "much more likely to be a part of outrageous conduct when made by someone with the ability to carry them out than when made by someone in a weak position.  *Id*.  The Restatement (Second) of Torts explicitly mentions police officers as examples of individuals who may be positioned to exercise power or authority over a plaintiff.  Restatement (Second) of Torts § 46, comment *e*, at 74 (1965)(cited by *Fahey*, 533 N.E.2d at 810).

The Court should also consider whether the plaintiff reasonably believed the threats would be carried out.  *Fahey*, 533 N.E.2d at 810.  A defendant's reasonable belief that his objective was legitimate does not automatically allow the defendant to pursue that objective by outrageous means. *Id*.  Finally, the Court should consider the defendant's awareness that the plaintiff is particularly susceptible to emotional distress.  *Id*. at 811.  Behavior that otherwise might not normally be considered outrageous may be actionable if the defendant knows that the plaintiff is peculiarly susceptible to emotional distress.  *Id*.

In the present case, the City was clearly in a position of power over DeBacker, both as a police department and as his employer.  The City's articulated objective of ███████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ The City's articulated objective of balancing other

officers alleged concerns with restoring DeBacker to full duty was also not a justification for the

restrictions they placed upon him following his return to work.  MPD was aware DeBacker was

particularly susceptible to ██████████ ████████████████████████████

████████████████████████████████████████████

████████

The present case is clearly distinguishable from *Lundy* in that the employer in that case

immediately restored the officers to active duty after they successfully passed psychological testing.

*Lundy v. City of Calumet City*, 567 N.E.2d 1101, 1102 (1991).  In the present case, despite not

having any knowledge of the criminal statute the City ultimately used as the basis of DeBacker's

termination until July 2012, MPD refused to restore DeBacker to full duty for a period of nearly

eleven months after DeBacker passed his fit for duty examination.  In addition, MPD did not follow

its internal policies and procedures set forth in the Employee Fitness for Duty Policy or MPD's

General Order 41 regarding light duty assignments upon DeBacker's return to work.  (Ex M, p 1-4,

Ex N, p 30)

### i.     Discussion of Plaintiff's Confidential Health Information.

From June 16, 2011 until the date of DeBacker's termination, the City repeatedly discussed

DeBacker's ██████████ with personnel within MPD who did not need to know any details of the

situation and with outside sources as well, and the City released information pertaining to

████████████████████████████████████████ .  The City

alleges ███████████████████████████████████ , however such an argument

65

is disingenuous. ████████████████████████████████████████

████████████ (Ex D, p 9, 11) ████████████████████████████

████████████████████████████. (Ex H, p 7-8, 10, 35)

     Hankins affirmatively stated it was unnecessary for anyone other than command staff to

know the reason for ████████████████████████. (Ex D, p 13)  In spite of this, supervisors

were advised by command ██████████████████████████████████

████████████ and the supervisors were requested to float that information down.  (Ex F, p 9, 29)

There were continued references to ██████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████. (Ex F, p 23)  Hankins and Fisk continued to

meet about ████████████████████████████████████████████

████████████████████. (Ex F, p 24)

     Titus advised at least two officers, Glogowski and Clark, that ████████████████████

████████████████████████████ (Ex I, p 3)  Langenderfer was told

by her sergeant that other officers had credible information about DeBacker and she should talk to

those officers because he was limited on what he could discuss with her.  (Ex E, p 6, 11-13)  Thus, a

Sergeant was advising their staff to seek out the information that other officers had regarding

DeBacker's ████████████ and the rumors going around about him and telling her that information

was credible.

     Finally, the rumors that were being spread throughout MPD and that command staff was

well aware of and did very little to counter, which will be set forth in Section ii below, were

wrought with statements about DeBacker's ████████████.

     DeBacker suffered emotional distress as a result of the aggregate of his treatment by MPD

on the date of the incident and upon his return to work until he was terminated, which will be set forth in Section 3(b) below.

### ii.        False and Derogatory Statements about Plaintiff.

Section 6 sets forth the false and libelous written statements Titus made about DeBacker to the ISP, thus the arguments surrounding those statements are incorporated herein.  In addition to those statements, MPD was wrought with rumors about DeBacker that command staff was fully aware were being disseminated, and the rumors contained substantial false and derogatory statements.  The Moline Code of Ordinances § 26-2314(13) states no member of the police department shall make a false statement or gossip about a member of the police department, either concerning personal character or conduct to the detriment of any such member of the police department.  (Ex N, p 7)  In spite of the ordinance, MPD did not charge any of the police officers engaging in such behavior against DeBacker, nor did they charge Titus despite their knowledge of the information he was providing to officers.

DeBacker was the hot topic of conversation, and everyone was talking about him at one point or another.  Officers were being told the following information:  █████████████ ███████ (Ex L, p 2); █████████████████████████████████ (Ex E, p 2); ██████████████████████████████████████ (W 9-10); ████ ███████████████████████████████████████████████████ ████████████████████████████████████████ █████████ (Ex D, p 13); ██████████████████ Ex D, p 36, 66-67, Ex G, p 6); ████████████ ██████████████████ (Ex D, p 36, 66, Ex G, p 6); ███████ ██████████████████████████████████████

(Ex E, p 11-13): ██████████████████████████████████████

████████████████████████████████████████████████. (Ex

E, p 11-13)

All of the aforementioned statements about DeBacker were clearly false, as the Statement of

Material Facts herein and contained in the City's Motion provide the factual scenario of what

occurred prior to and on June 16, 2011.  Further, the statements are of a such a nature as to be

outrageous and not simply mere insults, indignities, threats, annoyances, petty oppressions, or other

trivialities.  *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001)(internal citations and quotations

omitted).

### iii.     Wrongful Release of Confidential Health Information.

The City acknowledges it released an un-redacted version of the █████████████████

████████████████ ("Board") in their Statement of Material Facts to reporter, Dawn Neuses.

(Defendants SF 56)  The City Attorney advised DeBacker that upon receiving the ████████████,

Ms. Neuses said that she didn't even know how to write the article because it was so personal.  (Ex

B, p 36, Ex N, p 23)  A newspaper article was published in the Dispatch about ███████████

██████ as a result of the release by the City.  (Ex K, p 4, Ex N, p 22)

The City argues the ██████████████████████ was released pursuant to an "open

meeting" of the Board under 5 ILCS 120/1 (2014).  The City has not provided any argument or law

indicating the Open Meetings Act required the City to provide a copy of ██████████ to a reporter, and

DeBacker contends the City may have provided the █████ at the meeting however it was not required

to do so.

### iv.     Intentionally Interfering with Plaintiff's Attempts to Reinstate
###         his FOID Card.

Titus' acknowledged that he contacted the ISP with the intent to interfere with the

reinstatement of DeBacker's FOID Card.  (Ex A, p 24)  As set forth in Section 6, the representations Titus made to the ISP in his communications were false and made with the sole intent of fighting the reinstatement of his FOID Card.  Hankins acknowledged that Titus' communications through his work email during work hours could provide the ISP with the impression his contact was authorized by someone within MPD.  (Ex D, p 49)

In addition, Fisk and Hankins had repeated communication with the ISP regarding the status of DeBacker's FOID Card.  Hankins directed Fisk to check the status of DeBacker's FOID Card on more than one occasion.  (Ex F, p 25)  All of the Fisk's inquiries to the ISP were done from his work email and on his work computer.  (Ex F, p 32)  A jury could certainly perceive that the repeated contacts the City had with the ISP may have impacted DeBacker's attempts to have his FOID Card reinstated, especially in conjunction with the contacts Titus' was also making from his work email during work hours.

### v.      Making False Representations to the ISP Regarding the Incidents of June 16, 2011.

As set forth in Section 6, the statements contained in Titus communications with the ISP were false.  In addition, Titus' statement that the denial of DeBacker's FOID Card reinstatement would not impact his employment was also a false statement as set forth below.

### vi.     Making False Representations about Plaintiff's FOID Card Status and the Effect it has on his Employment with MPD.

Titus advised the ISP on several occasions that MPD does not require officers to have a FOID Card for employment so any decision of the panel would not affect DeBacker's employment. (Ex A, p 2, 4)  Titus informed them of this fact because he believed it might impact their decision on reinstatement.  (Ex A, p 21)  Titus' representations in that regard were false.  The fallacy of that argument is set forth in Section 1(e).  Such an argument by the City that MPD does not require a

FOID Card is simply splitting hairs, as the City requires an officer to carry a firearm and does not issue weapons, thus an officer has to have a FOID Card to purchase a firearm.  Further, DeBacker was entitled to relief from the criminal statute by way of reinstatement of his FOID Card.

> **b.** **Plaintiff Suffered Severe Emotional Distress as a Result of the Conduct of the City of Moline.**

Following his return to employment, DeBacker was placed in a demeaning position where he was required to wear blue jeans and a shirt, was not allowed to wear insignia or a badge, and did not even have the basic weapons a correction officer would have.  (Ex B, p 27)  He was isolated in a room, under cameras all the time, and felt like he was sentenced.  (Ex B, p 27)  DeBacker was isolated in his position and didn't see anyone.  (Ex B, p 27)

DeBacker advised Nurse Rudsell ███████ ████████████████████ that he was having employment problems, was frustrated, and had concerns with the way he was being treated in MPD.  (Ex H, p 6)  Nurse Rudsell felt during some of the meetings, ████████████████ ████████████████████ (Ex H, p 8)  Nurse Rudsell was aware of the humiliation DeBacker suffered when the ████████████ was made public.  (Ex H, p 9)

DeBacker was embarrassed when he had to go to the courthouse for his employment and was questioned about whether he was still a police officer and where his gun was.  (Ex C, p 19)  He was ashamed that he was unable to go to the traffic division without being supervised.  (Ex C, p 19)



███████████████████████████████████████████.  (Ex B, p 28)

████████████████████████████████████████████████████

███  (Ex B, p 28)  Every time DeBacker heard a rumor that was generated by the patrolmen, his feelings were hurt and he felt terrible.  (Ex K, p 5)  DeBacker was very proud of his job, and was highly embarrassed he was unable to do his job due to the restrictions.  (Ex K, p 5)

████████████████████████████████████████████



(Ex B, p 27-28)

(Ex B, p 28)

(Ex N, p 51-55)

. (Ex N, p 52)

The situation was life changing for DeBacker.  (Ex B, p 37)  He was no longer able to shoot, and as of the date of the deposition, he still hadn't shot a firearm despite having his FOID Card reinstated.  (Ex B, p 37)  DeBacker could no longer afford jeeping, and financially he is in debt.  (Ex B, p 37)  Everywhere he goes, people act as if they don't see him and turn the other way.  (Ex B, p 37)

As the aforementioned establishes,                                    as a result of the situation he encountered when he returned to his employment.                                    . The situation DeBacker encountered upon his return to work, as set forth in the statement of material facts, were so severe that no reasonable person could be expected to endure it.

**4.      Count IV – The City Violated the Fair Medical Leave Act ("FMLA")**

DeBacker agrees with the case law as articulated by the Defendant, and for purposes of brevity will not rearticulate the same.  DeBacker has clearly shown he was eligible for FMLA protections, his employer was covered by FMLA, he was entitled to take leave under FMLA, and he provided sufficient notice of his intent to take leave.  Thus, DeBacker has satisfied the first four

prongs of an interference claim.

DeBacker was never restored to full duty despite Hankins acknowledging he had a duty to return him to full duty.  (Ex D, p 29)  The City now argues in its Motion that it met its burden under the FMLA when it reinstated Plaintiff as booking officer because that was the only work he could legally perform.  The City forgets, however, that it was completely unaware of the criminal statute that allegedly formed the basis for DeBacker's termination until July 17, 2012.  (Ex D, p 33, 44) From September 2011 until July 2012, the criminal statute did not form any basis for the City's refusal to restore DeBacker to full duty.  (Ex D, p 33)

If DeBacker had never left the workplace, he would have never been placed in the booking officer position, he would never have had the numerous restrictions, and he would have been in uniform and fully armed.  The restrictions imposed upon DeBacker were viewed as demeaning and unreasonable by at least three officers in MPD.  (Ex G, p 8-11, , Ex E, p 4, 9, Ex I, p 5)  In addition,

███████████████████████████████████████████████

███████████████████████████████████  (Ex D, p 34)  DeBacker was ultimately returned to work as a booking officer in an area of the building that was substantially different than his prior work area and where at least three officers believed was unpleasant and would not want to work.  (Ex E, p 5, Ex G, p 9, Ex I, p 5,)

The City's reliance on the criminal statute is misplaced as the numerous communications the City had with the ISP and Titus' communications and representations with the ISP, all set forth in the statement of additional material facts, could have impacted the return of DeBacker's FOID Card.  Further, DeBacker did ultimately obtain reinstatement of his FOID Card, which relieves DeBacker of any liability under the criminal statute and removes any argument that DeBacker could not legally perform his duties as a police officer for MPD.

Finally, DeBacker contends the City fired him rather than restoring him to his former position.  As set forth previously, a jury could reasonably conclude that DeBacker would have had his FOID Card reinstated in a more expedient manner if Titus and personnel of MPD had not been communicating with the ISP with such regularity.  Titus was intentionally contacting the ISP in order to interfere with the reinstatement of DeBacker's FOID Card.  (Ex A, p 24)  Hankins was aware Titus was communicating with the ISP regarding DeBacker's FOID Card status, and acknowledged his communications through his work email could provide the ISP with the impression his contact was authorized by someone within MPD.  (Ex D, p 49)  If DeBacker had received reinstatement of his FOID Card in advance of his termination, the City could not have used the criminal statute as any pretextual basis for his termination.

 Finally, DeBacker would not have been fired if he would not have taken FMLA leave because ███████████████████████████████████████████████████

███████████████████████████████████████████████████

**5.**     **Count V – The City Retaliated Against Plaintiff in Violation of FMLA**

DeBacker made numerous oral requests for reinstatement to full duty following his return to work.  On February 8, 2012, DeBacker began making written requests for reinstatement to his employment.  (Ex D, p 83-84)  On May 18, 2012, DeBacker became more forceful in his requests for reinstatement and advised Fisk of the embarrassment he was experiencing every day when he came to work.  (Ex D, p 85-86)  He further advised Fisk he was being ostracized for the restrictions which were looked upon by his peers ████████████████████.  (Ex D, p 85-86)  Finally, DeBacker filed his union grievance which he followed up with his EEOC complaint which formally demanded reinstatement to full duty and met with the City to discuss a union grievance on June 26, 2012.  (Ex D, p 95)

Hankins testified at the Board hearing that until DeBacker or the Union filed some type of document indicating the ███████ said he should be armed and full duty, he would remain in his light duty capacity.  (Ex D, p 41, Transcript)  Following Hankins' testimony in that regard, DeBacker began taking immediate steps to become reinstated through formal channels.  (Ex D, p 83-84)  DeBacker and his union representative met with Hankins and the City Attorney in an attempt to resolve the union grievance on June 26, 2012.  (Ex D, p  Ex 95)

Following the filing of the union grievance and the EEOC complaint, the City Attorney stated the City was not going to deal with the union grievance requesting reinstatement to full duty until the EEOC complaint was resolved.  (Ex D, p 44)  Both formal avenues pursued by DeBacker requested reinstatement to full duty.  Following the EEOC mediation, the City promptly found a pretextual reason to terminate DeBacker.  The statements of Hankins at the ███████ on January 24, 2012 and the City Attorney at the EEOC mediation in July 2012 provide evidence of discriminatory and retaliatory intent sufficient to overcome summary judgment and present the issue to the jury.

### 6. Count VI – The City Defamed Plaintiff

DeBacker agrees with the standard of law as set forth by the City and for the sake of brevity will not restate the same.

### a. Titus' Statements in Writing Were Not Substantially True or Personal Opinions.

Throughout the ten month period that Titus communicated with the ISP in his attempts to interfere with the reinstatement of DeBacker's FOID Card, Titus made numerous defamatory statements about DeBacker that were false.

The defamatory statements made by Titus are as follows: ███████████

███████████████████████████████

██████" (Ex A, p 44); ████████████████████████████████████

████████████████ (Ex A, p 44); ██████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████ (Ex A, p 45); █████████████████

█████████████████████████████████████████████████

████████████████████ (Ex A, p 43); █████████████████████████████

██████████████████████████████████████████████████ (Ex

A, p 43); ██████████████████████████████████████████

██████████ (Ex A, p 43); and ██████████████████████████████████

█████████████████████████████████████████ (Ex A, p 46).

The aforementioned statements made by Titus were false.  ██████████████████

████████████████████████████████████████████

he was not confined to a room, a memo sent out only advised staff members that ████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████ (Ex A, p 45, Ex B, p 20, Ex D, p 5, 10,

36-37, 38, 49)

The aforementioned statements were false as previously stated.  The statements were clearly

published when they were transmitted to the ISP.  Finally, a jury could reasonably find that

DeBacker was damaged by the statements by virtue of the consistent denials of DeBacker's FOID

Card reinstatement until such time as he was granted an administrative law hearing where he was

able to present his case.

The aforementioned statements by Titus were of such a nature as to impeach DeBacker's

integrity, virtue, human decency, and reputation. *See Newell v. Field Enterprises, Inc.*, 415 N.E.2d 434, 440-441 (Ill. App. 1980). The statements clearly impeach DeBacker's respect for human life by the implication ████████████████████████████████████████

████████████████████████████████

The libelous statements are further of such a nature as to constitute libel per se. The statements impute the commission, or attempted commission, of a criminal offense, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ *See Id.* at 441. The statements also impute the inability of DeBacker to perform or want of integrity in employment by the very nature of the statements. *See Id.* Finally, the statements prejudice DeBacker in his profession as a police officer. *See Id.*

The Defendant argues the statements made by Titus were substantially true as reported to the City on June 16, 2011 and as such, the City is not liable for the statements. The argument set forth by the City presumes Titus made the statements at issue on June 16, 2011 based upon the information he alleges he possessed on that date, and that presumption is false. The statements set forth herein by Titus were not made until October 2, 2011 at the earliest and as late as July 18, 2012. At that point, DeBacker had been returned to work and restored to duty and Titus had been fully briefed ████████████ and what had transpired.

### b. Titus' Written Statements Were Made in the Scope of His Employment

Titus' statements to the ISP were made in the scope of his employment. Titus' command staff, including the Chief, were aware Titus was communicating with the ISP in an attempt to interfere with DeBacker's FOID Card reinstatement and that these communications were being made during work hours. (Ex A, p 14, 17, Ex D, p 49) Titus and Fisk discussed DeBacker's FOID

Card on a regular basis.  (Ex A, p 17)  Titus told Fisk about all of his emails and contact with the ISP.  (Ex A, p 22-23)  Fisk was aware Titus was communicating with the ISP during work hours.  (Ex A, p 22)  Fisk was providing Titus with copies of his communications with the ISP on at least three occasions.  (Ex A, p 14)

The email communications by Titus were sent from his work email address.   (Ex O, p 8, 28, 58, 59)  Hankins acknowledged Titus' communications through his work email could provide the ISP with the impression that his contact was authorized by someone within MPD.  (Ex D, p 49)

Titus wrote letters to the ISP both for personal reasons and as a representative of MPD.  (Ex A, p 38)  Fisk gave Titus permission to contact the FOID Review Division to determine how he could be involved in the process of fighting the reinstatement of DeBacker's FOID Card.  (Ex F, p 26, Ex A, p 37)  Fisk told Titus to contact the division, and Hankins was aware Fisk advised Titus to do so.  (Ex F, p 26)

Further, command staff and the Chief were also contacting the ISP regarding DeBacker's FOID, and the Chief was directing others within MPD to make those contacts.  (Ex F, p 25)  Thus, running FOID Card checks regarding DeBacker was clearly something of the nature that police officers are employed to perform.

The aforementioned establishes that checking the status of an individual's FOID Card is a duty that a police officer is employed to perform, Titus' actions in communicating with the ISP were performed during work hours from his work computer and email address, and Titus was engaging in these communications with the permission and authorization of MPD at the same time that they were also checking on the status of DeBacker's FOID Card.  *See* Restatement (Second) of Agency § 228 (1958).

### 7.      Count VII – Slander

DeBacker agrees that as a result of the dismissal of the slander claim against Titus, which was the sole basis in the Complaint of the slander claim against the City, Count VII should be dismissed.

## CONCLUSION

For all the reasons set forth above, summary judgment is inappropriate and defendant's Motion for Summary Judgment should be denied.

Michael E. DeBacker, Plaintiff

By:  /s/ Jennie L. Clausen
     Jennie L. Clausen, Attorney for Plaintiff
     H.J. Dane Law Office
     IA #AT0001551; IL #6304534
     1111 E. River Drive
     Davenport, IA  52803
     Telephone:  (563) 326-0006
     Facsimile:  (563) 326-6204
     Email: jennieclausen@hjdane.com

By:   /s/ Breanne M. Schadt                .
     Breanne M. Schadt
     H.J. Dane Law Office
     IA #1630317; IL #6287300
     1111 E. River Drive
     Davenport, IA  52803
     Telephone:  (563) 326-0006
     Facsimile:  (563) 326-6204
     Email: breanneschadt@hjdane.com

<u>CERTIFICATE OF TYPE VOLUME LIMITATIONS</u>

Pursuant to Local Rule 7.1(B)(4)(C), I hereby certify that the foregoing Argument section of Plaintiff, Michael E. DeBacker's, Resistance to Defendant, City of Moline's, Motion for Summary Judgment meets the type volume limitations set forth in Local Rule 7.1(B)(4), pursuant to Local Rule 7.1(D)(5) because the Argument section contains 44,983 characters which is less than the 45,000 character limit set forth by the rule.

_____ /s/ Jennie L. Clausen _____
Jennie L. Clausen, Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2014, I electronically filed this Resistance to City of Moline's Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:


Peter R. Jennetten                                          Attorneys for Jay Titus
Christina Cullom
Quinn, Johnston, Henderson, Pretorius, & Cerulo
227 N.E. Jefferson Ave.
Peoria, IL  61602-1211
Telephone: (309) 674-1133
Facsimile:  (309) 674-6503
Email: pjennetten@qjhpc.com

Martha L. Shaff                                             Attorneys for City of Moline
Brandon W. Lobberecht
Betty, Neuman & McMahon, L.L.C.
111 E. Third Street, Suite 600
Davenport, IA  52801-1596
Telephone: (563) 326-4491
Facsimile:  (563) 326-4498
Email: mls@bettylawfirm.com




           /s/ Jennie L. Clausen
Jennie L. Clausen, Attorney for Plaintiff