**E-FILED**
Monday, 17 November, 2014  08:16:14 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION**

| | | |
|---|---|---|
| MICHAEL E. DEBACKER, | ) | |
| | ) | |
| COMPLAINANT, | ) | |
| | ) | |
| AND CONCERNING, | ) | Civil Action No. 4:13-CV-04062 |
| | ) | |
| CITY OF MOLINE, | ) | |
| JAY TITUS, INDIVIDUALLY. | ) | |
| | ) | |
| DEFENDANTS. | ) | |

**PLAINTIFF, MICHAEL E. DEBACKER'S, RESISTANCE TO DEFENDANT
JAY TITUS' MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Plaintiff, Michael E. DeBacker, (hereinafter "DeBacker") by and through

his Attorneys, Jennie L. Clausen and Breanne M. Schadt, of H. J. Dane Law Office, and for his

Resistance to Motion for Summary Judgment states the following.

**TABLE OF CONTENTS**

I.     INTRODUCTION……………………………………………………………….2

II.    RESPONSE TO ALLEGEDLY UNDISPUTED MATERIAL FACTS:

       UNDISPUTED MATERIAL FACTS…………………………………………..2

       DISPUTED MATERIAL FACTS WITH CITATIONS…………………………2

       UNDISPUTED IMMATERIAL FACTS………………………………………..5

       DISPUTED IMMATERIAL FACTS…………………………………………...6

       STATEMENT OF ADDITIONAL MATERIAL FACTS……………………….6

III.   APPLICABLE LAW…………………………………………………………33

IV.    ARGUMENT………………………………………..……………………...33

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)(2) …………48**

**CERTIFICATE OF SERVICE ……………………………………………………..49**

## I.      INTRODUCTION

The Plaintiff, Michael E. DeBacker ("DeBacker"), filed the pending action alleging claims against his former employer, the City of Moline Police Department ("MPD"), and his former supervisor and co-worker, Jay Titus ("Titus") that arose during the scope of his employment. DeBacker.  There are sufficient material facts in dispute regarding all counts of the Complaint sufficient to overcome Titus' Motion for Summary Judgment, and DeBacker respectfully requests the Court deny the Motion for Summary Judgment in its entirety.

## II.      RESPONSE TO ALLEGEDLY UNDISPUTED MATERIAL FACTS

### A.      <u>UNDISPUTED MATERIAL FACTS:</u>

Plaintiff admits the following undisputed material facts asserted by the Defendant Jay Titus: 5, 6, 7, 8, 9, 10, 13, 14, 15, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30, 31, 33, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 53, 54, 55, 57, 58, 59, 61, 62, 63, 66, 68, 69, 70, 73, 74, 75, 76, 77, 78, 81, 83, 84, 85, 86, 88, 90, 91, 92, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 109, 110, 112.

### B.      <u>DISPUTED MATERIAL FACTS WITH CITATIONS</u>

16.      DeBacker had some ████████████ prior to 2011, but not enough to consider as the job in general is stress.  (Exh. A, Pg. 3)  DeBacker's ████████████ dated back to February 2011 when the ████████████████ was made against him.  (Exh. A, Pg. 8)

31.      In late May, DeBacker's ████████████ changed to ████████████████



████████████████.  (Exh. A, Pg. 9)

2

34.     DeBacker did not tell Julie he was going to make the ██████████████, rather he said that it would be messy.  (Exh. A, Pg. 30)

52.     Julie did not know DeBacker had paid off the credit cards until she returned to her home on June 16, 2011 to meet the captains, which was after her telephone call to Schumacher.  (Exh. D, Pg. 10)  Julie never advised Schumacher that DeBacker had been ████████████████████ ██████████████████████████████ as she only advised him what DeBacker had told her the evening before which did not include that statement.  (Exh. D, Pg. 5, 9)

60.     Mincks asked DeBacker if he had been having some ██████████, to which DeBacker nodded yes.  (Exh. A, Pg. 18)

64.     DeBacker ████████████████████████ based upon directives by Mincks and Fisk that if he did not ████████████████, the Department would seek an ████████████ ████████  (Exh. A, Pg. 21, Exh. F, Pg. 8)  DeBacker believed the Department could follow through with that ██████████████████████████████ (Exh. A, Pg. 21)

65.     Julie later discovered that her belief that all the credit cards had been paid off was false and instead the balances had been transferred.  (Exh. D, Pg. 15)

67.     Julie advised Patrick that IF it was DeBacker's decision to ██████████████, he would probably do it to clarify her response that it was an 8/10 on a scale of 1 to 10 as to how likely DeBacker was to do it.  (Exh. D, Pg. 11)

71.     Hankins, Patrick, and Fisk attended the roll calls as a result of receiving an email from Pickens that rumors were being spread that DeBacker was going to ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████.  The rumors included that the ████████████████████ ██████████████████████.  (Exh. F, Pg. 36, Exh. L, Pg. 5)  Patrick could not recall the

verbatim of what the officers were told and recalled that they were very generic in trying to explain what had happened.  (Exh. I, Pg. 2)

72.     Officers were directed by command staff to conduct area checks of Titus' and Mangeldorf's residences.  (Exh. L, Pgs. 2-3, Exh. J, Pgs. 2-3)

79.     A representative from the City of Moline released the un-redacted copy of the ████ from the administrative hearing.  (Exh T, Pg. 1)

80.     DeBacker's FOID card was revoked on June 24, 2011.  (Exh. N, Pg. 43)

82.     On June 8, 2012, after DeBacker filed his EEOC complaint, Hankins indicated he would send the Illinois State Police a letter indicating the change in his employment status once DeBacker was returned to uniform duty with a firearm.  (Exh. F, Pg. 37)  Hankins indicated his willingness to do so in an email advising DeBacker he wanted to meet to discuss resolving his EEOC complaint.  (Exh. F, Pg. 37)

87.     The Illinois State Police were advising Titus of the type of document he could send to be involved in the process of DeBacker's request for reinstatement of his FOID, thus the Illinois State Police was not requesting his statement unsolicited.  (Defendant's SJ Exh. 18, 19)

89.     The Department requires a police officer to carry a firearm and an Illinois resident is required to have a FOID card to acquire or possess a firearm.  (Exh. A, Pg. 21-22, 26)  The Department does not provide police officers with service weapons, thus the officer has to have their own personal weapon to utilize as a duty gun.  (Exh. A, Pg. 9)

93.     Hankins met with Fisk, Patrick, and Titus to advise Titus that they were giving DeBacker his weapon back.  (Exh. M, Pg. 20)  Hankins advised Titus that the union was forcing his hand so he had no choice.  (Exh. M, Pg. 20)  Titus inquired as to whether DeBacker could carry his weapon off duty as well, and asked Hankins to check on that issue.  (Exh. M, Pg. 21)  Fisk

contacted the FOID Review Division to ensure that DeBacker was exempt from FOID as a police officer.  (Exh. H, Pg. 11)

108.    DeBacker and Julie discussed different aspects of the incident with different people, including friends, family members, and co-workers.  (Defendant's SJ Exh. B, pg. 2)  Many of the discussions with other people surrounded the manner in which DeBacker was treated upon his return to work and the rumors that were being spread about him.  (Defendant's SJ Exh. B, pgs. 3-5) DeBacker provided information in order to dispute the rumors that were being spread about him within the Department.  (Defendant's SJ Exh. B, pgs. 3-5)

111.    Titus had a meeting with Glogowski and Liz Clark ("Clark") on June 16, 2011 and told them that DeBacker ███████████████████████.  (Exh. B, Pg. 4)  Titus made this statement despite having never been told that there were any ████████████████.  (Exh. H, Pg. 5)  Titus advised Glogowski and Clark that DeBacker had come into work, been removed from the building and ██████████████, and he wanted them to know.  (Exh. B, Pg. 4)

### C.    UNDISPUTED IMMATERIAL FACTS

1.    DeBacker's family status is immaterial to any issued contained in Defendant's Motion for Summary Judgment.

2.    DeBacker's prior employment is immaterial to any issue contained in Defendant's Motion for Summary Judgment.

3.    DeBacker's educational background is immaterial to any issue contained in Defendant's Motion for Summary Judgment.

4.    DeBacker's prior employment is immaterial to any issue contained in Defendant's Motion for Summary Judgment.

11.    DeBacker's hobby of competitive shooting is immaterial to any issue contained in

Defendant's Motion for Summary Judgment.

12.    DeBacker's treatment of his guns is immaterial to any issue contained in

Defendant's Motion for Summary Judgment.

17.    DeBacker's feelings about children are immaterial to any issue contained in

Defendant's Motion for Summary Judgment.

29.    DeBacker's discussions with other individuals regarding the changes to the

department are immaterial to any issue contained in Defendant's Motion for Summary Judgment.

35.    The circumstances of what DeBacker and Glogowski did on June 15, 2011 are

immaterial to any issue contained in Defendant's Motion for Summary Judgment

56.    Julie's actions when she arrived at her employment on the day of June 16, 2011 are

immaterial to any issues contained in Defendant's Motion for Summary Judgment.

### D.    DISPUTED IMMATERIAL FACTS

None.

### E.    ADDITIONAL MATERIAL FACTS

**A.    Background**

1.    Kim Hankins is the Chief of Police for the Moline Police Department.  (Exh. F, Pg.

2)  He oversees the department and is the final say in general day to day decision making.  (Exh. F,

Pg. 2)  Hankins was making the decisions on June 16, 2011 regarding the incident with DeBacker.

(Exh. F, Pg. 5)

**B.    Pre-June 16, 2011**

2.    DeBacker immediately apologized to Officer Michelle Mangelsdorf

("Mangelsdorf") when he realized she was offended by the statement he made to her, and told her

that it would not happen again.  (Exh. A, Pg. 4, Exh. K, Pg. 3)

6

3.      Mangelsdorf felt she had a cordial professional working relationship with DeBacker. (Exh. K, Pg. 2)  She did not feel like she was being sexually harassed by DeBacker and said she was made to file a complaint against him.  (Exh. K, Pg. 2-3)  She felt like their working relationship thereafter was awkward because of the silent treatment DeBacker was giving her, which was the result of the directive DeBacker was given that he could not discuss the situation with his supervisors or Mangelsdorf.  (Exh. K, Pg. 3, Exh. C, Pg. 2)

4.      By June 16, 2011, Mangelsdorf was feeling comfortable with DeBacker and her working relationship with him was less awkward.  (Exh. K, Pg. 4)

5.      Jerry Glogowski ("Glogowski") worked in the same office as DeBacker and Mangelsdorf.  (Exh. B, Pg. 3)  Glogowski never observed DeBacker engage in any sexually harassing behavior and believed DeBacker was respectful of Mangelsdorf.  (Exh. B, Pg. 3)

6.      At the time Titus took over as lieutenant in his chain of command, DeBacker got along with him great.  (Exh. A, Pg. 5)

7.      On April 11, 2011, DeBacker received a good annual performance review indicating his work performance was acceptable.  (Exh. F, Pg. 31, 44)

8.      The meeting Titus had with DeBacker, Mangelsdorf, and Mincks was not a meeting to discuss the changes, as Titus said he was not going to move or back down on the changes he was implementing.  (Exh. A, Pg. 6-7)

9.      Fisk acknowledged the Department realizes they have a problem with Titus during the first two months after he takes over a new unit as everybody hates him, and that they need to work with Titus on counseling him on how to handle meetings with his unit.  (Exh. D, Pg. 3)

10.     After the changes Titus made were implemented, DeBacker became buried in work. He was unable to get anything finished and could not do his office duties and follow-ups as a result

of having to be on the streets.  (Exh. A, Pg. 6)

11.     DeBacker ███████████████████████████████ as a result of the continuous increases in workload.  (Exh. A, Pg. 3)  He was considered the go to guy for people to ask questions, additional duties has been added, and felonies increased from 0-1 the first year to approximately 39 in 2010;  DeBacker filed most of them.  (Exh. A, Pg. 3)

12.     DeBacker ███████████████████████████ (Exh. D, Pg. 4)

13.     DeBacker advised Mincks that he was experiencing difficulties keeping up and did not have time to work on his hit and runs.  (Exh. A, Pg. 6-7)  Since DeBacker did most of the felony upgrades, which were time consuming, he experienced more difficulty than Mangelsdorf did with the changes.  (Exh. A, Pg. 7)  Mincks told DeBacker that they just had to get the work done.  (Exh. A, Pg. 25)

14.     On June 1, 2011, DeBacker's turn came to implement Titus' new responsibilities and go out on the street.  (Exh. A, Pg. 10)  DeBacker still had to do his office responsibilities and finish up on felony upgrades and other duties, but also had to be out on the street making traffic stops, following up on hit and runs, going to crashes, and towing cars.  (Exh. A, Pg. 10)

15.     Prior to Titus' changes, DeBacker did not go out on the street; he only would respond to something if he was out and close to something or he was going to court.  (Exh. A, Pg. 10)

16.     On May 25, 2011, ██████████████████████████████████ ████████████████████ (Exh. A, Pg. 8)

17.     ███████████████████████████████. (Exh. A, Pg. 8) ███████████████████████████████████. (Exh. D, Pg. 4) ███████████ ████████████████████████████████████████████████

██████████████████████. (Exh. D, Pg. 4) ████████████████████

████████████████████████████████████████████████ (Exh. D,

Pg. 4)

     18.    ██████████████████████████████████████

████████████████████████ (Exh. A, Pg. 8)

     19.    ██████████████████████████████████████

███ (Exh. A, Pg. 8)

     20.    In late May 2011, ██████████████████████████

████████████████, and ██████████████████████████████████

████████████████████. (Exh. A, Pg. 9)

     21.    ████████████████████████████. (Exh. A, Pg. 11) █

██████████████████████████████████ (Exh. A, Pg. 11) ███████

████████████████████ (Exh. A, Pg. 11)

     22.    ████████████████████████████

████████████████████████████████████ (Exh. A,

Pg. 11, 13) ██████████████████████████████████

█████████ (Exh. A, Pg. 11)

     23.    In June 2011, Titus started putting more pressure on DeBacker.  (Exh. A, Pg. 12)

He would come up to the office frequently and was upset.  (Exh. A, Pg. 12)  Jon Schumacher

advised Debacker at that time that Titus had a target on DeBacker's back.  (Exh. A, Pg. 12)  Titus

wasn't putting pressure on Mangelsdorf in the same way he was on DeBacker.  (Exh. A, Pg. 12)

     24.    On June 10, 2011, ████████████████████████████

████████████ (Exh. A, Pg. 12) ████████████████████████████

9

██████████████████████████ (Exh. A, Pg. 12) ████████████████████████████

██████████████████████████████ (Exh. A, Pg. 12-13)

25.     On June 15, 2011, Titus scheduled a meeting with Mincks, DeBacker and

Mangelsdorf.  (Exh. A, Pg. 14)  Titus told them he was tired of hearing things outside the

department, and half of the police department did not think they did anything.  (Exh. A, Pg. 14)

Mangelsdorf attempted to ask Titus where he'd heard this, and he cut her off and said it was not a

discussion.  (Exh. A, Pg. 14)  The tone of the meeting was very unpleasant.  (Exh. A, Pg. 15)

26.     That same day, ███████████████████████████████████████

████ (Exh. A, Pg. 11) █████████████████████████████████████████████████

█████████████████ (Exh. A, Pg. 11) ███████████████████████████████████

█████████████████████████████████████████████████████ (Exh. A,

Pg. 11)

27.     DeBacker discussed the ████████████████████████████████ on

June 15, 2011, and Glogowski told him he had ████████████████████████████

(Exh. B, Pg. 3)  DeBacker told him that evening ███████████████████████████

████████████████████████████████ (Exh. B, Pg. 4)

28.     DeBacker told Julie █████████████████████ (Exh. A, Pg. 16)

29.     ████████████████████████████████████ (Exh. A, Pg. 16)

███████████████████████████████████████████████. (Exh. D, Pg.

5)

30.     DeBacker discussed with Julie how he █████████████████████████

████████████ (Exh. D, Pg. 6) ████████████████████████████████████

██████████████████████ (Exh. D, Pg. 6)

31.     Debacker told Julie that he liked Titus ████████████████████████

█████████████████████████████ (Exh. D, Pg. 7)

32.     Julie gave the discussion a lot of thought after DeBacker went to sleep, ████████

████████████████████████████████████████████████████████████

(Exh. D, Pg. 6)

33.     Julie did not believe it ██████████████████████████████████████

█████████████████████████████████ (Exh. D, Pgs. 6-7)

**C.      June 16, 2011**

34.     Julie wanted DeBacker to stay home that morning, however DeBacker was

concerned about taking time off from work due to a prior email he'd received from Titus about

taking off a few hours a couple of weeks earlier.  (Exh. A, Pg. 16)

35.     Julie started crying during the telephone call to Mincks because ████████████

████████████████████████████████████████████████████████

███████████████████████████████████ (Exh. D, Pgs. 8)

36.     When DeBacker arrived at work, ████████████████████████████████

█████████████████████████ (Exh. A, Pg. 17) ████████████████████████

██████████████████████ (Exh. A, Pg. 17) He answered ██████████████████████

████████████ (Exh. D, Pgs. 9)  At that point, Julie wasn't interested in what he was saying ███████

██████████████████████████████████ (Exh. D, Pgs. 9)   Julie did not tell

DeBacker she had called anyone about the conversation they'd had the prior evening.  (Exh. D, Pg.

9)

37.     Mincks pulled DeBacker to the side and it was apparent to DeBacker that Julie had

called someone.  (Exh. A, Pg. 17)

38.     DeBacker went up to the traffic office with Mincks, which was a large open room with Mincks' office in the corner.  (Exh. A, Pg. 18)  Mincks told DeBacker he had talked to Schumacher and Julie, and ███████████████████████████████ (Exh. A, Pg. 18) DeBacker nodded affirmatively ██████████████████████.  (Exh. A, Pg. 18)

39.     Hankins, Captain Jerome Patrick ("Patrick"), Fisk, Mincks, and Titus had a meeting that morning regarding DeBacker.  (Exh. F, Pg. 4, Exh. H, Pg. 4)  Hankins was aware DeBacker was calm and quiet, and there were never any reports to him that DeBacker was irrational or combative.  (Exh. F, Pg. 4)

40.     Hankins told Titus Julie said that ███████████████████████████████ ██████████████████  (Exh. F, Pg. 4)

41.     ████████████████████████████████████████████████ ████████████████████  (Exh. A, Pg. 19)

42.     DeBacker was subdued, upset, and very quiet on the date of the incident.  (Exh. H, Pg. 6)  He was teary eyed.  (Exh. H, Pg. 7)  Fisk was not surprised that DeBacker was upset ██████ ██████████████████████████████████████████████████████.  (Exh. H, Pg. 7)  Fisk would have been upset under the circumstances also.  (Exh. H, Pg. 7)

43.     DeBacker was cooperative, and was not acting combative or irrational.  (Exh. H, Pg. 7)

44.     Fisk, Patrick, and Schumacher met Julie at her house.  (Exh. H, Pg. 2)  Patrick advised Julie that he was doing an investigation, and that there would be no discipline or charges filed.  (Exh. D, Pg. 10-11)

45.     Julie reported to them that ████████████████████████████ ███████████████████████████████████████████████████████

� (Exh. D, Pgs. 5-6, 11) ████████████████

████████████████████████████████████████ (Exh. D,

Pgs. 11)

46.   ████████████████████████████████

████████████████████████████████████████

(Exh. D, Pg. 11)  Patrick called someone on the telephone and gave them that information.  (Exh. D,

Pg. 11)

47.   ██████████████████████████████

████████████████████ (Exh. D, Pg. 12)  Fisk told Julie ████████

████████████████████████████ (Exh. D, Pg. 13)

48.   ████████████████████████████████

██████████████████████████████████████

██████████████████ (Exh. D, Pg. 19)

49.   ██████████████████████████ Hankins and Fisk had a meeting

with Titus.  (Exh. H, Pg. 10)  Titus was advised regarding what was going on with DeBacker ███

████████████████ (Exh. H, Pg. 10)

50.   Later that day, Titus was advised that ████████████████

██████████████████████████████████

████████████████ (Exh. M, Pg. 2)

51.   Hankins told Titus that DeBacker would never return to the Department.  (Exh. F,

Pg. 13, Exh. M, Pg. 15) ████████████████████████

████████████████ (Exh. F, Pg. 13) ████████████████

████████████████ (Exh. F, Pg. 13)

52.     It was unnecessary for anyone other than command staff to ████████████████

████████████████     (Exh. F, Pg. 11)

53.     Titus had a meeting with Glogowski and Liz Clark ("Clark") and told them that

████████████████████████████████████     (Exh. B, Pg. 4)

████████████████████████████████████     (Exh. H, Pg. 5)

54.     Glogowski was astonished and advised Titus that he did not believe it because he

was with DeBacker the night before.  (Exh. B, Pg. 4-5)

55.     ████████████████████████████████

████████████████████████████████     (Exh. B, Pg.

4)

56.     On the date of the incident, the Department was never advised, nor did they ever

think, that ████████████████████.  (Exh. F, Pg. 3) ████████████████████

████████████████     (Exh. F, Pg. 7)

57.     Several officers, including Glogowski, Wilson, and Chris Pickens ("Pickens") were

not surprised that DeBacker  had guns in his vehicle that day.  (Exh. B, Pg. 6, Exh. H, Pg. 5, Exh. G,

Pg. 2, Exh. L, Pgs. 4)  It is not uncommon for police officers to have firearms in their vehicles, and

Glogowski (when he was a police officer), Wilson and Pickens all carry weapons with them.  (Exh.

B, Pg. 15, Exh. G, Pg. 2, Exh. L, Pgs. 4)  Pickens would have been surprised if DeBacker did not

have any firearms with him the morning of the incident.  (Exh. L, Pgs. 3)

58.     On June 16, 2011, DeBacker ████████████████████.  (Exh. E, Pg.

231) ████████████████████████████.  (Exh. E,

Pg. 2)

D.     ████████████████

14

59. ███████████████████████████████████████████. (Exh. F, Pg. 18)

DeBacker was quiet at the time.  (Exh. F, Pg. 6) ████████████████████████

████████████████████ (Exh. F, Pg. 6, Exh. H, Pg. 8-9)

60. ████████████████████████████████████████

████████████████. (Exh. F, Pg. 6, Exh. H, Pg. 9)

61. ████████████████████████████████████████

████████████████. (Exh. F, Pg. 6)

62. ████████████████████████████████████████

██████████████████████████. (Exh. F, Pg. 8) ████████████

████████████████████(Exh. A, Pg. 20)

63. ██████████████████████████████████

███████████ (Exh. A, Pg. 21) ███████████████████████

██████████████████████████████████████

███████████████ (Exh. F, Pg. 8)

64. ████████████████████████████████████████

(Exh. A, Pg. 22-23)

65. ████████████████████████████████████████

████████████████ (Exh. A, Pg. 22)

66. ████████████████████████████████████████

██████████. (Exh. F, Pg. 10, Exh. D, Pg. 16) ██████████████

██████████████████████████████████████

██████████████████████ (Exh. F, Pg. 10, Exh. H, Pg.

18) ███████████████████████████

▬▬▬▬▬▬▬▬▬▬ (Exh. A, Pg. 22)

67.   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬ (Exh. N, Pg. 42)

68.   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬ (Exh. N, Pg. 41)

69.   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

(Exh. D, Pg. 17)  Fisk said that he did not believe he could get Titus to agree to that.  (Exh. D, Pg. 17)

70.   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬ (Exh. D, Pg. 17) ▬▬▬▬▬▬▬▬▬)

▬▬▬▬▬▬▬▬▬▬ (Exh. D, Pg. 17)

71.   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬ (Exh. N, Pg. 16Exh. N, Pg. 14) ▬▬▬▬▬▬▬▬

▬▬▬▬▬ (Exh. N, Pg. 14)  Dr.▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬ (Exh. N, Pg. 14)

72.   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬ (Exh. F, Pg. 21)

**E.     June 17, 2011 until DeBacker's Return to Work**

73.   ▬▬▬▬▬▬▬▬▬▬▬.  (Exh. A, Pg. 13)▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬ (Exh. A, Pg. 13)

74.   ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

███████████████ (Exh. A, Pg. 13) ████████████████████████████

██████████████████████████. (Exh. A, Pg. 13)

75.     ██████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ (Exh. N, Pg. 31)

76.     ███████████████████████████████████████████.

(Exh. N, Pg. 16) ███████████████████████████████████

██████████████████████████████████████████████████

██████ (Exh. N, Pg. 16)  Dr. ███████████████████████████

████████████████████████ (Exh. N, Pg. 16)

77.     On July 5, 2011, Hankins authorized Patrick and Fisk to advise Titus████████████

███████████████████████ ██████████████████████████████, and his

pay would be deducted from his accrued accounts and he ██████████████████████

██████ (Exh. H, Pg. 20)

78.     Titus had access to all of the confidential police reports regarding the incident with DeBacker and what occurred thereafter as he Patrick, Fisk, Mincks, and Hitchcock were directed to provide their reports to Titus so he could lock them down.  (Exh. H, Pg. 21)

79.     ███████████████████████████████████████. (Exh. N, Pg. 19)

80.     ███████████████████████████████████████

████████████████ (Z1, Z2)

81.     Hankins never directed any area checks to be performed of Titus' house and had no knowledge that area checks were ever done of Titus' house.  (Hankins 76)  Hankins did not believe there was a need for area checks of Titus' home.  (Exh. F, Pg. 12)

### F.      Rumors Regarding DeBacker

82.      The Moline Code of Ordinances Section 26-2314(13) states that no member of the police department shall make a false statement or gossip about a member of the police department, either concerning personal character or conduct to the detriment of any such member of the police department.  (Exh. N, Pg. 19)

83.      Later, prior to DeBacker's return to work, Hankins became aware of additional rumors and that both rumors mentioned ██████████████████████████████

████████  (Exh. F, Pg. 36)  Hankins was advised that the rumors were discussed amongst CID personnel who acted like it was common knowledge.  (Exh. U)  The rumors were spread throughout the entire Department at that point.  (Exh. O, Pgs. 3-9Exh. L, Pgs. 6)

84.      Langensderfer was told ██████████████████████████████

████████████████████████████████████████████████████

██████████████  (Exh. J, Pg. 6)

85.      Julie reported that Titus was telling everyone ████████████████████████ Hankins believed the source was an internal one that was told the information.  (Exh. F, Pg. 16, 32) Hankins told Fisk to talk to Titus about not discussing the issue.  (Exh. F, Pg. 15-16)

86.      Upon receiving Julie's report from Pickens, Fisk advised Pickens to treat her telephone call as confidential because he didn't want to "upset Jay anymore than he already is." (Exh. H, Pg. 17)

### G.      Fit for Duty Examination

87.      On July 21, 2011, ██████████████████████████████████ (Exh. F, Pg. 33)   DeBacker was not returned to work because other people were concerned about him returning to work so the city had to deal with it internally before restoring him to his former

duties.  (Exh. F, Pg. 17)

88.    Hankins advised Titus ████████████████████████████████

████████████████████ (Exh. F, PG. 34)

89.    ███████████████████████████████████

████████████████████████████████████████ (Exh. R, Pg.

7) ████████████████████████████████████

████████████████████████████ (Exh. R, pg. 6) ██████████████████

████████████████████████████████████████

████████████████████████████ (Exh. R, pg. 6) ████████████████

████████████████████████████████████████

██████████ (Exh. R, pg. 6)

90.    ████████████████████████████████████

████████████ (Exh. R, pg. 7-8)

91.    ████████████████████████████████████████

████████████████████████████ (Exh. R, pg. 7)

Hankins did not implement that recommendation because Titus chose not to participate.  (H. 168)

Hankins could have ordered Titus to attend the meeting, but did not feel it was the right thing to do

because Titus was not open to discussing anything with DeBacker.  (Exh. F, Pg. 19)

92.    ████████████████████████████ DeBacker return to work in a ████████

██████████ for a month prior to a return to his full duties.  ████████████ he could be armed during

that period of time.  (Exh. R, Pg. 7)  Hankins restored DeBacker in a light duty capacity, however

did not allow him to be armed.  (Exh. F, Pg. 19)  The decision not to allow him to be armed was

based on the rest of the department and it was decided it was in the best interests of the department

19

that he return to light duty but not be armed.  (Exh. F, Pg. 19)

**H.    DeBacker's Return to Work & Terms and Conditions of Employment**

93.    Hankins returned DeBacker to work in a light duty capacity.  (Exh. F, Pg. 20)

94.    The restriction that DeBacker could not be in any areas where guns were located was not related to any concern about DeBacker, but rather were due to balancing other people's concerns with him being around firearms.  (Exh. F, Pg. 25)

95.    DeBacker was asked to limit contact with Titus upon his return to work.  (Exh. H, Pg. 13)  Titus would complain when DeBacker was in the general area that he was in, and command would discuss Titus' concerns with DeBacker and advised him to avoid Titus as best as possible. (Exh. O, Pgs. 3-9)  DeBacker was so concerned about Titus' even seeing him at work that he felt the need to report those occasions when Titus might have seen him during his normal workday.  (Exh. O, Pgs. 3-9)

96.    As situations came up, DeBacker was further asked to limit his movements and if certain people were in the area, to avoid contact with them.  (Exh. H, Pg. 13)

97.    Following DeBacker's return to work, Titus was struggling and did not want to be there.  (Exh. H, Pg. 22)  Titus was seeing other officers become complacent about DeBacker being back at the Department and he viewed that as a betrayal towards him.  (Exh. H, Pg. 22)

98.    Titus advised Langenderfer that she was to refrain from spending time in booking and the keys to the squad car that she shared with DeBacker would be in another location.  (Exh. J, Pg. 4)  Langenderfer believed the request was unreasonable, and part of the reason for the email with that request was to target her because she was talking to DeBacker.  (Exh. J, Pg. 5) Langenderfer did not believe Titus would have had an issue if she had been talking to another officer.  (Exh. J, Pg. 5)

99.     Titus requested that DeBacker be banned from Officer Powell's office because he was there quite often.  (Exh. M, Pg. 12)  DeBacker was thereafter prohibited from going into Powell's office.  (Exh. M, Pg. 12)

100.     On November 15, 2011, Titus was having discussions with other officers regarding topics that supervisory personnel would like to discuss and the same included a discussion of DeBacker.  (Exh. M, Pg. 17)  The outline of issues referenced the "Officer DeBacker" issue, ███████████████████████████████████████ and the creation of a new position that offers little or no benefit to the PD when other positions are being eliminated.  (Exh. M, Pg. 18)

101.     Fisk wrote a report that DeBacker was spending more time outside the booking area and visiting with officers in other areas of the department.  (Exh. O, Pgs. 1-2)  Titus indicated he did not like DeBacker's freedom of movement, and Fisk requested that the issue be addressed with DeBacker pertaining to a reduction in the amount of time he spent outside his assigned area.  (Exh. O, Pgs. 1-2)

102.     Titus notified two individuals within the department that DeBacker was restricted to the booking area and was not allowed to carry a firearm, despite the fact that Hankins had not authorized the information to be provided to those individuals.  (Exh. F, Pgs. 23, 35)  DeBacker was not restricted to the booking area and the information Titus was providing other individuals within the department was false in that regard.  (Exh. F, Pg. 24)

103.     Titus told Lambach and Police Information Technician Judy Jackson ("Jackson") to report any odd behavior by DeBacker.  (Exh. M, Pg. 16)

104.     Titus somehow received an email from Fisk regarding DeBacker and complaints made about him, which appeared as though he was blind copied, and he later forwarded the email to

his personal email account.  (Exh. M, Pg. 17-18, 36)  Titus forwarded other complaints about

DeBacker and his work performance to his personal email address as well.  (Exh. P, Pg. 54)

105.     Hankins said DeBacker was not being fully reinstated because they were dealing

with people in the department that did not feel safe with DeBacker having a gun.  (Exh. F, Pg. 19)

106.     Fisk was meeting with Titus every day to talk to him about the ███████████

███████████████████  (Exh. H, Pg. 25)  Titus was very unhappy with the City of Moline

Administration due to his perception of how the incident was handled after DeBacker was

determined to be fit for duty.  (Exh. H, Pg. 25)  Titus strongly believed that DeBacker should not

have been allowed to return to work.  (Exh. H, Pg. 25)  Fisk believed that if the ██████████

███████████ Titus would be devastated.  (Exh. H, Pg. 25)

107.     ██████████████████████, Titus told Fisk that it was hard to see

DeBacker getting more freedoms while he was allegedly being ostracized from meetings which

involves issues in his division.  (Exh. H, Pg. 26)

108.     Fisk advised Titus that his anger over the hearing regarding DeBacker had taken

over every aspect of his life in an email exchange with him.  (Exh. H, Pg. 26)  The day after the

email exchange, Fisk advised Chaplain Miller that Titus needed to talk to someone professional,

however he was not very receptive to doing so.  (Exh. H, Pg. 27)

109.     Fisk advised Hankins that it was a full time job trying to keep Titus' head up after

the DeBacker incident.  (Exh. H, Pg. 28-29)  Fisk indicated he was meeting with Titus every day

trying to chisel away his hard feelings.  (Exh. H, Pg. 28-29)

110.     ████████████████████████████████████

█████████████████.  (Exh. S, Pg. 1-10)

111.     Following his return to work, DeBacker would frequently find his radio walkie

talkie had been moved and the battery wasn't getting charged.  (Exh. B, Pg. 11)  Glogowski

believed that someone in the department was messing with DeBacker by doing that, as no other

officers experienced that problem.  (Exh. B, Pg. 11)

112.    At one point, the temperature in the booking office increased to approximately 80

degrees and was incredibly humid.  (Exh. A, Pg. 24, Exh. N, Pg. 39)  The booking office was the

only area that had become warm and Titus had control over the heating and cooling of the building.

(Exh. A, Pg. 24, 27)  DeBacker reported it to Patrick, however the issue was not remedied and the

temperature did not change.  (Exh. A, Pg. 24)

113.    DeBacker had numerous difficulties in obtaining a squad car for work related

transportation, which he reported to Patrick.  (Exh. N, Pg. 48)  The key to the car he was directed to

drive would not be where it was supposed to be, was placed in Titus' box on several occasions, and

was unavailable for his use.  (Exh. N, Pg. 48)  DeBacker was unable to do his job as a result of the

necessity of tracking down a vehicle each time he needed transportation.  (Exh. N, Pg. 48)

114.    Titus communicated with Doug Burke, a retired Moline Police Department officer,

regarding the incident.  (Exh. M, Pg. 6)  Titus knows that he cannot tell other individuals about

employee reprimands, sick leave, health information, and suspensions; however, Titus felt it was

acceptable to tell Burke ████████████████████████████████████████

████████████████████ (Exh. M, Pg. 7)

115.    Titus forwarded emails concerning DeBacker to his personal email account.  (Exh.

M, Pg. 8)

116.    The booking area is recorded, and Titus, Fisk, and IT were the only individuals that

had access to the recordings.  (Exh. F, Pg. 27)  Titus watched DeBacker on video while he was in

booking, as the videos are available to him in his office.  (Exh. M, Pg. 22-23)

117. ████████████████████████████

██████████████████████████████████

███████████████████ (Exh. N, Pg. 38)

118. On July 13, 2012, Titus asked Fisk if anything was going on with DeBacker and that he had been told there were several union attorneys there while he was on vacation. (Exh. H, Pg. 32) Fisk advised Hankins that he wanted to meet with Titus soon because he was hearing rumors and was concerned about DeBacker's status. (Exh. H, Pg. 32)

**I.      DeBacker's FOID Card**

119. A FOID card is a mechanism for the state police to know who has the ability to possess and purchase firearms. (Exh. F, Pg. 21)

120. DeBacker's FOID card was revoked on June 24, 2011 as a result of his inpatient stay at a mental health facility. (Exh. N, Pg. 43)

121. The Department does not do checks on the status of a FOID card or whether it has been revoked. (Exh. M, Pg. 24)

122. Following the revocation of DeBacker's FOID card, DeBacker immediately began the process of attempting to get it reinstated. (Exh. A, Pg. 28) He filled out the paperwork, and was then advised that the law had changed and he would need to submit additional information. (Exh. A, Pg. 28) On March 13, 2012, DeBacker submitted additional information as requested by the Illinois State Police. (Exh. N, Pg. 44)

123. ██████████████████████████████

██████████████████████████████████

█████████████(Exh. N, Pg. 18)

124. On June 15, 2012, DeBacker received a letter denying his request for reinstatement

of his FOID card.  (Exh. A, Pg. 29, Exh. N, Pg. 45)

125.    DeBacker thereafter sent a letter to the Illinois State Police requesting

reconsideration of the denial for reinstatement of his FOID card.  (Exh. N, Pg. 46)  He sent a follow-

up correspondence on June 10, 2013 formally requesting an administrative hearing on the issue.

(Exh. N, Pg. 47)

126.    Titus asked Fisk to check DeBacker's FOID status, and Fisk agreed to do so.  (Exh.

H, Pg. 12)

127.    Titus and Fisk discussed DeBacker's FOID on a regular basis.  (Exh. M, Pg. 5)

Titus told Fisk about all of his emails and contact with ISP regarding DeBacker's FOID card.  (Exh.

M, Pg. 10)  Fisk was aware Titus was making those contacts during work hours.  (Exh. M, Pg. 10)

Fisk provided Titus with copies of the emails he received from the Illinois State Police regarding the

status of DeBacker's FOID card on at least 3 occasions.  (Exh. P, Pgs. 49, 51)

128.    Hankins did not believe it was appropriate for Fisk to provide Titus with emails

regarding contact he had with the Illinois State Police pertaining to DeBacker's FOID status.  (Exh.

F, Pg. 31)

129.    Titus engaged in regular and consistent communications with the Illinois State

Police regarding DeBacker's FOID card status.  (Exh. P, Pgs. 5-48)  The contact was through Titus'

work email and occurred during his work hours.  (Exh. P, Pgs. 5-48)

130.    On October 13, 2011, Titus sent an email to the Illinois State Police ███████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████ (Exh. P, Pgs. 5)

131.    Hankins stated that Titus' statement to the Illinois State Police ██████████

███████

████████████████████████████████████████████████████████ (Exh.

F, Pg. 30)

132.    On November 2, 2011, Titus sent two emails to the Illinois State Police.  The first

email requested via email that the Illinois State Police send a formal request for the police reports

relating to the incident.  He advised them that DeBacker was not allowed to arm himself as an

officer and was confined to a room at the police department with orders to not be in areas where

firearms are at or being stored for his and others safety.  (Exh. P, Pg. 6)  Titus sent a second email

indicating that the department does not require officers FOID cards so DeBacker would not lose his

employment based on losing his FOID if that were the panels' decision.  (Exh. P, Pg. 10) Titus

informed them of this because he believed it might impact their decision on reinstating DeBacker's

FOID.  (Exh. M, Pg. 9)

133.    On November 2, 2011, Titus also sent a letter to the Illinois State Police requesting

they deny DeBacker's request for reinstatement of his FOID card.  (Exh. P, Pg. 1)  Titus stated ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████ and that the department does not require officers to have a FOID card for employment so

any decision by the panel would not affect his employment.  (Exh. P, Pg. 3-4)

134.    ████████████████████████████████████████████████████

█████████ (Exh. F, Pg. 26)

135.    On January 9, 2012, Titus reported to Fisk that he was not receiving

communications from the Illinois State Police any longer.  (Exh. H, Pg. 23)  Fisk then contacted the

Illinois State Police for Titus to determine where DeBacker was at in the process and if a decision

had been made regarding revocation.  (Exh. H, Pg. 23)  Fisk made clear in his communications with

the Illinois State Police that he was contacting them on behalf of Titus.  (Exh. H, Pg. 23)  Fisk

reported back to Titus regarding the information he received, and indicated he would provide

additional information when he heard back from them.  (Exh. H, Pg. 24)

136.     On July 18, 2012, Titus sent an email to the Illinois State Police stating that he was

involved with a fellow officer ████████████████████████████████████████████

████████████████████████████   ████████████████████████████████████████

████████████████████████████████████████████████████████ that he wanted

to add to the file.  (Titus 62)  Titus thereafter spoke to the Illinois State Police as a follow-up to his

email.  (Titus 64)

137.     Titus sent an additional 8 emails (above and beyond those specifically detailed

herein) to the Illinois State Police during the period of November 2, 2011 until January 6, 2012

discussing and inquiring into the status of DeBacker's FOID card.  (Exh. P, Pg. 7, 16, 19, 22, 30, 34,

38, 43)  Titus emailed several of the exchanges to his personal email address, including the email

information Fisk received and forwarded to him.  (Exh. P, Pgs. 13, 26, 49, 51)

138.     Hankins did not authorize Titus to forward emails to his personal email address

regarding DeBacker and the same was inappropriate.  (Exh. F, Pg. 31)

139.     Officer Robert McNabb sent an email to the Illinois State Police asserting that

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████ (Exh. F, Pg. 53)  McNabb forwarded Titus a copy of the email the same day he sent

it, to which Titus thanked him and said he appreciated it.  (Exh. F, Pg. 53)

140.    Titus acknowledged that the information McNabb put in his email to the Illinois State Police was information he should not have had access to, and it was not fully accurate.  (Exh. M, Pg. 19)

141.    Titus acknowledged he did what he could to interfere with the reinstatement of DeBacker's FOID card and to get DeBacker fired from the Department.  (Exh. M, Pg. 11)  Titus acknowledged if there was anything else he could have done to get DeBacker fired, he would have done it.  (Exh. M, Pg. 11)

142.    Hankins acknowledged that Titus' communications through his work email could provide the Illinois State Police with the impression that his contact was authorized by someone within the Department.  (Exh. F, Pg. 30)

143.    Titus wrote letters to the Illinois State Police both for personal reasons and as a representative of the Department.  (Titus 274)

144.    When Fisk received information about DeBacker's FOID card, he would provide that information to Titus.  (Exh. H, Pg. 14)

145.    Titus performs the background checks for officers and the Department does not check FOID status for pre-employment background checks.  (Titus 65)

146.    DeBacker's FOID card was reinstated on November 21, 2013.  (Exh. A, Pg. 21, Exh. N, Pg. 20)

147.    The Recommended Order and Decision of Administrative Law Judge Robin Schmidt determined that ███████████████████████████████████████ ████████████████████████████████ (Exh. N, Pg. 29)  Judge Schmidt further opined that ███████████████████████████████████████████████████████ ██████████████████████████ (Exh. N, Pg. 29)

**J.       DeBacker's Requests for Reinstatement to Full Duty**

148.    A month prior to DeBacker's termination, Titus had a meeting with Hankins, Patrick and Fisk where Hankins told him that they were giving DeBacker his weapon back.  (Titus 225) Hankins advised it would be happening the following day, and the union was forcing his hand so he had no choice.  (Exh. M, Pg. 20)  Titus inquired as to whether DeBacker could carry his weapon off duty as well, and asked Hankins to check on that issue.  (Titus 228)  Fisk called Titus that evening to advise him that the return of DeBacker's weapons was on standby.  (Titus 230)

**K.       Emotional Distress of DeBacker**

149.    DeBacker advised Fisk that he was embarrassed every day to come to work due to his restrictions.  (Exh. H, Pgs. 15, 30)  The restrictions continued to expand, rather than diminish over time.  (D 137)

150.    The booking officer position was a demeaning position; DeBacker wore blue jeans and a shirt, was not allowed to wear insignia or a badge, and did not even have the basic weapons that a correction officer would have.  (D 137)  He was down in a room, under the surveillance of cameras at all times, and felt like he was sentenced.  (D 137)  He was isolated and didn't see anyone.  (D 137)

151.    DeBacker advised ▮▮▮▮▮▮▮ that he was having employment problems, was frustrated with not being returned to full duty, and had concerns with the way he was being treated in the department.  (Exh. E, Pg. 2) ▮▮▮▮ felt that during some of the meetings, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ and at other times, he was trying to be more positive.  (Exh. E, Pg. 3) DeBacker advised her that he was humiliated that the ▮▮▮▮▮▮▮ was made public.  (Exh. E, Pg. 4)

152.    DeBacker was ashamed that he was unable to go to the traffic division without being

supervised.  (Exh. D, Pg. 20)

153.     DeBacker was very embarrassed to go to the courthouse and be questioned about whether he was still a police officer and where his gun was.  (Exh. D, Pg. 20)

154.     Langenderfer knew DeBacker was embarrassed about being the booking officer, and she indicated that she would also be embarrassed in that position.  (Exh. J, Pg. 5)

155.     Schumacher was aware that DeBacker was highly embarrassed because he was proud of his job, he was very upset about not being able to carry a gun, not being able to do his job, and about what other people were thinking about him.  (Exh. C, Pg. 5)  Every time DeBacker heard a rumor that was generated by the patrolmen, it hurt his feelings and made him feel terrible.  (Exh. C, Pg. 5)

156.     DeBacker expressed his frustration to Glogowski regarding his restrictions and that he wanted to be reinstated to full duty.  (Exh. B, Pg. 10)  He further advised Glogowski that he was embarrassed by the booking officer position and believed it was demeaning.  (Exh. B, Pg. 11)

157.     Glogowski does not believe DeBacker was treated fairly, and believes the incident impacted his life and his wife.  (Exh. B, Pg. 13)



158.     ████████████████████████████

████ (D 139) ████████████████████████

████ (D 140)

159.     ████████████████████████████

████████████████ (D 141)

160.     ████████████████████████████████ (D 142) ████████████████████████████████

(D 142)

161.     The situation was life changing for DeBacker.  (D 285)  DeBacker was no longer

able to competitively shoot, and as of the date of the deposition, he still hadn't shot even though he

had his FOID back.  (D 286)  He could no longer afford his jeeping, and he was trying to sell his

trailer.  (D 286)  Everywhere he goes, people act as if they don't see him and turn the other way.  (D

286)  Financially, he is unable to do anything and has substantial debt.  (D 286)  His current

employment requires him to work outside in the elements, and he is banged up and injured

performing the job.  (D 287)  He has no benefits, substantially reduced income, and the job was

nearly over.  (D 287)

### L.     DeBacker's Termination of Employment

162.     The City of Moline did not learn of the criminal statute that they used as the basis for

DeBacker's termination of employment until July 2012.  (Exh. F, Pgs. 22, 28)  The criminal statute

did not form any basis for the City's refusal to restore DeBacker to full duty from September 2011

until July 2012.  (Exh. F, Pg. 22)

163.     Section 65/8 of the Illinois FOID Card Statute provides grounds for denial or

revocation of an individual's FOID Card.  430 ILCS 65/8.  The Department of State Police has

authority to revoke a FOID card under the statute if a person ████████████████████████████

████████████████████████  430 ILCS 65/8(e).  An active law enforcement officer employed

by the government who is revoked can obtain relief under the statute ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████  430 ILCS 65/8(e).

164.     Section 65/10(c-5) provides a direct expedited appeal to the director for law

enforcement officers who have had their FOID Card revoked which can provide relief within thirty

days of an application for relief.  430 ILCS 65/10.

165.    The FOID Card statute explicitly states that any person prohibited from possessing a firearm under Section 24-3.1 of the Criminal Code may apply to the Director of State Police for a hearing on the revocation.  430 ILCS 65/10(c), (f).

166.    Case law states that the Illinois criminal statute referenced by the Defendant, Section 24-3.1, must be reviewed in conjunction with the Illinois FOID statute, and persons who have obtained from the Department a valid FOID card are not liable for criminal sanctions under the criminal statute. *Rawlings v. Illinois Dept. of Law Enforcement*, 391 N.E.2d 758, 764 (Ill.App. 3 Dist. 1979).

167.    Fisk contacted the FOID review division to ensure that DeBacker was exempt from FOID as a police officer.  (Exh. H, Pg. 11)  ███████████████████████████████ ████████████████████████████████████████████ (Exh. H, Pg. 11)  Fisk researched the law and forwarded the research to Hankins, Patrick, and Titus.  (Exh. H, Pg. 16)

168.    On August 7, 2012, DeBacker was terminated from his employment with the Department.  (Exh. F, Pg. 29, 42-43)

169.    Hankins told Titus that he was terminating DeBacker's employment prior to doing so on the date of his termination.  (Titus 243)

170.    Following his termination, on August 17, 2012, January 25, 2013, July 24, 2013, DeBacker ███████████████████████████████████████████████ ████████████████████████████████████████ (Exh. N, Pg. 32-33, 35-36) ████████████████████████████████████████████ ██████████████████. (Exh. N, Pg. 33)

**N.    Actual Disability and Perception of Disability**

171.    DeBacker's supervisors knew he was having difficulties at work in the months prior

to the incident.  (Exh. N, Pg. 9)  Several days prior to the June 16, 2011 incident, DeBacker ████

after being diverted from an abandoned vehicle call to assist with a traffic crash.  He pulled his

squad car over and didn't know what to do.  (Exh. Q, Pgs. 2-3)  On another occasion, ██████████

██████████████████████████████████████████████████████████  (Exh. Q,

Pgs. 2-3)

## III.   APPLICABLE LAW

A motion for summary judgment should be granted where there are no issues of material

fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (2014)  Any doubt

as to the existence of a general issue for trial is resolved against the moving party.  *Citizens for a*

*Better Environment v. Caterpillar, Inc.*, 30 F.Supp.2d 1053, 1056 (C.D. Ill. 1998).

## IV.   ARGUMENT

### A.  COUNT III:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In order to prove intentional infliction of emotional distress, a plaintiff must establish three

elements: (1) extreme and outrageous conduct; (2) intent or knowledge by the actor that there is at

least a high probability that his or her conduct would inflict severe emotional distress and reckless

disregard of that probability; and (3) severe and emotional distress.  *Adams v. Sussmann &*

*Hertzberg, LTD*, 684 N.E.2d 935, 950 (Ill.App.Ct. 1997)  The emotional distress must be so severe

that no reasonable person could be expected to endure it, and the intensity and duration of the

distress are factors to be considered in determining its severity.  *Id*. at 951 (internal citations

omitted).

In evaluating whether conduct is extreme and outrageous, there are several factors for the

Court to consider.  *McGrath v. Fahey*, 533 N.E.2d 806, 809 (1988).  First, the more control that the

defendant has over a plaintiff, the more likely defendant's conduct will be deemed outrageous,

especially when the alleged conduct involves either a veiled or explicit threat to exercise such authority or power to plaintiff's detriment.  *Id.*  Threats are "much more likely to be a part of outrageous conduct when made by someone with the ability to carry them out than when made by someone in a weak position.  *Id.*  The Restatement (Second) of Torts explicitly mentions police officers as examples of individuals who may be positioned to exercise power or authority over a plaintiff.  Restatement (Second) of Torts § 46, comment *e*, at 74 (1965)(cited by *Fahey*, 533 N.E.2d at 810).  DeBacker was aware that Titus was actively seeking to have him terminated from his employment, and every action Titus took demonstrated his intent in that regard.

Titus was DeBacker's supervising officer on June 16, 2011 and remained part of the command staff upon DeBacker's return to work.  Titus was clearly in a position of power over DeBacker.  DeBacker was asked to limit contact with Titus upon his return to work, and Titus would complain to command staff when DeBacker was in the general area of him.  (Exh. H, Pg. 13, Exh. O, Pgs. 3-9)  DeBacker was so concerned about Titus even seeing him at work that he would report when he saw Titus to Fisk to ensure command understood it was inadvertent.  (Exh. O, Pgs. 3-9)  Further, Titus advised at least one other officer that she was to limit her contact with DeBacker and the officer did not believe Titus would have had an issue if she had been talking to any other officer.  (Exh. J, Pg. 5)  When Titus would request that DeBacker's movements be limited or that he be restricted from an area, command staff would thereafter follow through on Titus' demands and DeBacker would be advised of yet another restriction, i.e. when he was prohibited from going into Officer Powell's office.  (Exh. M, Pg. 12)

The Court also considers whether the plaintiff reasonably believed the threats would be carried out.  *Fahey*, 533 N.E.2d at 810.  A defendant's reasonable belief that his objective was legitimate does not automatically allow the defendant to pursue that objective by outrageous means.

*Id.* Finally, the Court should consider the defendant's awareness that the plaintiff is particularly susceptible to emotional distress. *Id.* at 811. Behavior that otherwise might not normally be considered outrageous may be actionable if the defendant knows that the plaintiff is peculiarly susceptible to emotional distress. *Id.*

Titus acknowledged that he did what he could to get DeBacker fired from the Department. (Exh. M, Pg. 11) If there was anything else he could have done to get him fired, he would have done it. (Exh. M, Pg. 11) Titus' anger over the hearing with DeBacker had taken over every aspect of his life. (Exh. H, Pg. 26) He strongly believed that DeBacker should not have been allowed to return to work. (Exh. H, Pg. 25) Titus' actions following DeBacker's return to work establish a clear intent on the part of Titus to inflict severe emotional distress on DeBacker or, at a minimum, knowledge that there was a high probability that his conduct would cause DeBacker emotional distress.

On June 16, 2011, Titus had a meeting with Glogowski and Clark whom he knew were friends with DeBacker. (Exh. B, Pg. 4) ████████████████████████████████████ ████████████████████████████████ (Exh. B, Pg. 4) Titus knew this statement was false when he made it because ██████████████████████████████████ (Exh. H, Pg. 5) ████████████████████████████████████████████ ████████████████████████. (Exh. B, Pg. 4) The only reason he had for telling them this was that he wanted them to know. (Exh. B, Pg. 4) It was completely unnecessary for him to provide them with this information as they were not command staff. (Exh. F, Pg. 11) Titus did this with the sole intent of causing emotional distress to DeBacker.

Following DeBacker's return to work, he engaged in a pattern and practice of restricting DeBacker's movements within the Department and ostracizing him. (Exh. H, Pg. 13, Exh. O, Pgs.

3-9, Exh. M, Pg. 12)  Titus advised commanding officers that he did not like DeBacker's freedom of movement, and attempted to ensure DeBacker was confined to the booking area.  (Exh. O, Pgs. 1-2, Exh. H, Pg. 13, Exh. O, Pgs. 3-9, Exh. M, Pg. 12)  Further, Titus was requesting that other Department personnel ███████████████████ regarding DeBacker directly to him. (Exh. M, Pg. 16)

At one point, the temperature in the booking area was increased to approximately 80 degrees.  (Exh. A, Pg. 24, Exh. N, Pg. 39)  Titus controlled the heating and cooling of the building, and the booking office was the only area that had become warm.  (Exh. A, Pg. 24, 27)  After DeBacker reported the issue, the temperature did not change and the issue was not remedied.  (Exh. A, Pg. 24)  The keys to the squad car that DeBacker was directed to drive would frequently be gone or would be in Titus' box, which made it difficult for DeBacker to do his job.  (Exh. N, Pg. 48)

The booking area where DeBacker worked was recorded, and Titus had access to the recordings.  (Exh. F, Pg. 27)  DeBacker learned that people were viewing a video of him falling asleep, and Titus admitted to watching DeBacker on video while he was in booking.  (Exh. M, Pg. 22-23)

Titus regularly and consistently discussed DeBacker's FOID Card status with Fisk, who was one of DeBacker's commanding officers.  (Exh. M, Pg. 5)  He communicated on numerous occasions with the Illinois State Police, providing them false information, with the intent of interfering with the reinstatement of DeBacker's FOID Card.  (Exh. M, Pg. 11)

DeBacker had been returned to work and deemed fit for duty.  Despite Titus' knowledge that DeBacker was deemed fit for duty and was ████████████████████, Titus continued to do everything he could to get DeBacker fired.  He felt betrayed when other officers were pleasant with DeBacker and complacent about DeBacker's return to his job.  (Exh. H,

Pg. 22)  The restrictions that were placed upon DeBacker were directly and causally related to 

(Exh. F, Pg. 25)  Finally, Titus was thanking other officers who also attempted to interfere with the reinstatement of DeBacker's FOID Card and letting them know he appreciated their false communications with the Illinois State Police.  (Exh. P, Pg. 53, Exh. M, Pg. 19)

Titus was particularly aware that DeBacker _____.  Titus' own statement to the Illinois State Police acknowledged that DeBacker _____ (Exh. P, Pg. 1)  Titus advised the Illinois State Police that DeBacker _____ (Exh. M, Pg. 35)

There are sufficient issues of material fact regarding whether Titus' conduct was extreme and outrageous, and as such, Titus' Motion should be denied and the issue should be presented to the jury.

**COUNT IV: DEFAMATION – LIBEL**

The following argument is also set forth in the Plaintiff's Resistance to the City of Moline's Motion for Summary Judgment as the issues are identical and relate to the exact same statements made by Titus.  Titus made numerous defamatory statements about DeBacker that were false.  The defamatory statements made by Titus that were discovered by DeBacker during the filing and pendency of this case are as follows, with argument following each statement establishing the inaccurate nature of the statement.

_____ (Exh. M, Pg. 35)  Titus was aware, as of June

16, 2011, that DeBacker ████████████████████████████████████████████

(Exh. F, Pg. 4)  The only action that DeBacker took on June 16, 2011 was showing up to work,

which he was scheduled to do that day, and obtaining the ████████████████████ .  (Exh. A, Pg.

17)████████████████████████████████  Titus had no factual basis for his statement in

that regard.

        DeBacker's ████████████████████████████████████████████

████████████████  (Exh. M, Pg. 35)  Hankins affirmatively acknowledged that this statement by

Titus was false.  (Exh. F, Pgs. 24-25, 30)████████████████████ ████████████████

█████████████████████████████████████████████████████████████

████████  (Exh. A, Pg. 17)

        "Mr. DeBacker is not allowed to arm himself as an officer and is confined to a room here at

the police department with orders to not be in areas where firearms are at or being stored for his and

others safety."  (Exh. M, Pg. 30)  Hankins stated that DeBacker was not restricted to the booking

area as alleged by Titus.  (Exh. F, Pg. 9, 24)  Hankins' articulated reason for not allowing DeBacker

to be in areas with firearms████████████████████████████████████████████

████████████████████████████████  (Exh. F, Pg. 25)

        ████████████████████████████████████████████

█████████████████████████████████████████  Hankins said that this

statement was false, ████████████████████████████████████████████

████  (Exh. G, Pg. 2Exh. F, Pg. 26)  Titus further acknowledged that the only thing that went out

was a notice that DeBacker was put on ████████████████, and all staff members were not

informed about DeBacker's ████████████████████  (T 46-47)

        █████████████████████████████████████████████████████████



(Exh. P, Pg. 4)

(Exh. F, Pg. 9, 26)  When questioned, Titus changed his statement to indicate that he was advised there were

(Exh. M, Pg. 32)

(Exh. P, Pg. 4)  Hankins said there was

(Exh. F, Pg. 26)  There was never any reference to any other person

has no factual basis.

(Exh. M, Pg. 31)  DeBacker did not show up at work rather DeBacker went to work on June 16, 2011 which he did, . (Exh. A, Pg. 17)

In order to prove defamation, a showing must be made that the Defendant made a false statement about the Plaintiff, that there was an unprivileged publication of the defamatory statement to a third party by the Defendant, and the Plaintiff was damaged by the publication.  *Harrison v. Chicago Sun-Times, Inc.*, 793 N.E.2d 760, 766 (Ill. App. Ct. 2003).  The aforementioned statements were clearly false.  Hankins refuted the accuracy of several of the statements, as set forth above, and the Statement of Material Facts of the Plaintiff and Defendant provide support that the statements were false and Titus was aware of this at the time he made the statements.  The statements were clearly published when they were transmitted to the Illinois State Police.  Finally, a jury could reasonably find that DeBacker was damaged by the statements by virtue of the consistent denials of

DeBacker's FOID Card reinstatement until such time as he was granted an administrative law hearing where he was able to present his case.

The aforementioned statements by Titus were of such a nature as to impeach DeBacker's integrity, virtue, human decency, and reputation. *See Newell v. Field Enterprises, Inc.*, 415 N.E.2d 434, 440-441 (Ill. App. 1980). The statements clearly impeach ███████████████ ██████████████████████████████████████ when the facts are clear that ███████ ██████████████████████████████████

The libelous statements are further of such a nature as to constitute libel per se. The statements impute the commission, or attempted commission, of a criminal offense, despite the fact that ███████████████████████████████████████████████████ ██████████████████████████████████ as alleged within the statements. *See Id.* at 441. The statements also impute the inability of DeBacker to perform or want of integrity in employment on their face. *See Id.* Finally, the statements prejudice DeBacker in his profession as a police officer. *See Id.*

The statements are not substantially true as Titus alleges. Such an argument presumes that Titus made the statements at issue on June 16, 2011 based upon the information he alleges he possessed on that date, and that presumption is false. The statements set forth herein by Titus were not made until October 2, 2011 at the earliest and as late as July 18, 2012. At that point, DeBacker had been returned to work and restored to duty. Titus was aware that DeBacker ████████ █████████████████████ and his sole intent in sending the communications to the Illinois State Police at that time was to interfere with the reinstatement of DeBacker's FOID Card. (Exh. M, Pg. 11) Titus also desired to get DeBacker fired from the Department and if there was anything more he could have done to get DeBacker fired, he would have done it. (Exh. M, Pg. 11)

## B.  COUNT VIII – TORTIOUS INTERFERENCE OF CONTRACT

DeBacker agrees with the legal authority regarding the elements of the cause of action as set forth in Titus' Motion and as such, will not restate the same.  In the present case, the City of Moline claims the application of the criminal statute to DeBacker as the pretextual reason for DeBacker's discharge.

The City cited Section 24-3.1 of the Criminal Code (hereinafter "UUW") which states that a



720 ILCS 5/24-3.1.  Section 65/8 of the Illinois FOID Card Statute provides grounds for denial or revocation of an individual's FOID Card.  430 ILCS 65/8.  The Department of State Police has authority to revoke a FOID card 430 ILCS 65/8(e).

An active law enforcement officer employed by the government who is revoked can obtain relief under the statute 430 ILCS 65/8(e).  Section 65/10(c-5) provides a direct expedited appeal to the director for law enforcement officers who have had their FOID Card revoked which can provide relief within thirty days of an application for relief.  430 ILCS 65/10.

Further, the FOID Card statute explicitly states that any person prohibited from possessing a firearm under Section 24-3.1 of the Criminal Code may apply to the Director of State Police for a hearing on the revocation.  430 ILCS 65/10(c), (f).  Case law also states that the Illinois criminal statute referenced by the Defendant, Section 24-3.1, must be reviewed in conjunction with the Illinois FOID statute, and persons who have obtained from the Department a valid FOID card are

41

not liable for criminal sanctions under the criminal statute. *Rawlings v. Illinois Dept. of Law Enforcement*, 391 N.E.2d 758, 764 (Ill.App. 3 Dist. 1979).

The aforementioned shows that the City's pretextual reason for DeBacker's termination of employment, namely the criminal statute, is directly tied to the reinstatement of DeBacker's FOID Card. To say that DeBacker was not terminated for failure to have his FOID Card is splitting hairs. If DeBacker had his FOID Card reinstated, the criminal statute would be inapplicable to him. Titus directly interfered with the reinstatement of DeBacker's FOID Card and intended to do so.

DeBacker was a union employee and his employment was governed by his union contract. (Moline 00157) Thus, DeBacker was not an at-will employee and had a valid contractual relationship with the City. Titus was aware of that contractual relationship by way of his employment and contact with the union representatives. (Exh. M, Pg. 33) Titus acknowledged that not only did he do what he could to interfere with the reinstatement of DeBacker's FOID Card, he also did what he could to get DeBacker fired. (Exh. M, Pg. 11) Titus further acknowledged that if there was anything else he could have done to get DeBacker fired, he would have done it. (Exh. M, Pg. 11) **DeBacker was fired from his employment and thereby the City breached its contract with him. DeBacker was damaged by the breach as he lost his income, benefits, and insurance. (D 287)**

A reasonable juror could determine that Titus' actions in interfering with the reinstatement of DeBacker's FOID lead to the initial two denials. Further, Titus advised the Illinois State Police that DeBacker would not lose his job if the panel denied the reinstatement of his FOID Card. (Exh. P, Pg. 10) DeBacker did, however, lose his job as a result of the not receiving the reinstatement of his FOID Card in an expedient manner. The City alleged that they were firing DeBacker as a result of the criminal statute as he could not legally possess a firearm, however as set forth herein the

criminal statute would have been inapplicable to DeBacker if his FOID Card had been reinstated.

### C.  AFFIRMATIVE DEFENSES

#### 1.  TITUS DOES NOT HAVE AN ABSOLUTE PRIVILEGE REGARDING THE STATEMENTS HE MADE REGARDING DEBACKER.

Titus' statements were for both personal reasons and as a police officer in the Department. In the event that Titus is successful in this claim, however, the City of Moline is then liable for the statements made by Titus because it follows that they were made during the course of his employment.  The very fact that the City and Titus are both making polar opposite arguments shows that there is a dispute over material facts sufficient to overcome summary judgment on that issue. DeBacker further contends, however, that both the City of Moline and Titus are liable for the statement he made to the Illinois State Police and to his co-workers.

"The class of absolutely privileged communications is narrow and is practically limited to legislative and judicial proceedings and other acts of State, including communications made in the discharge of a duty under express authority of law."  *Weber v. Cueto*, 209 Ill.App.3d 936, 942 (5th Dist. 1991)(internal citations omitted).  The rule applies when an individual "acts under legal compulsion in doing so."  *Id*.

Titus was not acting with any legal duty in mind, nor was he acting under a legal compulsion to do so.  Titus cites a Moline ordinance that is akin to a mission statement rather than a specific law that requires an action on the part of an officer.  The ordinance is not of the nature of "narrow" categories such that the absolute privilege applies.  In the event Titus' argument has any merit, which it does not, then the City of Moline would have been under the same duty to engage in actions resisting DeBacker's attempts to obtain reinstatement of his FOID Card, which they did not do.

#### 2.  TITUS' STATEMENTS TO THE ILLINOIS STATE POLICE WERE

**NOT MADE IN FURTHERANCE OR AS PART OF JUDICIAL OR QUASI-JUDICIAL PROCEEDINGS.**

Titus' defamatory statements to the Illinois State Police were not made in furtherance of or as part of a judicial or quasi-judicial proceeding.  An absolute privilege may be applicable in various judicial or quasi-judicial proceedings.  *Hartlep v. Torres*, 756 N.E.2d 371, 373 (1st Dist. 2001)  A witness is privileged to publish defamatory matter concerning another in communications preliminary to a judicial proceeding or as part of a judicial proceeding in which he is testifying if it has some relation to the proceeding.  *Id*. (citing Restatement (Second) of Torts Section 588, Comment c, at 251 (1977)).  Titus was not a witness at any hearing in front of the Illinois State Police nor did he generate these emails and the notarized statement to the Illinois State Police as "necessarily preliminary" to any judicial or legal proceeding in which he was participating.  *See Zych v. Tucker*, 844 N.E.2d 1004, 1009 (Ill.App.1.Dist. 2006).

Titus' emails and notarized statements were not sent in response to any inquiry from the Illinois State Police, nor were they provided in the court of any hearing in front of the Illinois State Police.  Titus argues that his notarized statement was sent in response to a request from the Illinois State Police, however that is false.  Titus sent an email to the Illinois State Police asking how he could participate to contest DeBacker's FOID Card reinstatement, and they advised him of the type of document he could send to be involved in the process.  (Defendant's SJ Exh. 18, 19)  The Illinois State Police was not requesting Titus' statement unsolicited, and his notarized statement and emails were not necessarily preliminary to any such testimony that Titus provided in a hearing before them. (Defendant's SJ Exh. 18, 19)

In addition, the statements were not made as part of any testimony by Titus, nor were they provided in the course of a hearing before the Illinois State Police.  Titus did not make a formal charge to the Illinois State Police against DeBacker, nor did he make any type of complaint to the

Illinois State Police.  As a result of all of the aforementioned, Titus cannot make a claim of absolute privilege regarding the emails and notarized statement he provided to the Illinois State Police.  He acknowledged he did what he could to interfere with the reinstatement of DeBacker's FOID Card and to get DeBacker fired from the Department.  (Exh. M, Pg. 11)  The statements Titus made were done in furtherance of those goals, and not in furtherance of or as part of a quasi-judicial proceeding.

Titus asserts that DeBacker only alleges the Complaint to the Chief of Police and an appeal of the decision as the basis for his claims of Intentional Infliction of Emotional Distress and Interference with Contract claims.  The same is false.  DeBacker also asserted that Titus interfered with his attempt to have his FOID Card reinstated, and the circular reason of the City for DeBacker's termination was a criminal statute that is directly tied to DeBacker's FOID Card.  The Complaint alleges that Titus made false representations to the Illinois State Police in an attempt to prevent him from having his FOID Card reinstated knowing that would impact his employment contract with the City.  (Complaint § 104)  DeBacker maintains his argument in that regard, and the same argument applies in that Titus is not entitled to an absolute privilege regarding his statements made to the Illinois State Police which impacted his employment contract with the City.

### 3.   TITUS' STATEMENTS WERE NOT CONDITIONALLY PRIVILEGED.

Titus' defamatory statements were not made to a limited group of third parties who had an interest in the information he was providing, as he alleges as the basis for his assertion of a conditional privilege.  A conditional privilege exists as a matter of law when the following factors are present: (1) good faith by the defendant in making the statement; (2) an interest or duty to uphold; (3) a statement limited in its scope to that purpose; (4) a proper occasion; and (5) publication in a proper manner and to proper parties only.  *Kuwik*, 156 Ill.2d at 25.  Titus acknowledged that he did what he could to interfere with the reinstatement of DeBacker's FOID

Card and get him fired from the Department.  (Exh. M, Pg. 11)  The statements were not made in good faith, or at a minimum, there is a genuine fact issue as to whether Titus made the statement in good faith, and as such, it is an issue for a jury.  *See id.* at 25-26.

Even if Titus could prove that a qualified privilege applies, which he cannot, he still intentionally made the defamatory statements with a reckless disregard as to the matter's falseness, and in fact, while knowing the matter was false.  *See Kuwik v. Starmark Star marketing & Administration, Inc.*, 156 Ill.2d 16, 24 (Ill. S. Ct. 1993).  By the time that Titus made the statements to the Illinois State Police in his emails and notarized statement, he was well aware that ███████████████████████████████████████████ ███, and that DeBacker had been cleared for duty and ████████████████████████.

### 4.  TITUS' DEFAMATORY STATEMENTS WERE NOT SUBSTANTIALLY TRUE.

DeBacker has set forth the exact statements that he has determined at the time of filing, and during the pendency of this case, as being defamatory in Section B herein.  The statements within Section B are clearly false, and Hankins confirmed this regarding several of the statements.  DeBacker incorporates his arguments set forth in Section B herein.

### 5.  TITUS' DEFAMATORY STATEMENTS ARE NOT OPINION.

The statements set forth in Section B are not opinion statements.  The statements are clear and verifiably false.  The statement that DeBacker ████████████████" him and ████████████ ████████are clear and unambiguous.  Titus alleged that DeBacker was "confined to a room here at the police department" asserts a fact, not an opinion, and was false as stated by Hankins.  (Exh. M, Pg. 30, Exh. F, Pg. 9, 24)  Titus' statement in that regard to the Illinois State Police, however, was not offered as an opinion but as a fact.

Titus' statement that it was a "████████████████████████████████████████,

46

 ” was clearly false.  DeBacker did not have any ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Finally, the statement that ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ” is a statement of fact that is false.  There is no evidence

that DeBacker ▮▮▮▮▮▮▮▮▮▮▮▮, and the only information that anyone was advised was

that DeBacker came to work with the intent to contact ▮▮▮▮▮.  (Exh. A, Pg. 19)

Titus' statements, as set forth in Section B, are not opinions by Titus but rather were

provided to the Illinois State Police as facts and are not protected.

## 6.  THE TORT IMMUNITY ACT DOES NOT BAR DEBACKER'S CLAIMS.

Each of the Defendant's are making directly opposite arguments regarding the issue of

whether Titus was acting in the scope of his employment in regards to the defamatory statements he

made to the Illinois State Police.  The very fact that both Defendant's have provided facts to support

their allegations provides proof that there are facts in dispute regarding that issue such that a jury

must make the determination.

In regards to Titus' argument that he made statements to his co-workers as part of an

unfolding investigation is simply false.  On June 16, 2011, Titus had a meeting with Glogowski and

Clark for the sole purpose of telling him that DeBacker ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮  (Exh. B, Pg. 4)  Titus made this statement despite confirmation by Titus' command staff that

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (Exh. H, Pg. 5)  Titus told

them that DeBacker had come to work, been removed from the building, and he wanted them to

know.  (Exh. B, Pg. 4)  Titus did not make those statements in the course of an investigation, and

the statements were not made within the chain of his command.

In addition, the statements that were made to the Illinois State Police were not made by

Titus while instituting or prosecuting a judicial or administrative proceeding. Titus did not institute

any proceeding in front of the Illinois State Police, nor did he participate as a witness or a

participant in the hearing regarding the reinstatement of DeBacker's FOID Card. As a result, his

claim of immunity must fail and Titus is not entitled to summary judgment on that basis.

Michael E. DeBacker, Plaintiff

By:    /s/ Jennie L. Clausen
         Jennie L. Clausen, Attorney for Plaintiff
         H.J. Dane Law Office
         IA #AT0001551; IL #6304534
         1111 E. River Drive
         Davenport, IA  52803
         Telephone:  (563) 326-0006
         Facsimile:  (563) 326-6204
         Email: jennieclausen@hjdane.com

By:    /s/ Breanne M. Schadt   .
         Breanne M. Schadt
         H.J. Dane Law Office
         IA #1630317; IL #6287300
         1111 E. River Drive
         Davenport, IA  52803
         Telephone:  (563) 326-0006
         Facsimile:  (563) 326-6204
         Email: breanneschadt@hjdane.com

<u>CERTIFICATE OF TYPE VOLUME LIMITATIONS</u>

Pursuant to Local Rule 7.1(B)(4)(C), I hereby certify that the foregoing Argument section of

Plaintiff, Michael E. DeBacker's, Resistance to Defendant, Jay Titus', Motion for Summary

Judgment meets the type volume limitations set forth in Local Rule 7.1(B)(4), pursuant to Local

Rules because it is only 24,807 characters.


       <u>/s/ Jennie L. Clausen</u>

       Jennie L. Clausen, Attorney for Plaintiff

49

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2014, I electronically filed this Resistance to Defendant Jay Titus' Motion for Summary Judgment with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Peter R. Jennetten                                             Attorneys for Jay Titus
Christina Cullom
Quinn, Johnston, Henderson, Pretorius, & Cerulo
227 N.E. Jefferson Ave.
Peoria, IL  61602-1211
Telephone: (309) 674-1133
Facsimile:  (309) 674-6503
Email: pjennetten@qjhpc.com


Martha L. Shaff                                               Attorneys for City of Moline
Brandon W. Lobberecht
Betty, Neuman & McMahon, L.L.C.
111 E. Third Street, Suite 600
Davenport, IA  52801-1596
Telephone: (563) 326-4491
Facsimile:  (563) 326-4498
Email: mls@bettylawfirm.com



_____/s/ Jennie L. Clausen_____
Jennie L. Clausen, Attorney for Plaintiff