# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

| | | |
|---|---|---|
| MICHAEL E. DEBACKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-4062 |
| | ) | |
| CITY OF MOLINE and JAY TITUS, individually, | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

Now before the Court are Motions for Summary Judgment by Defendant Jay Titus and the City of Moline. For the reasons set forth below, The City's Motion for Summary Judgment [77] is GRANTED IN PART and DENIED IN PART, and the Motion for Summary Judgment by Defendant Titus [78] is GRANTED IN PART and DENIED IN PART.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 as the claims asserted in the Complaint present federal questions under the  Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, and the Americans with Disabilities Act, 42 U.S.C. §§12112(d) and 12203(a) ("ADA").   The Court further has supplemental jurisdiction over Plaintiff's state law claims for intentional infliction of emotional distress, libel, slander, and tortious interference with a contract pursuant to 28 U.S.C. § 1367.

## BACKGROUND

Plaintiff, Michael DeBacker ("DeBacker"), began working for Defendant City of Moline (the "City") in April 1994.  He is certified as a Traffic Crash Reconstructionist and a Master Firearms Instructor.   In fact, DeBacker is a sharp shooter, has participated in numerous

competitive shooting events, keeps ammunition and numerous weapons at his home, and typically has three firearms in his vehicle while not on duty. At the times relevant to this Complaint, he was a Traffic Investigator and Firearms Instructor.

In February 2011, a female co-worker filed a sexual harassment complaint against DeBacker regarding a comment that he made to her. This complaint caused him increased stress and anxiety. Defendant Titus became his commanding officer in April 2011, which caused additional stress by increasing the duties assigned and changing the way DeBacker and a co-employee performed their duties. In May 2011, DeBacker admits that he was having suicidal thoughts about using his duty gun to commit suicide, and although he discussed some symptoms and stress he was experiencing with his family physician and was placed on Zoloft, he did not specifically mention any suicidal thoughts. He concedes that his ideations eventually included committing suicide and simultaneously shooting Titus by placing a round of hardball ammunition in his duty gun and shooting it at a trajectory to pass through his head and also hit Titus.

On June 15, 2011, after an unpleasant meeting with Titus, DeBacker called his family physician to request an increase in his dosage of Zoloft. That evening, he told his wife, Julie, about the suicidal ideations he had relating to himself and Titus; however, he claimed that he would never act on those thoughts and was repulsed by them. He also mentioned the prior suicide of another officer, Mike Sottos, and stated that he could see how Sottos could do it. Julie works in the medical field and had training on identifying mental health issues, including symptoms of possible suicide, depression, and harmful ideation. The next morning, Julie became concerned because DeBacker was quiet, looked depressed, and told her "everything is going to be all right." She called a family friend, Mark Schumacher ("Schumacher") and

another family friend, Fred Mincks ("Mincks"), who was also DeBacker's co-worker/supervisor, to ask Mincks to pull DeBacker aside until Schumacher could get there to pick him up because she did not want him at work that day and wanted to take him to see a doctor. Mincks also received a call from Schumacher informing him that Julie had called him and was concerned that DeBacker may be intending to commit suicide and also kill Titus. Mincks relayed this information to Titus.

Chief Kim Hankins and other commanding officers were also informed of the situation. It is undisputed that Chief Hankins believed that DeBacker was not fit for duty and had mental health issues that needed to be worked out. It is further undisputed that Chief Hankins believed that there was a possibility of an imminent threat based on the information being relayed by DeBacker's wife, which indicated that she thought it was an "8 out of 10" likelihood that DeBacker would follow through with his ideations. The Department deemed it necessary to take DeBacker for an evaluation of medical treatment related to his mental health condition, and he was placed on administrative leave.

DeBacker was taken for a psychiatric evaluation at the Robert Young Center. That evening, after it was determined that DeBacker had no delusional thoughts or suicidal/homicidal ideations and would be released, the City threatened to obtain a court order committing him if he did not stay voluntarily for inpatient treatment. As a result, DeBacker voluntarily admitted himself. Three days later, he was discharged from treatment but remained off work until a fit-for-duty examination could be performed. On June 24, 2011, his treating psychiatrist noted: "Major depressive disorder current in full remission, adjustment disorder with anxiety, improving, obsessive-compulsive personality disorder;" he found DeBacker's thought process negative for lethality or psychosis. This psychiatrist released DeBacker for return to work on

July 21, 2011. Generally, when an officer is released to return to work by their treating physician, they are returned to their previous duties in a matter of a few days. DeBacker remained on FMLA leave until August 26, 2011.

Following an examination with the City's contracting provider on August 23, 2011, DeBacker was found to be fit-for-duty and was directed to return to work on September 19, 2011 as a booking officer. Upon his return, he was placed on several restrictions: (1) he was not to have contact with Titus; (2) he was not to possess a firearm; and (3) he was to avoid areas of the Department where firearms could be accessed. In assigning DeBacker's duties on his return, Chief Hankins took into consideration his stress and anxiety, as well as the safety concerns of other employees.

During this process, DeBacker's FOID card had been revoked by the Illinois State Police as a result of his in-patient status at a mental institution. After being cleared for a return to duty, DeBacker appealed the revocation and requested that his FOID card be reinstated. Titus contacted the Illinois State Police both by email and letter to protest the reinstatement of DeBacker's FOID card. It is undisputed that the Department did not direct Titus to make this contact. DeBacker asked the City to assist him in obtaining the reinstatement, but the City refused. The City did, however, provide copies of the police investigative reports pursuant to a subpoena from the State Police. Following his return to work, DeBacker requested to be reinstated to his former position with his firearm. Each of his requests were denied by the City based on conversations with human resources, legal, and the City Administrator.

In September 2011, Titus availed himself of the process available for Department personnel to lodge complaints against co-employees by filing a formal citizen's complaint seeking discipline against DeBacker relating to the June 16, 2011 incident. Chief Hankins

denied Titus' citizen complaint and stated that no discipline would be taken against DeBacker for the incident. Titus appealed this denial, which then went to an arbitration hearing before the Board of Fire and Police Commissioners. On February 1, 2012, the Board affirmed the Department's denial of Titus' complaint.

In May 2012, DeBacker filed a complaint with the EEOC and a grievance with his union. Following an unsuccessful attempt to mediate the EEOC complaint, Chief Hankins contacted the State Police to ask about the necessity of DeBacker's FOID card and the impact, if any, on his ability to carry a firearm while on duty as a police officer. Although the FOID card statute contains an exception for police officers possessing a firearm while on duty in their official capacity that makes it unnecessary for a police officer on duty to have a FOID card, the State Police advised that an Illinois criminal statute prohibits anyone who has been a patient at a mental institution within the last five years from possessing a firearm. It is undisputed that the City was unaware of the implications of this criminal statute until July 2012.

Section 26-2321 of the Moline Code of Ordinances requires each member of the Department to be armed on duty with a firearm. On August 7, 2012, the City notified DeBacker that his employment was terminated in light of the conflict between the Illinois criminal statute and the Moline Code.

DeBacker brought this suit against the City and Titus, alleging violations of the Americans With Disabilities Act ("ADA"), the Family Medical Leave Act ("FMLA"), intentional infliction of emotional distress, defamation for both libel and slander, and tortious interference with a contractual relationship. The slander claim against Titus was previously dismissed, and both the City and Titus have now moved for summary judgment on the remaining claims. The Motions are fully briefed, and this Order follows.

## STANDARD OF REVIEW

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A material fact is one that might affect the outcome of the suit. *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 598-99 (7th Cir. 2000). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 588. Any disputed issues of fact are resolved against the moving party. *GE v. Joiner*, 552 U.S. 136, 143 (1997). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp.*, 477 U.S. at 323. Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Id*. at 324. Where a proposed statement of fact is supported by the record and not adequately rebutted, a court will accept that statement as true for purposes of summary judgment; an adequate rebuttal requires a citation to specific support in the record. *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998). This Court must then determine whether there is a need for trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only

by a finder of fact because they may be reasonably resolved in favor of either party.  A*nderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## DISCUSSION

### I. Americans With Disabilities Act

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual" with regard to the terms, conditions, and privileges of employment.  42 U.S.C. § 12112(a); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir. 1996).  Under the ADA , disability discrimination requires a showing that: (1) the plaintiff is disabled within the meaning of the ADA; (2) he was meeting his employer 's legitimate employment expectations; and (3) he suffered an adverse employment action because of his disability.  *Gogos v. AMS Mechanical Systems, Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013); *Kampmier v. Emeritus Corp*., 472 F.3d 930, 937 (7th Cir. 2007); *Rooney v. Koch Air, LLC*, 410 F.3d 376, 380-81 (7th Cir. 2005).

If a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its employment decision. *Buie v. Quad/Graphics, Inc*., 366 F.3d 496, 503 (7th Cir. 2004).  If this is done, the burden then shifts back to the plaintiff to show by a preponderance of the evidence that the proffered reason was merely a pretext for intentional discrimination or retaliation.  *Id.*  Pretext can be shown by evidence suggesting that the proffered reason was factually baseless, was not the actual motivation, or was insufficient to motivate the employer's action.  *Grube v. Lau Industries, Inc*., 257 F.3d 723, 729 (7th Cir. 2001).

A person is "disabled" under the ADA if he has (1) a physical or mental impairment which substantially limits one or more of the major life activities; (2) a record of such impairment; or (3) is regarded as having such an impairment.  42 U.S.C. § 12102(2); *Riemer v. Illinois Department of*

*Transportation*, 148 F.3d 800, 804 (7th Cir. 1998). The City first argues that DeBacker is not disabled based on DeBacker's admission that he "does not, and has not at any time, considered himself to be actually disabled." DeBacker responds that he was disabled on June 16, 2011, based on his diagnosis of depression, anxiety, and hypothyroidism.

There is no question that these conditions qualified as impairments within the meaning of the ADA; rather, the question is whether these impairments substantially limited one of more of his major life activities. "Substantially limited" means that "the individual is either unable to perform, or significantly restricted as to the condition, manner or duration under which the individual can perform, a major life activity as compared to an average person in the general population." *Krocka v. City of Chicago*, 203 F.3d 507, 513 (7th Cir. 2000). If the individual takes medication to mitigate the impairment, then "the individual must be evaluated taking into account the ameliorating . . . effects of the measures on his ability to perform a major life activity." Id.

DeBacker asserts that he was substantially limited in his major life activities of concentrating, thinking, and working. However, he bases this contention on his suicidal ideations and one instance where he had difficulty determining whether to go to a call or do his follow-ups prior to June 16, 2011. However, DeBacker testified in his deposition that he started feeling better and his suicidal thoughts diminished after seeing his doctor on May 25, 2011 and starting to take Zoloft. (DeBacker Dep. at 64-65) Just talking to his doctor made him feel like he had "turned a corner." *Id.* He increased his dosage on June 15, 2001 to help him feel even better and was not still having suicidal thoughts at that time. *Id.*, at 67-68. While this may be evidence of some limitation, it cannot reasonably be found to rise to the level of a substantial limitation on his major life activities, particularly as he admits that his problems were ameliorated by his

medication and counseling. Accordingly, DeBacker has failed to establish that he was actually disabled within the meaning of the ADA.

Alternatively, the ADA also affords protection to employees with impairments that are not actually disabling but are misperceived to be disabling by others. *Krocka*, 203 F.3d at 513-14. The Seventh Circuit has held:

> Many ... impairments are not in fact disabling but are believed to be so, and the people having them may be denied employment or otherwise shunned as a consequence. Such people, objectively capable of performing as well as the unimpaired, are analogous to capable workers discriminated against because of their skin color or some other vocationally irrelevant characteristic.

*Id.*, *citing Vande Zande v. State of Wisc. Dept. of Admin.*, 44 F.3d 538, 541 (7th Cir. 1995). To satisfy this standard, a plaintiff must demonstrate that the employer entertain misperceptions about him; such misperceptions may be that "one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment, when, in fact, the impairment is not so limiting." *Id.*

The City responds that the restrictions imposed were not related to major life activities or a disability, but rather were attempts to integrate him back into the Department after an extremely unusual event. DeBacker argues that the delay in allowing his return to duty and limitations placed on him upon his return to work indicate that he was perceived to be or regarded as disabled by the City.

It is apparent that the City was aware of DeBacker's depression and anxiety, as it was the City that essentially forced him to obtain the initial evaluation and inpatient treatment. The only issue is whether the City mistakenly believed that his impairments were substantially limiting to his ability to return to full duty as a police officer. The plaintiff in *Krocka* was required to

participate in a monitoring program as a condition of his return to work as a police officer despite the fact that his depression had been completely corrected by medication. However, this was not found to be regarding the plaintiff as disabled because the plaintiff was allowed to continue working as a police officer, without any restrictions on the type of duties assigned, ability to carry a weapon, or any other aspect of his work. *Id.*, at 514-15. Even if the requirement of monitoring was an "adverse and unjustified employment action . . .because of his impairment," there was no evidence that the plaintiff's impairment was regarded as substantially limiting in his ability to do his job. *Id.*

Here, DeBacker was restricted in his access to areas in the Department, denied any access to weapons, precluded from wearing an official uniform or driving a squad car, and had a complete change of duties and responsibilities that limited his contact with other employees. While undoubtedly adverse, there must still be a causal antecedent to the treatment in order to be actionable under the ADA. "Employers do not run afoul of the ADA when they make employment decisions based on physical or mental characteristics that . . . are 'limiting, but not substantially limiting' such that they do not rise to the level of a disability." *Id.*

DeBacker points to the fact that the City did not accept the initial evaluation and findings of fitness by the Robert Young Center or his personal physician and required him to submit to an additional fit-for-duty examination with their designated provider as evidence that they regarded him as disabled. It is undisputed that on June 16, 2011, Chief Hankins believed that DeBacker posed the possibility of an imminent threat to himself and others. Chief Hankins further stated that he believed DeBacker to be suffering from mental health issues on June 23, 2011, and that as of late July 2011, he still did not support DeBacker's return. (Hankins Dep. at 116, 152-53)

The City required DeBacker to be evaluated by the City's contracting provider and returned to work shortly after that provider found him to be fit for duty. Following his return to work, Chief Hankins did not know if DeBacker was still suffering from mental health issues, as he had no additional information on DeBacker's mental health issues or treatment, and he seemed to be normal. *Id.*, at 175, 191. DeBacker was also required to meet with the City Nurse on a weekly basis following his return. While Chief Hankins did not believe that DeBacker posed any danger regarding his mental health issues, he did believe that DeBacker's return to a department where some officers did perceive him to be a safety concern was problematic. *Id.*, at 195-96. However, Chief Hankins did express a concern about what might happen if DeBacker went off his meds. (DeBacker Dep., at 159) The normal process for someone returning to work after being released by their physician is to return them to their previous duties within a few days, but that is not what happened here. (Hankins Dep., at 130) Chief Hankins was unaware of the criminal statute prohibiting anyone who had been an inpatient in a mental institution from possessing a firearm until after July 2012. By that time, DeBacker had been back on the job for approximately ten months. *Id.*, at 190.

The Seventh Circuit has held that where the psychiatric health of an employee is at issue, is job related, and reflects a concern for the safety of employees, "the employer may, depending on the circumstances of the particular case, require specific medical information from the employee and may require that the employee undergo a physical examination designed to determine his ability to work." *Krocka*, 203 F.3d at 515. In so holding, the Court of Appeals recognized that the job of a police officer poses "significant safety concerns" to other employees, as well as the public at large. *Id.* Under such circumstances, ordering a fitness exam was found to be reasonable and responsible on the part of the police department. *Id.* However, the Seventh

Circuit noted that what follows that examination "may indicate the employer's perception of the employee's ability to function on the job and thus provide some evidence that the employer regarded the employee as disabled." *Id.*

Had DeBacker been returned to his regular position after completing a short period of light-duty readjustment following the recommendations accompanying his fit for duty exam and kept his weekly sessions with the City Nurse, the Court would have no problem concluding as a matter of law that the City had acted prudently and responsibly without regard to his mental condition. Unlike *Krocka*, however, where the officer was returned to full duty without restriction following his fit for duty examination, DeBacker was returned to work with several significant restrictions and alterations to his job duties that were not recommended by the evaluating psychiatrist. Despite Chief Hankins' explanation that these conditions were intended to be a way of easing DeBacker back into the department, where some other officers expressed hostility to his return, there is evidence that could support a contrary finding.

For example, on June 16, 2011, Chief Hankins told Titus that DeBacker would never return to the Department based on his belief that DeBacker's mental issues would never allow a psychiatrist to clear him for return to duty. (Hankins Dep., at 82) Supervisors told other officers to treat the situation "with the seriousness of a Sottos situation, referencing an officer that had committed suicide a few years earlier. Chief Hankins met with Titus and other supervisors to advice them that DeBacker was going to be getting his weapon back, stating that the Union was forcing his hand and that he had no choice. Additionally, the fact that the City terminated him rather than allow him to continue in the booking officer position could promote the reasonable inference that the City regarded him to be substantially limited from a class of jobs as a police officer. *See Powers v. USF Holland, Inc.*, 667 F.3d 815, 825 (7th Cir. 2011) (noting that an

employee was not regarded as disabled where he only showed that his employer considered him substantially limited in performing one job for the company rather than a whole class of jobs.) This raises a genuine issue of material fact as to whether the City regarded him as disabled.

DeBacker has also satisfied the remaining elements of his prima facie case. Chief Hankins stated that DeBacker was performing the essential functions of his job as assigned following his return to duty; DeBacker did nothing upon his return to interfere with his restoration to full duty, and his work performance was satisfactory. (Hankins Dep., at 29-30) His fit for duty examination provided that he could return to work and be armed during a month-long period of reintegration before returning to full duty. As the FOID statute contains an exception to a FOID card requirement for a police officer on duty, and Chief Hankins was unaware of the criminal statute addressing the possession of a firearm by an individual who had been in a mental institution within five years, the refusal to allow DeBacker to be armed while on duty must have originated solely with the City. It is also clear that DeBacker suffered an adverse employment action either in terms of his reclassification into the booking officer position or his termination because of his perceived disability.

The City claims that sometime after July 2012, it learned that § 24-3.1 of the Illinois Criminal Code prohibits someone who has been institutionalized within the last five years from possessing a firearm. As it determined that the application of this statute would preclude DeBacker from possessing a firearm for the foreseeable future, and police officers in the Department were required to be armed while on duty, this presented a legitimate, non-discriminatory reason for his termination.

DeBacker responds that this reason is pretextual. Initially, he notes that the City is directly responsible for the condition that caused the revocation of his FOID card and application

of §24-3.1 of the Criminal Code, as it essentially forced him to voluntarily admit himself for inpatient mental health treatment under threat of involuntary committal after the doctors at the Robert Young Center had examined him and found him to pose no threat to himself or anyone else and recommended his release on June 16, 2011. Additionally, the City asserted that DeBacker was required by City Ordinance to possess a firearm while on duty when Hankins (after consultation with City HR and legal) had placed him in a position that performed necessary functions for the Department without a firearm for the ten months following his return to duty until the time of his termination. Officers that have had their FOID cards revoked or who are prohibited from possessing a firearm under § 24-3.1 have the right to apply to the Director of State Police for an administrative hearing on the revocation and an expedited appeal process. Case law further provides that an officer who has successfully obtained the return of his FOID card is not liable for criminal sanctions under § 24-3.1. *See Rawlings v. Illinois Dept. Of Law Enforcement*, 391 N.E.2d 758, 764 (Ill.App.3rd Dist. 1979).

Although DeBacker's request for reinstatement of his FOID card was denied on June 15, 2012, the letter informing him of this decision provided that he could petition for a formal administrative hearing. There is evidence in the record that Titus used his position within the Department to attempt to interfere with DeBacker's ability to obtain the reinstatement of his FOID card, which may have influenced this denial. DeBacker did submit a written request for a formal administrative hearing and was able to have his FOID card reinstated. However, rather than waiting to see how this process played out, the City invoked the Criminal Code as an absolute bar to his continued employment at best, and at worst, may have actively impeded his ability to cure the deficiency being asserted against him. DeBacker has therefore met his burden of making a sufficient showing that the City's stated reason for his termination may have been

pretextual, and the City's Motion for Summary Judgment is denied as to Count 1.  *See Miller v. Illinois Dept. of Transportation*, 643 F.3d 190, 197 (7th Cir. 2011).

## II.     Retaliation

The City next argues that it is entitled to summary judgment on DeBacker's claim that he was terminated in August 2012 in retaliation for filing an EEOC complaint against the City in May 2012.  Like discrimination, retaliation may be shown through direct or indirect evidence. To prove retaliation under the direct method, Plaintiff must show: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection between the two. *Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 664 (7th Cir. 2011); *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). A causal connection requires evidence that the protected activity was "a substantial or motivating factor" in the decision to terminate her.  *Hoppe v. Lewis Univ.,* 692 F.3d 833, 842 (7th Cir. 2012).  Retaliation may also be shown through the indirect, burden-shifting method , which requires proof that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; (3) he was meeting his employer's legitimate expectations; and (4) similarly situated employees who did not engage in the protected activity suffered no adverse employment action.  *Squibb v. Mem. Med. Ctr.,* 497 F.3d 775, 788 (7th Cir. 2007).

There is no question that DeBacker engaged in a protected activity by filing a charge of discrimination with the EEOC in May 2012 or that he suffered an adverse employment action when he was terminated.  DeBacker contends that the close temporal proximity between the failure of his EEOC mediation and his termination provides the causal connection, as his mediation was held on July 9, 2012, and he was terminated on August 8, 2012.  However, the Court cannot ignore the fact that the City became aware that the EEOC charge was filed in May

2012 and, standing on its own, a time period of a few months separating the protected activity and the adverse action is insufficient to establish a causal link for a claim of retaliation. *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir.2008). *See also*, *Harper v. C.R. England, Inc.*, 687 F.3d 297, 308 (7th Cir.2012) ("[i]t is well established that 'mere temporal proximity between [the statutorily protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue,'" *quoting Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir.2002). Instead, a plaintiff must cite "other facts" sufficient to create "an inference of a causal connection" in order to withstand a summary judgment motion. *Id., quoting Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir.2008). DeBacker has failed to do so. Accordingly, his attempt to state a claim for retaliation under the direct method fails.

Under the indirect method, the Court has found in connection with the ADA claim that DeBacker has made a sufficient showing that he was meeting his employer's legitimate expectations at the time that he was terminated. The last prong of the analysis requires him to demonstrate that similarly situated officers who did not engage in protected activity were not terminated. DeBacker argues that he was treated less favorably than Officers Glogowski and Adams, who did not file EEOC complaints and were restored to full duty without being terminated.

Whether a fellow employee is similarly situated is a flexible, common sense question. *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007). To show disparate discipline, the comparators must: (1) deal with the same supervisors; (2) be subject to the same standards; and (3) have engaged in conduct of a similarly serious nature without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Peele v.*

*Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002). Other than asserting that Glogowski and Adams had their FOID cards revoked for mental health treatment but were restored to full duty, DeBacker makes no effort to demonstrate any of the other relevant facts. There is no evidence indicating that either officer threatened to kill another officer, worked under the same supervisors, had the same decisionmaker, or had no mitigating circumstances to distinguish their treatment. Accordingly, the City is entitled to summary judgment on the retaliation claim in Count II.

### III. Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress under Illinois common law, Plaintiff must allege that: (1) Defendants' conduct was extreme and outrageous; (2) Defendants intended to inflict severe emotional distress or knew there was a high probability that their conduct would cause severe emotional distress; and (3) Defendants' conduct did cause severe emotional distress. *See Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997); *Doe v. Calumet City*, 641 N.E.2d 498, 506 (Ill. 1994); *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988). Conduct is extreme and outrageous only if "the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency . . . ." *Public Finance Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976); *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992). Moreover, "as to the third prong, an action may lie 'only where the distress inflicted is so severe that no reasonable man could be expected to endure it.'" *See McNamara v. Guinn*, 2000 WL 1222128, at *3-4 (N.D.Ill. August 23, 2000), *citing McGrath*, 533 N.E.2d at 809. In the employment context, recovery has been limited to cases in which the employer's conduct is truly egregious. *Van Stan*, 125 F.3d at 568.

DeBacker alleges that the City and Titus intentionally inflicted emotional distress on him by disclosing his confidential mental health information to the media and other officers, allowing false rumors to spread about him indicating that he had threatened to kill Titus in front of his wife and family, was going to stake out Titus' house and shoot his family, was going to shoot himself and any responding officers, and that he had made and taken steps to execute very detailed and specific plans for the attack but was intercepted at the Department, returning him to work under considerable restrictions in an isolated area that was constantly monitored by video without his uniform or firearm, messing with his radio, turning up the heat to make the booking area uncomfortably hot, moving the squad car keys to an area that DeBacker could not access, interfering with his ability to have his FOID card reinstated. Titus is further alleged to have forwarded copies of personnel emails about DeBacker to his personal email account and submitted false information to the Illinois State Police in connection with DeBacker's FOID card process.

Defendants cite *Van Stan*, 125 F.3d at 568, for the proposition that plaintiffs cannot proceed on IIED claims where the alleged misconduct has been linked to an employer's legitimate interest, such as ensuring the safety of the public and officers. With respect to the claim against the City, the Court finds *Van Stan* and *Lundy v. City of Calumet*, 567 N.E.2d 1101 (1st Dist. 1991), to be instructive. In *Lundy*, police officers who received inconclusive psychological testing were notified that the results were indicative of either deliberate manipulation of the test or mental problems, relieved of uniformed duty, prohibited from wearing their guns or badges, reassigned to positions in the records department, forbidden from accepting overtime or secondary employment, and required to submit to retesting. *Id.*, at 1102. The Police Chief shared this information and the results of the psychological testing with

members of the city council and transmitted his memo to the officers in such a manner as to allow the information to be read by other officers in the department. *Id.* This conduct was found to be insensitive but amounted to insults or indignities that were ultimately insufficient to rise to the level of extreme and outrageous misconduct required to state a claim even when the Chief's authority over the plaintiff officers was considered. *Id.*, at 1103-04. The misconduct addressed in *Lundy* is functionally analogous to what is alleged against the City here and warrants the same result. The City is therefore entitled to summary judgment on DeBacker's IIED claim.

With respect to Titus individually, however, the Court finds that the record compels a different result. The record promotes a reasonable inference that Titus abused his position of authority within the Department to purposefully and maliciously obstruct DeBacker's efforts to have his FOID card reinstated and have him disciplined. Titus was clearly aware of DeBacker's mental distress. Although he was not asked or authorized to do so in his capacity as a Lieutenant with the Department, Titus contacted the Illinois State Police from his official email address to attempt to dissuade the State Police from reinstating DeBacker's FOID card. The record also supports the conclusion that these communications contained deliberate falsehoods, such as the indication that DeBacker had threatened Titus' family, taken substantial steps to carry out his plan, and was thwarted from executing his plan when he arrived at work on June 16, 2011. This could reasonably be found to be more than mere insults, indignities, or annoyances and rise to the level of extreme and outrageous conduct. Although Titus points to statements by Mark Schumacher relating what he claims to have been told by Julie DeBacker that could be construed to support some of these additional assertions, Julie provides a different version of their

conversations, and disputes of material fact cannot be resolved on summary judgment. Accordingly, Titus' Motion for Summary Judgment must be denied.

### IV.    Interference With FMLA Rights

The FMLA entitles eligible employees to 12 work weeks of unpaid leave during any 12 month period for serious health conditions. 29 U.S.C. § 2612(a)(l). The statute contains prescriptive protections that are expressed as substantive statutory rights to prohibit interference with, restraint of, or denial of the exercise or attempt to exercise an employee's right to take leave, and gives employees a cause of action if such interference occurs. 29 U.S.C. §§2615(a)(l) and 2617.   The FMLA also provides a remedy in the event that an employee is discriminated against for having exercised his rights under the Act.  29 U.S.C. § 2615(a)(l) & (2).

DeBacker claims that the City interfered with his rights under the FMLA.  To maintain this cause of action, he must show:  (1) he was eligible for protection under the FMLA; (2) Defendant was covered by the FMLA; (3) he was entitled to leave under the FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) Defendant denied him leave to which he was entitled.  *Ridings v. Riverside Medical Center*, 537 F.3d 755, 761 (7th Cir. 2008). Employees who take such leave are entitled to be restored to the position held by the employee when leave commenced or an equivalent position.  29 U.S.C. § 2614(a)(1).  However, this right is not absolute.  *Goelzer v. Sheboygan County, Wisconsin*, 604 F.3d 987, 993 (7th Cir. 2010).

This is not a typical case where the employee asks to take FMLA leave and his request is denied.  DeBacker claims that the City violated the FMLA by failing to restore him to his prior assignment or an equivalent position upon his return to work.  DeBacker was clearly eligible for FMLA leave, and the City was a covered employer.  He was entitled to FMLA leave and gave notice of his intent to take leave.  In this case, DeBacker received FMLA leave from July 21, 2011 thru

August 26, 2011.  However, he claims that the City interfered with his rights by refusing to reinstate him to either his former position or a comparable position upon returning from his leave.

However, DeBacker's right to reinstatement is not absolute.  *Goelzer v. Sheboygan County, Wisconsin*, 604 F.3d 987, 993 (7th Cir. 2010).  "[A]n employee is not entitled to return to [his] former position if [he] would have been fired regardless of whether [he] took leave."  *Id.*  Here, DeBacker has failed to point to any evidence suggesting that he was terminated as a result of taking FMLA leave or that the City did not fully reinstate him to his former position because he took FMLA leave.  *See Kohls v. Beverly Enters. Wisc., Inc.*, 259 F.3d 799, 805 (7th Cir. 2001).  His inability to carry a firearm as a result of his inpatient treatment would have remained even if he had been able to return to work immediately and not taken FMLA leave.  While the stated reason for his termination was that he was unable to fulfill a condition precedent to his job that resulted from the circumstances following the reason for his need for FMLA leave, this is simply not equivalent to demonstrating that he was terminated because he took leave time.  The nexus between DeBacker's leave and his termination is missing, and making the inference would require more of a leap in logic than a fact-finder would deem reasonable.  The City is therefore entitled to summary judgment on Count IV.

### V.     FMLA Retaliation

DeBacker claims that the City retaliated against him for taking FMLA leave.  Again, to proceed under the direct method, a claim of retaliation requires a showing by the plaintiff that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection between the two. *Benuzzi*, 647 F.3d at 664; *Goelzer*, 604 F.3d at 995-96; *Makowski v. SmithAmundsen, LLC*, 662 F.3d 818, 824 (7th Cir. 2001); *Ridings v. Riverside Medical Center*, 537 F.3d 755, 771 (7th Cir. 2008).  Under the indirect, burden-shifting method, the plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; (3) he was meeting his employer's legitimate expectations; and (4)

similarly situated employees who did not engage in the protected activity suffered no adverse employment action. *Squibb,* 497 F.3d at 788. DeBacker makes no effort to proceed under the indirect method.

DeBacker bases this claim on the fact that he made several oral and written requests for reinstatement to his former position following his return to work, culminating in his union grievance and EEOC complaint, and was thereafter terminated. But this is an FMLA retaliation claim. What DeBacker misses with this argument is any reasonable connection to his FMLA protected activity, as he must be retaliated against for exercising his rights under the FMLA to succeed. *Scruggs v. Carrier Corp.*, 688 F.3d 821, 826-27 (7th Cir. 2012). As no reasonable jury could find in favor of DeBacker on this record, the City is entitled to summary judgment on Count V.

**VI.     Defamation - Libel**

The libel claim alleged in Count VI is based on emails from Titus to the Illinois State Police indicating that DeBacker's plan to kill him "was very specific, over a period of time and he took steps to carry through with it," as well as a notarized statement to the Illinois State Police on November 2, 2011. Libel *per se* involves the use of written words that: (1) impute the commission of a criminal offense; (2) impute infection with a communicable disease of any kind; (3) impute an inability to perform or want of integrity in discharge of duties of office or employment; and (4) prejudice a particular party in his profession or trade. *Newell v. Field Enterprises, Inc.*, 415 N.E.2d 434, 440-41 (Ill.App. 1980).

DeBacker has identified the following statements by Titus:

- "A fellow officer of mine made plans to murder me and kill himself. His plan was stopped and he was admitted into a mental health facility."

- The "plan was very specific, over a period of time and he took steps to carry through with it."

- "Mr. DeBacker is not allowed to arm himself as an officer and is confined to a room here at the police department with orders to not be in areas where firearms are at or being stored for his and others safety."

- "Due to Officer DeBacker's plan to murder me, the police department immediately informed all staff members that this occurred for everyone's personal safety."

- "There were also valid safety concerns for another officer and personnel in the City of Moline due to some statements made by Officer DeBacker to Julie."

- "This is a very clear and calculated plan to end Officer Debacker's, mine and possibly others' lives."

- "I was involved with a fellow officer who had come to work with the intention of committing a murder/suicide with me being the victim of the murder."

Although the undisputed record supports a finding that DeBacker had thoughts of committing suicide and taking his shot in such a way as to kill Titus in the process, the deposition testimony of Schumacher discussed above that could be read to support the claim that the plan was more clear, calculated, specific, or detailed or that steps had been taken to carry through with it is disputed. There is also an issue of fact as to whether the Department was aware of these additional allegations. Although some officers in the upper chain of command were informed about the nature of the situation, the memo sent out to the department only stated that DeBacker was on administrative leave. Chief Hankins testified that he never believed there was a safety concern for any other officer in the department, that there was any specific plan, or that DeBacker came to work with the intent of committing a murder/suicide. On the other hand, Schumacher claims that he relayed all the information to Officer Mincks and that it was also discussed when the officers went to DeBacker's house to talk to Julie that morning. Accordingly, there is a genuine issue of material fact in the record as to whether the statements made by Titus were largely false. They were sent via email from an official email account and can quite reasonably be characterized as harming or prejudicing

DeBacker in his profession and imputing the commission of a crime. He has therefore stated a cause of action against Titus.

Whether he has stated a claim for libel against the City is a different matter. In order to hold the City liable for Titus' conduct, DeBacker must prove that Titus was acting within the scope of his employment at the time he sent the emails. Three criteria must be satisfied in order to establish that conduct was within the scope of employment: (1) it is of the kind he is employed to perform; (2) it occurs substantially within the authorized time and space limits; and (3) it is actuated, at least in part, by a purpose to serve the master. Restatement (Second) of Agency § 228 (1958); *Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 992 (Ill. 2007); *Wright v. City of Danville*, 675 N.E.2d 110, 118 (Ill. 1996).

Here, DeBacker has admitted that the Department does not normally do investigative checks on a person's FOID card status and did not direct Titus to make contact with the Illinois State Police. Nor does he offer evidence rebutting the City's assertion that while the Department was generally aware that Titus was contacting the State Police regarding the FOID card status, the Department was not aware that Titus was using his work email address to do so and would not have authorized his conduct through his work e-mail. No one from the Department saw the emails before Titus sent them. Although Titus discussed DeBacker's FOID status with Captain Fisk, who knew that Titus was contacting the State Police during business hours, Fisk did not direct him to make the contacts, and DeBacker points to nothing in the record indicating that Fisk knew that Titus was using his official work email to make the contacts. Nor does the fact that the Chief or Fisk checked the status of DeBacker's FOID card in determining whether the statute prohibiting possession of a firearm would apply to him suggest that Titus' efforts to interfere with or protest the reconsideration process were the kind of duties that he was employed to perform. Accordingly, the Court cannot find that DeBacker has satisfied his burden of showing that the communications were within the scope of Titus' employment, and the City is entitled to judgment as a matter of law on Count VI.

### VII.    Defamation - Slander

The slander claim alleged in Count VII is based on oral communications by Titus to various individuals indicating that DeBacker was crazy, had specific plans to murder Titus and his family, had elaborate maps of Titus' home, took steps to carry through with his plan, was unstable and a danger to the public, and questioning DeBacker's competency in his profession. The claim against Titus was previously dismissed, leaving only the claim against the City.

The City argues that under Illinois law, when a claim is brought against an employer for the actions of an employee, no independent wrong is asserted against the employer, the employer's liability is wholly derivative of that of the employee. *Bausback v. K Mart Corp.*, 550 N.E.2d 1269, 1272 (Ill.App. 1990). Accordingly, as the slander claim against Titus has been dismissed, the City argues that it cannot be liable as a matter of law. DeBacker concedes this point, and the City is entitled to summary judgment on Count VII.

### VIII.    Tortious Interference

The elements of a claim for tortious interference are: (1) a valid and enforceable contract between plaintiff and another party; (2) defendant's awareness of the contract; (3) defendant's intentional and unjustified inducement of the breach; (4) a breach by the other, caused by the defendant's wrongful conduct; and (5) damages. *Burrell v. City of Mattoon*, 378 F.3d 642, 651-52 (7th Cir. 2004). Titus argues that, as an at will employee, DeBacker cannot state a claim for tortious interference.

DeBacker responds that as a City employee, he was employed under the Union's contract and therefore was not an at will employee. However, even assuming that he was not an at will employee, the Seventh Circuit has held that "any tortious interference with contractual relations claim based on the collective bargaining agreement would be preempted by the Labor Management Relations Act."

*Kimbro v. Pepsico, Inc.*, 215 F.3d 723, 727 (7th Cir. 2000). Therefore, he has failed to state a claim for tortious interference against Titus in Count VIII.

### IX. Immunity

Titus asserts the affirmative defense of immunity under the Tort Immunity Act. Section 210 of the Act provides in relevant part:

> A public employee acting in the scope of his employment is not liable for an injury caused by his negligent misrepresentation or the provision of information either orally, in writing, by computer or any other electronic transmission, ir in a book or other form of library material.

745 ILCS 10/2-210. As the Court has found an issue of material fact as to whether Titus was acting in the scope of his employment, he is not shielded from liability under the Act. The same result necessarily follows for any claims of conditional or absolute privilege.

### CONCLUSION

For the reasons set forth above, the City's Motion for Summary Judgment [77] is GRANTED IN PART and DENIED IN PART. Titus' Motion for Summary Judgment [78] is GRANTED IN PART and DENIED IN PART. As a result of the rulings contained in this Order, the ADA claim in Count I remains for trial against the City, and the IIED and Libel claims in Counts III and VII remain for trial against Titus individually. This matter is now ready for final pretrial conference. All existing deadlines are VACATED, and the Court will contact the parties to set a new schedule for the remainder of the case.

ENTERED this 27th day of January, 2015.

s/ James E. Shadid
James E. Shadid
Chief United States District Judge